COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
JEFFREY W. HERRMANN
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Attorneys for Plaintiff

*[Additional counsel appear on signature page.]*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEWARD INTERNATIONAL ENHANCED INDEX FUND, Derivatively On Behalf of CADBURY PLC,<br><br>Plaintiff,<br><br>vs.<br><br>ROGER CARR, TODD STITZER, ANDREW R.J. BONFIELD, WOLFGANG GUY R. ELLIOTT, RAYMOND VIAULT, COLIN R. DAY, BARONESS SARAH ELIZABETH MARY HOGG and LORD CHRISTOPHER FRANCIS PATTEN,<br><br>Defendants,<br><br>– and –<br><br>CADBURY PLC, an English corporation,<br><br>Nominal Defendant. | No.<br><br>CLASS ACTION<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY<br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Steward International Enhanced Index Fund, maintaining its principal place of business at 5847 San Felipe, Suite 4100, Houston, Texas 77057 by its attorneys, alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Cadbury Plc ("Cadbury" or the "Company") by a shareholder of the Company.  The action is brought against the members of the Company's Board of Directors ("Board") arising out of defendants' breaches of fiduciary duty related to their rejection of and failure to properly consider the buyout offer for Cadbury by Kraft Foods, Inc. ("Kraft") at a significant premium.

2.     The Company, incorporated in England, was founded in 1824 and is the world's second largest confectionary group.  Cadbury is headquartered in Uxbridge, England.  Two-thirds of all investors in Cadbury are American.

3.     The members of Cadbury's Board are rewarded handsomely for the positions they hold.  Annually, the non-management members of the Board are paid £60,000 per year if they are non-U.S. based, and $150,000 per year if U.S. based.  For being Chairman of the Board, Roger Carr is paid £390,000 (over $700,000) in addition to his £60,000 director fee.  "Senior" directors and Board Committee Chairs are each paid additional annual amounts of £15,000-£20,000.  In 2008, Cadbury's non-executive directors received a total of £939,000 in fees excluding travel

allowances. Cadbury's three executive directors reaped over £11,000,000 in 2008 remuneration.

4.    The performance of the Company's stock has not been on par with the lavish compensation its Board has received. Cadbury's common stock trades on the London Stock Exchange. Cadbury's ADR's trade on the New York Stock Exchange at a ratio of one ADR for four ordinary shares. The stock reached a high of £7.20 per share on June 4, 2007, and before that had traded in the £3-£6 range since 2003. Since reaching its high of £7.20, the stock has declined substantially, trading for most of 2007-2009 in the £5-£6 per share range.

5.    On August 28, 2009, when Cadbury's shares were trading at £5.81 per share, Kraft's CEO Irene Rosenfeld and Cadbury CEO Roger Carr met. This was at a time when Rosenfeld had telephoned Carr a week earlier (August 21, 2009) to request the meeting. At the meeting, Rosenfeld proposed to Carr that Kraft purchase Cadbury for $16.7 billion in a mixture of Kraft stock and cash.

6.    Carr's reaction was abrupt and immediate. No deal. Carr then sought and obtained endorsement of his negative decision from Cadbury's Board members and its investment bankers from Goldman Sachs, Morgan Stanley and UBS. Carr reiterated the refusal of the Cadbury Board to respond to or negotiate in good faith in a letter he wrote to Rosenfeld dated August 31, 2009. In the meantime, Cadbury's stock fell back to £5.68 per share.

7.    On September 7, 2009, Kraft for the first time communicated its offer directly to Cadbury's shareholders.  The offer stated, in part:

> Kraft Foods is proposing an offer for Cadbury (the "Possible Offer") of 300 pence in cash and 0.2589 new Kraft Foods shares per Cadbury share.  This values each Cadbury share at 745 pence (based on the closing price of $28.10 for a Kraft Foods share on 4 September 2009 and an exchange rate of 1.6346 $/£) and values the entire issued share capital of Cadbury at £10.2 billion.  The combination would build on Kraft Foods' position as a global powerhouse in snacks, confectionery and quick meals with a rich portfolio of iconic brands.

The Possible Offer represents a premium of:

•    42% over Cadbury's share price of 524 pence on 3 July 2009, prior to recent analyst suggestions regarding potential sector consolidation;

•    34% over Cadbury's 90-day average share price of 555 pence in the period up to 4 September 2009, the last business day preceding this announcement; and

•    31% over Cadbury's closing share price of 568 pence on 4 September 2009, the last business day preceding this announcement.

> Kraft Foods would also offer a mix and match facility under which Cadbury shareholders could elect, subject to availability, to vary the proportions in which they would receive cash and new Kraft Foods shares. Kraft Foods reserves the right to change the terms of the Possible Offer and the consideration mix in the future as explained in the Important Notice below.  Financing would be on the basis that Kraft Foods would maintain an investment-grade credit rating.  Kraft Foods believes that the strategic and financial rationale for the transactions is compelling.  The transaction would create:

•    a company with approximately $50 billion in revenues;

•    a global powerhouse in snacks, confectionery and quick meals, with an exceptional portfolio of leading brands around the world;

- a geographically diversified combined business, with leading positions and significant scale in key developing markets including India, Mexico, Brazil, China and Russia;

- a strong presence in instant consumption channels in both developed and developing markets, expanding the reach and margin potential of the combined business; and

- the potential for meaningful revenue synergies over time from investments in distribution, marketing and product development. In addition, there is a significant opportunity to realise pre-tax cost savings of at least $625 million annually. This is expected to be achieved through increased operational efficiencies over and above the current performance improvement programmes at Kraft Foods and Cadbury (including Cadbury's Vision Into Action ("VIA") programme). Kraft Foods expects that it will achieve the run-rate on these cost savings by the end of the third year following completion. Total one-off implementation cash costs of approximately $1.2 billion would be incurred in the first three years following completion.

Kraft Foods has a proven track record of successfully completing and integrating strategic combinations to build iconic brands and multi-national businesses, including the acquisitions of LU in 2007 and Nabisco in 2000.

(Footnotes omitted.)

8.    Cadbury's stock reacted favorably to the offer by immediately rocketing to £7.83 per share, a more than 30% increase over the price prior to Kraft's offer being made public. The response of the Cadbury Board was to again refuse the offer, as reflected in the letter from Carr to Rosenfeld posted on Cadbury's website on September 12, 2009. The letter states:

Dear Irene

In my letter of 31st August, I informed you that the Board had rejected your unsolicited proposal on the grounds that it is unattractive and fundamentally undervalues Cadbury. Under your proposal, Cadbury

would be absorbed into Kraft's low growth, conglomerate business model, an unappealing prospect which contrasts sharply with our strategy to be a pure play confectionery company. I also re-affirmed the Board's confidence in our future prospects as an independent company. There is nothing in your letter dated 7th September, or your various announcements on and since that date, to change our view.

9.      Carr's letter evidences the continuing breaches by the Cadbury Board of its fiduciary duties. Carr's letter references his previous contemptuous reaction to the offer in which he described Kraft as an "unattractive" "slow growth" "conglomerate." Carr "expands" upon that vitriolic response by admitting that the Cadbury Board's sole vision for the Company is as a "pure confectionary" company driven only by "organic" growth.

10.     The negative reaction of the Cadbury Board stands in sharp contrast to the comments of various financial experts.  Bank of America has removed its "neutral" recommendation on the Company because it says the price of Cadbury is now almost entirely dependent upon the outcome of the potential deal with Kraft. Warren Buffett has expressed his belief both that Kraft stock is undervalued and that the Kraft offer is a "full price" offer for Cadbury.

11.     Cadbury's shareholders stand to lose out massively if the Cadbury Board continues to refuse to negotiate a transaction with Kraft. But, Cadbury's Board stands to lose its lavish compensation and positions of power if the Company is sold. The Board's rejection of Kraft's offer out of hand and refusal to evaluate in good faith Kraft's offer are breaches of the defendants' fiduciary duties to the Company.

12.     Most recently, Cadbury's CEO, Todd Stitzer, has admitted privately that the combination of Kraft and Cadbury makes "some strategic sense." Unfortunately, Cadbury has since denied that Stitzer conveyed that sentiment, asserting that the reports of such comments represent an "inaccurate reflection" of what was said and that Cadbury's "no deal" stance remains the same.

13.     In pursuing their unlawful plan to maintain their lucrative positions as directors of a large, publicly traded company, and refusing to act in good faith and in accordance with the fiduciary duties owed to Cadbury, the Company's Board directly breached applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing. Rather than acting in the best interests of the Company as their fiduciary duties mandate, defendants – without good faith consideration – rejected Kraft's offer. Thus, plaintiff alleges that defendants have breached their fiduciary duties by failing to consider in good faith the Kraft offer and otherwise take value-maximizing actions that are in the best interests of the Company and its owners.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. §1332(a)(2), because plaintiff and defendants are citizens of different states, certain of the defendants are citizens of foreign countries and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

- 6 -

15.    This Court has jurisdiction because Cadbury conducts business in New Jersey and has its principal place of business in the U.S. at 389 Interpace Parkway, Parsippany, New Jersey 07054-1198 and defendant Andrew Bonfield resides in this judicial district.

16.    Venue is proper in this judicial district because the conduct at issue took place and had an effect in this district.

## PARTIES

17.    Plaintiff Steward International Enhanced Index Fund is, and at all times relevant hereto was, a shareholder of Cadbury.  Plaintiff is a citizen of Texas.

18.    Nominal party Cadbury is a U.K. corporation headquartered in Uxbridge, Middlesex, England.  The Company is a manufacturer of confectionary.

19.    Defendant Roger Carr ("Carr") is and was at all relevant times a director of the Company.  Defendant Carr is a citizen of the U.K.

20.    Defendant Todd Stitzer ("Stitzer") is and was at all relevant times Chief Executive Officer and a director of the Company.  Defendant Stitzer is a resident of Connecticut.

21.    Defendant Andrew R.J. Bonfield ("Bonfield") is and was at all relevant times a director of the Company.  Defendant Bonfield is a citizen of the State of New Jersey.

22.    Defendant Wolfgang Berndt ("Berndt") is and was at all relevant times a director of the Company.  Defendant Berndt is an Austrian citizen.

23.    Defendant Guy R. Elliott ("Elliott") is and was at all relevant times a director of the Company. Defendant Elliott is a citizen of the U.K.

24.    Defendant Raymond Viault ("Viault") is and was at all relevant times a director of the Company. Defendant Viault is a resident of Florida.

25.    Defendant Colin R. Day ("Day") is and was at all relevant times a director of the Company. Defendant Day is a citizen of the U.K.

26.    Defendant Baroness Sarah Elizabeth Mary Hogg ("Hogg") is and was at all relevant times a director of the Company. Defendant Hogg is a citizen of the U.K.

27.    Defendant Lord Christopher Francis Patten ("Patten") is and was at all relevant times a director of the Company. Defendant Patten is a citizen of the U.K.

28.    The defendants identified in ¶¶19-27 collectively constitute the entirety of the Company's Board. These individuals are hereinafter referred to as the "Individual Defendants."

29.    By virtue of their positions as directors and/or officers of Cadbury and/or their exercise of control and ownership over the business and corporate affairs of Cadbury, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause Cadbury to engage in the practices complained of herein. Each Individual Defendant owed and owes Cadbury fiduciary obligations and were and are required, among other things, to: (1) promote the success of the Company for the benefit of the Company as a whole; (2) act fairly as between shareholders of the Company; (3) act to maximize

shareholder value in connection with any change in ownership and control to the extent consistent with governing statutes; (4) govern Cadbury in such a manner as to heed the expressed views of its public shareholders; (5) refrain from abusing their positions of control; (6) act independently, in good faith, and not favor their own interests at the expense of Cadbury and its public shareholders; (7) exercise reasonable care, skill and diligence; and (8) avoid conflicts of interest.

30.     Each Individual Defendant herein is sued individually and as an aider and abettor and in his or her capacity as a director of Cadbury. The liability of each of the Individual Defendants arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with the Company and owe the Company a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure.

32.     Every corporate director is required to act in good faith, in the best interests of a corporation, and to act with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation were a bona fide offer is presented to a company that represents a substantial premium over the trading price of its stock, directors are required to take all steps reasonably required to

properly evaluate and respond accordingly to the offer. To diligently comply with this duty, the directors of a corporation may not, among other things, take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)    discourages or inhibits alternative offers to purchase the corporation or its assets; or

(d)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the company.

33.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Cadbury, are obligated to refrain from:

(a)    participating in any transaction where the directors' or officers' loyalties are divided;

(b)    participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation;

(c)    unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

(d)    unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

34.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the offer, violated the fiduciary duties owed to Cadbury, including their duties of loyalty, good faith and independence, insofar as they have failed to give proper and good faith consideration to the Kraft bid, which represents a significant premium over the stock's trading price in the days, weeks, and months prior to the offer, for the sole purpose of entrenching themselves in the lucrative positions as managers of a large publicly traded corporation, and to obtain for themselves continued personal benefits.

35.    Because the Individual Defendants have breached their duties of loyalty, good faith and independence in connection with their failure to act in good faith to consider the Kraft bid, the Individual Defendants have breached their fiduciary duties of good faith and fair dealing owed to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

36.    Plaintiff brings this action derivatively in the right and for the benefit of Cadbury to redress injuries suffered and to be suffered by Cadbury as a direct result of the breaches of fiduciary duty by defendants. Cadbury is named as a nominal party solely in a derivative capacity.

37.    Plaintiff will adequately and fairly represent the interests of Cadbury in enforcing and prosecuting its rights.

38.    Plaintiff is an owner of Cadbury stock and was an owner of Cadbury stock during all times relevant to the defendants' wrongful course of conduct as alleged herein.

39.    Plaintiff has demonstrated its standing to bring this action as a shareholder and/or beneficial owner of Cadbury common stock at the time the acts and omissions complained of herein occurred, and plaintiff continues to be a shareholder of Cadbury.  Second, plaintiff will fairly and adequately represent the interests of the Company in enforcing the rights of the Company, as detailed herein. Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than seeking to correct the wrongs that have been done to the Company.  To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

40.    The Cadbury Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action for the reasons detailed throughout this Complaint.  Consequently, plaintiff's demand upon the Company to take the action requested herein is excused as futile. Cadbury's Board and its management are also antagonistic to this lawsuit as follows, and thus, plaintiff has not made a pre-filing demand on the Cadbury Board to initiate this action:

(a)    The members of Cadbury's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling alliances, interests and dependencies. Therefore, they are not able to and will not vigorously prosecute any such action.

(b)    The members of Cadbury's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, including substantial annual cash and stock payments, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(c)    In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves – something they are unwilling to do. Such a suit would require the directors to expose themselves to millions of dollars in liability to the Company and its shareholders.

(d)    Cadbury's current and past officers and directors are protected against personal liability for the breaches of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to Cadbury. However, due to certain changes in the language of directors' and officers' liability

insurance policies in the past few years, the directors' and officers' liability insurance policies covering defendants in this case contain provisions that eliminate coverage for any action brought directly by Cadbury against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of Cadbury's officers, there would be no directors' and officers' insurance protection. Consequently, this is another reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

41.    Plaintiff has not made any demand on shareholders of Cadbury to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Cadbury is a publicly traded company with approximately 1.3 billion shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## BACKGROUND TO THE KRAFT OFFER

42.     Cadbury was founded in 1824.   It now operates in more than 60 countries.  The Company employs about 46,000 people.  Two-thirds of Cadbury's shareholders are American.

43.     In 2008 the group demerged Cadbury Schweppes after pressure from shareholders.  Management decided to create a pure confectionery business focusing on chocolate, gum and sweets.  In March 2009, it sold its Schweppes Australian beverage business to the Japanese company Asahai Breweries for £614 million.

44.     For years Cadbury has been run by an American, Todd Stitzer, and it plans to sever some of its historic links with Britain by shutting the Somerdale factory in the mall market town of Keynsham, near Bristol, and transferring jobs to Poland. Kraft has promised to keep the facility open.  As a result, Somerdale employees are hoping that Kraft will succeed in its attempt to purchase the Company.

45.     The members of Cadbury's Board receive significant remuneration in exchange for serving on the Board.  Annually, the non-management members of the Board are paid £60,000 per year if they are non-U.S. based, and $150,000 per year if U.S. based.  In 2008, Cadbury's non-executive directors received a total of £939,000 excluding travel allowances.    Cadbury's three executive directors reaped compensation of over £11 million in 2008.

46.     Kraft is the world's largest food group after Nestlé and it, too, has a long and proud history.  It began in 1903 when James L. Kraft began selling cheese from

the back of a wagon in Chicago, Illinois. In 1914 the firm started making its own cheese.

47.    In 1988 Kraft was bought by the tobacco company, Philip Morris, for $12.9 billion. In 2000 Philip Morris purchased the biscuit firm Nabisco, maker of Oreo cookies, for $19.2 billion to merge it with Kraft. The company was listed on the New York Stock Exchange in 2001. The biscuit business of Danone was bought in 2007 for $7.2 billion.

48.    Kraft, which generates annual sales of $4.2 billion, has 98,000 employees – more than twice as many as Cadbury – and 168 plants. It generates sales of $42 billion.

**THE OFFER**

49.    On August 28, 2009, when Cadbury's shares were trading at £5.81 per share, Kraft CEO Irene Rosenfeld and Cadbury CEO Carr met. Rosenfeld had telephoned Carr a week earlier (August 21, 2009) to request the meeting. At the meeting, Rosenfeld proposed to Carr that Kraft purchase Cadbury's for $16.7 billion in stock and cash.

50.    Carr's reaction was abrupt and immediate. No deal. Carr then sought and obtained endorsement of his negative decision from Cadbury Board members and its banks, Goldman Sachs, Morgan Stanley and UBS. Carr reiterated the refusal of the Cadbury Board in a letter he wrote to Rosenfeld dated August 31, 2009. By then, Cadbury's shares were trading at £5.68 per share.

51.    On September 7, 2009, Kraft communicated its offer to Cadbury's shareholders. The offer stated, in relevant part:

Kraft Foods is proposing an offer for Cadbury (the "Possible Offer") of 300 pence in cash and 0.2589 new Kraft Foods shares per Cadbury share. This values each Cadbury share at 745 pence (based on the closing price of $28.10 for a Kraft Foods share on 4 September 2009 and an exchange rate of 1.6346 $/£) and values the entire issued share capital of Cadbury at £10.2 billion. The combination would build on Kraft Foods' position as a global powerhouse in snacks, confectionery and quick meals with a rich portfolio of iconic brands.

The Possible Offer represents a premium of:

•    42% over Cadbury's share price of 524 pence on 3 July 2009, prior to recent analyst suggestions regarding potential sector consolidation;

•    34% over Cadbury's 90-day average share price of 555 pence in the period up to 4 September 2009, the last business day preceding this announcement; and

•    31% over Cadbury's closing share price of 568 pence on 4 September 2009, the last business day preceding this announcement.

Kraft Foods would also offer a mix and match facility under which Cadbury shareholders could elect, subject to availability, to vary the proportions in which they would receive cash and new Kraft Foods shares. Kraft Foods reserves the right to change the terms of the Possible Offer and the consideration mix in the future as explained in the Important Notice below. Financing would be on the basis that Kraft Foods would maintain an investment-grade credit rating. Kraft Foods believes that the strategic and financial rationale for the transactions is compelling. The transaction would create:

•    a company with approximately $50 billion in revenues;

•    a global powerhouse in snacks, confectionery and quick meals, with an exceptional portfolio of leading brands around the world;

• a geographically diversified combined business, with leading positions and significant scale in key developing markets including India, Mexico, Brazil, China and Russia;

• a strong presence in instant consumption channels in both developed and developing markets, expanding the reach and margin potential of the combined business; and

• the potential for meaningful revenue synergies over time from investments in distribution, marketing and product development. In addition, there is a significant opportunity to realise pre-tax cost savings of at least $625 million annually. This is expected to be achieved through increased operational efficiencies over and above the current performance improvement programmes at Kraft Foods and Cadbury (including Cadbury's Vision Into Action ("VIA") programme). Kraft Foods expects that it will achieve the run-rate on these cost savings by the end of the third year following completion. Total one-off implementation cash costs of approximately $1.2 billion would be incurred in the first three years following completion.

Kraft Foods has a proven track record of successfully completing and integrating strategic combinations to build iconic brands and multi-national businesses, including the acquisitions of LU in 2007 and Nabisco in 2000.

In addition, Kraft Foods expects that the combination would enhance its growth and margin profile, and be accretive to earnings in the second year following completion on a cash basis (which excludes the one-time expenses related to the transaction and the impact of non-cash items such as the amortisation of intangibles after acquisition). Should the combination with Cadbury be completed, Kraft Foods would expect to revise its long-term growth targets to 5+% for revenue and 9-11% for earnings per share, from its previously announced 4+% and 7-9% respectively.

Commenting on the proposed transaction, Irene B. Rosenfeld, Chairman and CEO of Kraft Foods, said:

"This proposed combination is about growth. We are eager to build upon Cadbury's iconic brands and strong British heritage through increased investment and innovation. We have great respect and admiration for Cadbury, its employees, its leadership and its proud

- 18 -

heritage.  As we have done, Cadbury has built wonderful brands by focusing on quality, innovation and marketing, but we believe the next stage in Cadbury's development will be challenging, given the increased importance of scale in the industry.  Cadbury's brands, which are highly complementary to our portfolio, would benefit from Kraft Foods' global scope and scale and array of proprietary technologies and processes.

"Our extensive combined global business network would create opportunities for talented Cadbury employees and managers across all areas of the combined enterprise.  We would augment Kraft Foods' and Cadbury's world-class capabilities by employing a 'best of both' focus, from sales and marketing to distribution and manufacturing.

"Our current plans contemplate that the UK would be a net beneficiary in terms of jobs.  For example, we believe we would be in a position to continue to operate the Somerdale facility, which is currently planned to be closed, and to invest in Bournville, thereby preserving UK manufacturing jobs.

"We have taken note of Cadbury's recent performance and the ongoing implementation of its VIA programme.  We believe that Cadbury's share price already reflects its prospects as a standalone entity and the benefits of VIA.  Our proposal therefore not only takes into account these factors, but also provides a compelling premium and, we believe, significantly more value for Cadbury shareholders than Cadbury could create independently.

"We hope to engage with the Board of Cadbury on a constructive basis with the goal of consummating a recommended transaction."

(Footnotes omitted.)

52.    Cadbury's stock shot to £7.83 per share (a 30% increase over the prior closing price) in response to the now public offer from Kraft.  Nonetheless, the response of Cadbury's Board was to again refuse the offer in strident terms, as reflected in the letter from Carr to Rosenfeld posted on Cadbury's website on September 12, 2009.  The letter states:

Dear Irene

In my letter of 31st August, I informed you that the Board had rejected your unsolicited proposal on the grounds that it is unattractive and fundamentally undervalues Cadbury. Under your proposal, Cadbury would be absorbed into Kraft's low growth, conglomerate business model, an unappealing prospect which contrasts sharply with our strategy to be a pure play confectionery company. I also re-affirmed the Board's confidence in our future prospects as an independent company. There is nothing in your letter dated 7th September, or your various announcements on and since that date, to change our view.

I would like to take the opportunity to expand on some points I made in my letter.

Over the past few years, Cadbury has completed a major corporate transformation through the acquisition of Adams and the demerger and sale of our beverage businesses. The disposal of Beverages provides the clear business focus we believe essential to achieve outstanding performance.

We have created a pure play confectionery business with strong brands occupying leading market positions in both developed markets and high growth emerging economies ¬ a business of considerable inherent value, impossible to replicate and with a unique position in the global confectionery market. We have a clear set of targets, a track record of delivery accepted by the market and value enhancing plans to further exploit our proven growth platforms.

We have demonstrated through our performance to date that we have the scale, capabilities and resource to deliver on our commitments to shareholders. Since the Adams acquisition, our confectionery business has delivered top line growth of over 6%, we have increased our global market share by over 100 bps and generated comparable margin growth of over 200 bps, all while materially increasing spend on marketing and science and technology to drive innovation.

We have been able to demonstrate both organic and inorganic growth. The acquisition of Adams, together with more recent acquisitions, including Intergum and Sansei, provided scale and new growth opportunities in attractive product areas of gum and candy

together with exposure to emerging markets that complements our powerful British Commonwealth heritage.

53.     Carr's letter is evidence of the continuing breaches by the Cadbury Board of its fiduciary duties.  Carr references in his letter his previous, contemptuous reaction to the offer in which he described Kraft as an "unattractive" "slow growth" "conglomerate."  Carr "expands" upon that vitriolic response by admitting that the Cadbury Board's sole vision for the Company is a "pure confectionary" company driven only by "organic" growth.

54.     The negative reaction of the Cadbury Board stands in sharp contrast to the comments of various financial experts.  Bank of America has removed its "neutral" recommendation on the Company because it says the price of Cadbury is now almost entirely dependent upon the outcome of the potential deal with Kraft. Warren Buffett has expressed his belief both that Kraft stock is undervalued and that the Kraft offer is a "full price" offer for Cadbury.

55.     Cadbury's shareholders stand to lose out massively if the Cadbury Board continues to refuse to negotiate a transaction with Kraft.  The performance of the Company's stock has not been on par with the lavish compensation its Board has received.  The stock reached a high of £7.20 per share on June 4, 2007, and before that had traded in the £3-£6 range since 2003.  Since reaching its high of £7.20, the stock has declined substantially, trading for most of 2007-2009 in the £5-£6 per share range. However, in recent days, in reaction to the Kraft offer, the stock has traded at almost

£8 per share, climbing from £5.68 per share on September 4, 2009 to £7.83 per share on September 7, 2009. Cadbury's shareholders do not want to see the stock fall back to its £5.60 levels.

56.     Most recently, Cadbury's CEO, Stitzer, has admitted privately that the combination of Kraft and Cadbury makes "some strategic sense."   Unfortunately, Cadbury has since denied that Stitzer conveyed that sentiment, asserting that the reports of such comments represent an "inaccurate reflection" of what was said and that Cadbury's "no deal" stance remains the same.

57.     Cadbury's Board stands to lose its lavish compensation and positions of power if the Company is sold. The Board's rejection of Kraft's offer out of hand and refusal to evaluate in good faith Kraft's offer are breaches of the defendants' fiduciary duties to the Company. Kraft's offer represents a premium of over 30% to the price at which the Company's stock closed the day before the offer was announced, a premium of over 40% to where the Company's stock traded just two months earlier, and a price in excess of where the Company's stock has traded at any time over the past 5 years.

58.     In pursuing their unlawful plan to maintain their lucrative positions as directors of a large, publicly traded Company, and refusing to act in good faith and in accordance with the fiduciary duties owed to Cadbury, the Company's Board violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing.

Rather than acting in the best interests of the Company, as their fiduciary duties mandate, defendants – without good faith consideration – rejected Kraft's offer. Thus, plaintiff alleges that defendants have breached their fiduciary duties by failing to consider in good faith the Kraft offer and otherwise take value-maximizing actions that are in the best interests of the Company and its owners.

59.    By the acts and omissions alleged herein, the Individual Defendants, in violation of their fiduciary duties to the Company, have entrenched and are entrenching themselves in power while wrongfully disenfranchising Cadbury's public shareholders.  As a consequence, Cadbury (and its shareholders) have been and are being harmed.

## COUNT I

### For Breach of Fiduciary Duties
### Against the Individual Defendants

60.    Plaintiff repeats and realleges each allegation set forth herein.

61.    Defendants have violated fiduciary duties of care, loyalty, candor, good faith and independence owed to Cadbury and have acted to put their personal interests ahead of the interests of Cadbury and its shareholders.

62.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, have violated their fiduciary duties by failing to give adequate consideration to the Kraft

- 23 -

bid for Cadbury without regard to the fairness of the transaction to Cadbury, or the significant stock-price premium that this offer represents.

63.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Cadbury because, among other reasons:

(a)    they failed to properly and adequately consider the premium bid by Kraft, or take other necessary steps to maximize the value of Cadbury;

(b)    they failed to properly maximize the value of Cadbury common shares and ADRs; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships in connection with their refusal to consider this bona fide and legitimate premium offer.

64.    Because the Individual Defendants dominate and control the business and corporate affairs of Cadbury, and are in possession of private corporate information concerning Cadbury's assets (including the knowledge of any other undisclosed bids for the Company), business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Cadbury which makes it inherently unfair for them to reject any proposed transaction for the sole purpose of entrenching themselves as managers and directors of the Company, to the exclusion of maximizing stockholder value.

65.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward the Company.

66.    As a result of defendants' actions, plaintiff has been and will be harmed.

67.    The Individual Defendants are engaging in self dealing, are not acting in good faith and have breached and are breaching their fiduciary duties to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment and preliminary and permanent relief in favor of the Company against defendants as follows:

A.    Declaring and decreeing that the Individual Defendants' conduct has been in breach of the fiduciary duties owed by the Individual Defendants to Cadbury;

B.    Declaring and decreeing that the Individual Defendants' refusal to consider and respond in good faith to the offer to acquire Cadbury is in breach of the fiduciary duties owed by the Individual Defendants to Cadbury and ordering the Individual Defendants to comply with said fiduciary duties;

C.    Directing the Individual Defendants to refrain from advancing their own interests at the expense of Cadbury or its shareholders and exercise their fiduciary duties to act reasonably and respond in good faith to offers which are in the best interest of Cadbury and its shareholders;

D.    Prohibiting the Individual Defendants from entering into any contractual provisions which harm Cadbury or its shareholders or prohibit the Individual

Defendants from maximizing shareholder value, including any confidentiality agreement or contract designed to impede the maximization of shareholder value;

E.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

F.    Restraining defendants from adopting, implementing or instituting any defensive measures that have or are intended to have the effect of making the consummation of an offer to purchase the Company more difficult or costly for a potential acquiror; and

G.    Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 30, 2009       COHN LIFLAND PEARLMAN
                                  HERRMANN & KNOPF LLP
                                  PETER S. PEARLMAN
                                  JEFFREY W. HERRMANN


                                  _____
                                  *s/ Peter S. Pearlman*
                                  PETER S. PEARLMAN
                                  Park 80 Plaza West-One
                                  Saddle Brook, NJ  07663
                                  Telephone:  201/845-9600
                                  201/845-9423 (fax)
                                  psp@njlawfirm.com

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MARK SOLOMON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt cadbury der 2.doc

## VERIFICATION

I, Dan E. Watson, Executive Vice President of the Steward International Enhanced Index Fund hereby verify that I am familiar with the allegations in the derivative shareholder COMPLAINT FOR BREACH OF FIDUCIARY DUTY, and that I have authorized the filing of the derivative shareholder COMPLAINT FOR BREACH OF FIDUCIARY DUTY, and that the foregoing is true and correct to the best of my knowledge, information and belief.

STEWARD INTERNATIONAL
ENHANCED INDEX FUND

DATED: _____7/30/09_____

_____
Dan E. Watson, Executive Vice President