Douglas S. Eakeley
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE CADBURY PLC SHAREHOLDER LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br>ALL CASES | **DOCUMENT ELECTRONICALLY FILED**<br><br>Civil Action No. 09-5006 (DMC) (MF)<br><br><br><br>**Hearing Date:  January 21, 2010**<br><br>Filed Under the Briefing Schedule Set by the Court at the January 5, 2010 Hearing |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 3

    A.    Overview of the Takeover Process in the United Kingdom .................................. 3

    B.    Kraft Makes an Unsolicited and Inadequate Offer for Cadbury ........................... 5

    C.    Procedural History ................................................................................................. 7

ARGUMENT ........................................................................................................................... 9

I.    THE U.K. IS A MORE SUITABLE FORUM FOR THIS CASE THAN
THE DISTRICT OF NEW JERSEY ........................................................................... 9

    A.    The Court Should Defer Jurisdiction Under The Doctrine Of
*Forum Non Conveniens* ......................................................................................... 9

        1.    The U.K. Is An Adequate Alternative Forum ......................................... 11

        2.    Plaintiffs' Choice Of Forum Should Be Afforded Little Deference ......... 14

        3.    Public and Private Interest Factors Favor Dismissal ............................... 16

            a.    Public Interest Factors ................................................................. 16

            b.    Private Interest Factors ................................................................ 18

    B.    U.S. Law Has Only A Very Limited, Secondary Application Here,
Which Has Not Been Invoked By Plaintiffs. ....................................................... 20

II.    THIS ACTION SHOULD BE DISMISSED UNDER RULE 12(b)(6) FOR
FAILURE TO STATE A CLAIM. ............................................................................. 22

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302 (S.D.N.Y. 2007) ..................................... 13

*Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007) .................................................................... 22

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ................................................... 17, 21

*In re Factor VIII or IX  Concentrate Blood Prods. Litig.*, 484 F.3d 951 (7th Cir. 2007) ........... 14

*Frumkin v. JA Jones*, 129 F. Supp. 2d 370 (D.N.J. 2001) .......................................................... 20

*Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248 (D. Mass. 1999) .............................. 20

*Ieradi v. Mylan Lab., Inc.* 230 F.3d 594 (3d Cir. 2000) ............................................................ 24

*Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., LTD*, 860 F. Supp. 1055
    (D.N.J. 1994) ........................................................................................ 11, 14, 17, 18

*In re Merck & Co. Sec. Litig.* 432 F.3d 261 (3d Cir. 2005) ......................................................... 24

*Miller v. Boston Scientific Corp.*, 380 F. Supp. 2d 443 (D.N.J. 2005) ........................................ 15

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ..................................................... 22

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ................................................................. 11, 15

*Plessy Co. plc v. Gen. Elec. Co. plc*, 628 F. Supp. 477 (D. Del. 1986) .................................. 20, 23

*Pollux Holdings Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) .............................. 9

*R. v Panel on Takeovers and Mergers Ex p. Datafin Plc*, 1987 QB 815 .................................... 23

*Thomson Info. Servs. v. British Telcoms.*, 940 F. Supp. 20 (D. Mass. 1996) ......................... 11, 13

*Warn v. M/Y Maridome*, 169 F.3d 625 (9th Cir. 1999) ............................................................. 11

*Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183 (3d Cir. 2008) ....................................*passim*

*Windt v. Qwest Commc'ns Int'l, Inc.*, 544 F. Supp. 2d 409 (D.N.J. 2006) ...................... 10, 11, 16

*Winer Family Trust v. Queen* 503 F.3d 319 (3d. Cir. 2006) ......................................................... 3

**STATUTES AND RULES**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 22

Federal Rule of Civil Procedure 44.1 ........................................................................... 3

Securities Exchange Act of 1934 § 14(d) ..................................................................... 21

**MISCELLANEOUS**

David Jones, *Cadbury shares dip below Kraft bid for first time,* Reuters, Jan. 7, 2010 .............. 24

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,
23 U.S.T. 2555, T.I.A.S. No. 7444 ............................................................... 18

John Armour and David A. Skeel, Jr., *Who Writes the Rules for Hostile Takeovers,
and Why?—The Peculiar Divergence of U.S. and U.K. Takeover Regulation,*
95 Geo. L.J. 1727 (2007) ................................................................. 17, 22, 23

Tom McNamara, *International Forum Selection and Forum Non Conveniens,*
34 Int'l Law 558, 560-61 (2000) ................................................................. 11

NYDOCS04/516338.4

Defendants Roger Carr, Todd Stitzer, Andrew R.J. Bonfield, Wolfgang Berndt, Guy R. Elliot, Raymond Viault, Colin R. Day, Baroness Sarah Elizabeth Hogg, Lord Christopher Francis Patten and nominal defendant Cadbury plc (collectively, "Defendants") respectfully submit this brief, the accompanying declaration of David Watkins, dated January 11, 2009 (the "Watkins Declaration" or "Watkins Decl.") and the declaration of Douglas S. Eakeley, Esq., dated January 11, 2010 (the "Eakeley Decl."), in support of their motion to dismiss the Amended Verified Shareholder Class Action and Derivative Complaint, dated December 23, 2009 (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

This putative derivative class action arises from the highly publicized offer of Kraft Foods, Inc. ("Kraft") for all outstanding shares of Cadbury plc ("Cadbury").  Plaintiffs are purported Cadbury shareholders who allege that Cadbury's directors violated their fiduciary duties by failing to negotiate a merger with Kraft and for publishing shareholder communications with material omissions.  The Complaint seeks a finding that Defendants are liable for breaching their fiduciary duties and an injunction compelling Defendants to negotiate a merger with Kraft. Plaintiffs also seek costs for this action, including attorneys' fees.

This case does not belong before this Court.  This is a quintessentially U.K. dispute.  The takeover target, Cadbury, is a public company organized under the laws of England and Wales, with shares listed on the London Stock Exchange (and a secondary listing on the New York Stock Exchange).  Its principal place of business is in England and a majority of its shareholders are in the United Kingdom.  Nearly every individual Defendant is a citizen and resident of the U.K., and the substantive law governing their conduct as directors of Cadbury is English law.  Finally, all conceivably relevant documents and witnesses are located in England.

This action simply has no connection whatsoever with the District of New Jersey – indeed, even Plaintiffs themselves are from outside this State.

If all that were not enough, Kraft's offer for Cadbury is controlled by and highly regulated under U.K. law.  The U.K. has a sophisticated takeover regime, complete with an expert body – the Panel on Takeovers and Mergers (the "Takeover Panel") – charged with regulating the conduct of bidders, targets and controlling shareholders in connection with such offers.  Everything from the timing of announcements, the substance of disclosures, the limitations on board actions and various other processes are all strictly governed by U.K. statute and the City Code on Takeovers and Mergers (the "Takeover Code"), and overseen by the Takeover Panel.  Indeed, England is viewed as having one of the most highly sophisticated and regulated takeover regimes among its peer nations.

In the face of all this, Plaintiffs, who are residents of Texas and Washington, have chosen the District of New Jersey as their preferred forum.  By doing so, they are asking this Court to apply U.K. corporate governance law and the Takeover Code to Defendants located in England in the context of a hostile offer for a U.K. company with a majority of shareholders abroad.  Plaintiffs are also demanding the production – on an expedited basis, no less – of documents located in the U.K., some of which are prohibited from disclosure under U.K. law.

This choice of forum might have been understandable if the U.K. failed to provide recourse for aggrieved shareholders to redress alleged malfeasance at U.K. companies.  On the contrary, however, shareholders have a statutory right under English law to bring a derivative claim against a director in an English court seeking damages on behalf of the company in connection with an alleged act or omission involving negligence, default, breach of duty, or

breach of trust by the director.  Moreover, shareholders may lodge complaints relating to matters within the Takeover Panel's jurisdiction directly with its Executive.

Putting aside their improper choice of forum, Plaintiffs' allegations are also facially inadequate and must be dismissed for failure to state a claim.  In essence, Plaintiffs are arguing that Defendants should have accepted Kraft's offer.  However, under English law, the power to accept Kraft's offer rests exclusively with the very Cadbury shareholders that Plaintiffs purport to represent.  Indeed, under English law, Cadbury's board is prohibited from taking any action that may result in shareholders being denied the opportunity to decide for themselves on an offer's merits.  Cadbury's shareholders are therefore already fully capable of bringing about the outcome that Plaintiffs want this Court to compel.  Further, Plaintiffs' case ignores the objective and critical fact that Kraft's offer has consistently valued Cadbury shares for less than they could be sold on the open market, which defeats any argument that Cadbury and its shareholders were injured by the board's refusal to accept Kraft's derisory offer.

For these reasons, and those set forth in more detail below, the Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

**A.    Overview of the Takeover Process in the United Kingdom**

In the United Kingdom, takeover offers subject to the Takeover Code are regulated and supervised by an independent statutory body, the Takeover Panel.  The Takeover

---

[1] The facts recited herein are taken from the Complaint, the Watkins Declaration and the Eakeley Declaration, and documents attached thereto.  *See Winer Family Trust v. Queen* 503 F.3d 319, 328 (3d. Cir. 2006) (a district court may properly consider documents attached to defendant's motion to dismiss that are integral to the dispute).  With respect to references to U.K. law throughout this brief, Federal Rule of Civil Procedure 44.1 states that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

3

Panel is the supervisory authority designated to carry out certain regulatory functions in relation to takeovers under the EC Directive on Takeover Bids.  Its statutory functions are set out in the Companies Act 2006.  (Watkins Decl. ¶ 6.)

The Takeover Panel's central objective is to ensure fair treatment for all shareholders in takeover bids.  Its two main functions are (1) to issue and administer the Takeover Code and (2) to supervise and regulate takeovers pursuant to the guidelines and rules set out in the Takeover Code.  (*Id.* ¶ 7.)  The Takeover Code is designed principally to ensure that shareholders are treated fairly and are not denied an opportunity to decide on the merits of a takeover and that shareholders of the same class are afforded equivalent treatment by an offeror.  (*Id.* ¶ 8.)

The Takeover Code provides an orderly framework within which takeovers are conducted.  It sets out the timeline for takeover offers and responses, regulates disclosure, and specifies the duties of offeree companies and their directors.  The Takeover Code also provides for remedies in the event of contravention of its provisions.  (*Id.* ¶ 9.)

The Takeover Code and the Takeover Panel's procedures apply to Kraft's bid for Cadbury.  The Takeover Panel has assigned two case handlers to the Cadbury/Kraft process: Chris Jillings (senior case handler) and Geoff Iles (junior case handler).  (*Id.* ¶ 11.)

Under the Takeover Code, unlike in the United States, measures such as the "poison pill" and other structural defenses to a hostile offer are not permitted during the course of an offer, or even before the date of the offer if the board has reason to believe that a *bona fide* offer might be imminent.  Under those circumstances, Rule 21.1 of the Takeover Code requires Cadbury not to take any action, without the approval of its shareholders in general meeting, which may result in any offer or *bona fide* possible offer being frustrated or in shareholders

being denied the opportunity to decide on its merits. Rather, the offeror and offeree are required to set out their positions to shareholders, who decide for themselves whether or not to accept the offer. (*Id.* ¶ 24.)

      **B.**    **Kraft Makes an Unsolicited and Inadequate Offer for Cadbury**

      Cadbury is a leading global confectionery company with a portfolio of chocolate, gum and candy brands, with its principal office based in Uxbridge, Middlesex, United Kingdom. (Compl. ¶ 9.) With origins stretching back nearly 200 years, Cadbury's brands include many favorites including Cadbury, Dairy Milk, and Halls. (*Id.* ¶¶ 9, 22.) Cadbury common shares are traded on the London Stock Exchange. Cadbury also lists American Depository Shares ("ADS") on the New York Stock Exchange. (*Id.* ¶ 9.)

      On September 7, 2009, Kraft announced that it had made a merger proposal to Cadbury's board of directors. Kraft's "possible offer" was 300 pence in cash and 0.2589 new Kraft shares per Cadbury share (or 745 pence, based on Kraft's share price and the currency exchange rate on September 4, 2009). The possible offer valued the entire issued share capital of Cadbury at £10.2 billion. (*Id.* ¶ 33.)

      Cadbury issued a statement noting that the board reviewed the proposal and rejected it, and that "[t]he Board believes that the proposal fundamentally undervalues the group and its prospects." (*Id.* ¶ 35.)

      On September 30, 2009, the Takeover Panel imposed a deadline of November 9 for Kraft to make a firm offer for Cadbury. (*Id.* ¶ 47.) Kraft announced a firm intention to make an offer for Cadbury on November 9. Kraft announced that the offer would be 300 pence and 0.2589 Kraft shares per Cadbury share, implying a value for each Cadbury share of 717 pence (based on the closing price of USD 26.78 for a Kraft share on November 6, 2009 and an exchange rate of 1.6609 USD / GBP). The decrease in implied value was due to the fall in

5

Kraft's share price rather than a change in the terms of the offer.  (*Id.* ¶ 49.)  Kraft formally commenced its tender offer for Cadbury stock on December 4, 2009.  (*Id.* ¶ 62.)

        In accordance with the timeline set by the Takeover Panel, Cadbury sent its first formal response to Kraft's offer to Cadbury shareholders on December 14, 2009.  (*Id.* ¶ 64.)  Cadbury recommended that shareholders should take no action in relation to Kraft's unsolicited offer, on the basis that the offer substantially undervalues the company.  ("Higher Performance, Higher Value: Reject Kraft's Offer," Ex. 6 to the Watkins Decl. at 3.)

        On January 5, 2010, Kraft announced that its offer would be extended and would remain open for acceptance until February 2, 2010.  Kraft also announced a partial cash option for Cadbury shareholders tendering their shares – without, however, increasing the overall value of its offer.  (Watkins Decl. ¶ 31.)

        On January 6, 2010, Kraft announced that it had received valid acceptances of its offer from approximately 1.52 percent of Cadbury shareholders (including ADS holders).  (*Id.* ¶ 32.)  To satisfy a condition to Kraft's offer, Kraft must receive valid acceptances in respect of not less than 90 percent (or such lower percentage as Kraft may decide, but in no event less than 50 percent) of Cadbury's shares.  (*Id.* ¶ 33.)

        Under Rule 31.9 of the Takeover Code, Cadbury cannot (except with the consent of the Takeover Panel) announce any new material information, including trading results, profit or dividend forecasts, and asset valuations, after January 12, 2010 (which is "Day 39" after the publication of the initial offer document).  (*Id.* ¶ 37.)

        On December 30, 2009, Cadbury received dispensation from the Takeover Panel to release detailed estimated trading results for 2009 on "Day 42" – January 15 – rather than January 12.  Cadbury's Day 39 disclosure document (its second formal response document) will

contain virtually the same information as the Day 42 document, except that the former will
contain Cadbury's 2009 performance as 11-month actual results and 1-month estimated results.
(*Id.* ¶ 38.)

As things currently stand, the last date for Kraft to submit a revised offer to
Cadbury shareholders ("Day 46") is January 19, 2010, under Rule 32.1(b) of the Takeover Code.
(*Id.* ¶ 34.)

The last day for Cadbury shareholders to accept Kraft's offer is February 2, 2010.
If the offer fails, Kraft will not be permitted to make another takeover bid for Cadbury for 12
months, unless permitted to do so by the Takeover Panel.  (*Id.* ¶ 35.)

### C.    Procedural History

Plaintiff Steward International Enhanced Index Fund ("Steward") filed a
purported shareholder derivative action against Cadbury's directors and Cadbury (as nominal
defendant) in this Court on September 30, 2009.  To date, Steward has purportedly effectuated
service on eight of the ten Defendants.[2]  The parties submitted a joint stipulation and proposed
order extending the time for Defendants to respond to the complaint to January 15, 2009, which
was signed by Magistrate Judge Falk on December 30, 2009.  (Eakeley Decl. ¶¶ 2, 3.)

Plaintiff Susan Dougherty filed a similar complaint in the Superior Court of New
Jersey, Morris County, Chancery Division, on November 9, 2009.  No defendant was served
process in that action.[3]  On December 18, 2009, Defendants removed the case to this Court on

---

[2] The eight Defendants on whom service was purportedly effected do not concede that such
service was effective and expressly reserve all rights and defenses with respect thereto.

[3] On or about December 9, 2009, Dougherty purportedly served Cadbury Adams USA LLC,
which is not a party to the *Dougherty* action or this consolidated action.

diversity grounds and requested that it be consolidated with the related *Steward* action.  (*Id.* ¶¶ 4, 6.)

On the afternoon of December 23, 2009, Defendants' counsel received notice of the electronic filing of a proposed order to show cause and amended complaint filed by Dougherty.  Plaintiff sought injunctive relief with respect to Defendants' alleged failure to negotiate with Kraft and for alleged omissions from Cadbury's communications responding to Kraft's offer.  Dougherty also sought expedited discovery.  (*Id.* ¶ 7.)

Defendants responded by letter to the Court dated December 28, 2009, requesting that the Court deny the relief sought and instead schedule a Rule 16 conference to consolidate the two related actions and set an orderly pleading and briefing schedule.  (*Id.* ¶ 8.)  Counsel for Steward wrote to Defendants on December 29, 2009, demanding immediate production of various categories of disclosures and documents in connection with the Kraft offer.  (*Id.* ¶ 11.)  Defendants responded by letter dated December 31, declining such requests for the reasons set forth in Defendants' December 28 letter to the Court.  (*Id.*)  On December 30, 2009, counsel for Dougherty wrote to the Court noting (among other things) that she did not oppose consolidation of the two actions.  (*Id.* ¶ 9.)  The following day, counsel for Steward wrote to the Court, stating that the cases should not be consolidated as long as Dougherty continued to seek an order preventing Cadbury shareholders from tendering their shares to Kraft.  (*Id.* ¶ 12.)  Plaintiffs later reached agreement on lead and liaison counsel and agreed that the actions should be consolidated.  (*Id.* ¶ 13.)

The Court heard arguments on the issues raised by the foregoing submissions on January 5, 2010.  After consolidating the actions, the Court set forth the reason for the hearing – Dougherty's application for injunctive relief in relation to the Kraft offer.  However, Plaintiffs'

8

counsel curtailed the scope, stating that "the Plaintiffs are here relating to disclosures that have been made" and that the "timing has changed" since the filing of the application for temporary restraints.  (Hr'g Tr. 9:8-10, Jan. 5, 2010, Ex. 5 to the Eakeley Decl.)  Having dropped their application for injunctive relief, Plaintiffs are now asking only "that discovery be ordered and that Plaintiffs be allowed to take limited discovery in advance of that." (*Id.* at 10:1-3.)

Upon hearing the parties' arguments, the Court stated that it would first consider this motion to dismiss before ruling on any of the requested discovery or other interim relief.

## ARGUMENT

## I.     THE U.K. IS A MORE SUITABLE FORUM FOR THIS CASE THAN THE DISTRICT OF NEW JERSEY.

### A.     The Court Should Defer Jurisdiction Under The Doctrine Of *Forum Non Conveniens.*

The doctrine of *forum non conveniens* is a well established feature of common law that allows a court to defer its jurisdiction where principles of justice and convenience favor the action being brought in another forum.  *See Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 188-89 (3d Cir. 2008), *cert. denied*, 129 S. Ct. 904 (2009); *Pollux Holdings Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003) (*forum non conveniens* "affords a trial court discretion in a case over which it has jurisdiction to decline to exercise it, whenever it appears that such case may be more appropriately tried in another forum").  In the Third Circuit, as elsewhere, a *forum non conveniens* determination involves a three-step analysis:  A district court must first determine whether an adequate alternative forum is available.  If such a forum exists, the court must then determine the appropriate amount of deference due to plaintiff's choice of forum.  Finally, the court must balance public and private interest factors to determine whether proceeding in the chosen forum would result in oppression or vexation to the defendant out of all proportion to plaintiff's convenience.  *Windt*, 529 F.3d at 189-90.

9

Chief Judge Brown recently applied this three-step analysis in a case with facts similar to those here.  In *Windt v. Qwest Commc'ns Int'l, Inc.*, defendants argued that the Netherlands was a more suitable forum in which to address plaintiffs' dispute because, among other things, the claims were controlled by Dutch law, the documents and witness were located in the Netherlands, and the matter bore no connection with the state of New Jersey.  544 F. Supp. 2d 409 (D.N.J. 2006), *aff'd* 529 F.3d 183 (3d Cir. 2008), *cert. denied*, 129 S. Ct. 904 (2009). Chief Judge Brown methodically addressed each step of the *forum non conveniens* analysis and decided to defer jurisdiction in favor of the Netherlands.  Agreeing with defendants, the court held that the Netherlands was an adequate alternative forum because "there is no doubt that Plaintiffs can bring this action in the Netherlands . . . and that jurisdiction over Defendants would be properly obtained."  *Id.* at 420.  The court also found that plaintiffs' chosen forum should be afforded "a low degree of deference" and that New Jersey had "virtually no interest" in the subject matter of the dispute, all of which favored dismissal.  *Id.* at 421, 425.

The Third Circuit affirmed.  In a detailed opinion, the Court of Appeals held that the Netherlands had "a substantial interest in resolving this dispute as it involves the alleged mismanagement of a Dutch company by Supervisory Board members and executives of that Dutch company."  *Windt*, 529 F.3d at 193.  The Court agreed with Chief Judge Brown that "avoiding problems in the application of foreign law" favored dismissal, and that subjecting defendants to litigation in New Jersey would be oppressive and vexatious in light of (among other things) the expense of "flying witnesses and themselves across the Atlantic both ways."  *Id.* at 193, 196.

The result here should be no different.  As explained below, each of the three steps in the *forum non conveniens* analysis weighs in favor of dismissal.  In fact, this is an even

10

more compelling case for dismissal because, unlike in *Windt*, not one of the parties here is domiciled in New Jersey.  *See Windt*, 544 F. Supp. 2d at 423 (two defendants were domiciled in New Jersey).  Thus, there is utterly no connection to the state of New Jersey whatsoever.  Each step of the analysis is examined below.

       1.    <u>The U.K. Is An Adequate Alternative Forum.</u>

The availability of an adequate alternative forum is a threshold requirement in a *forum non conveniens* dismissal.  *Windt*, 544 F. Supp. 2d at 417.  Two conditions must be met to satisfy this requirement:  (1) the defendant must be amenable to process in the alternative forum, and (2) the subject matter of the lawsuit must be cognizable in the alternative forum in order to provide the plaintiff with redress.  *Id.* at 418.  Only in "'rare circumstances' where the remedy available in the other jurisdiction is 'clearly unsatisfactory,' the threshold requirement will not be met."  *Windt,* 544 F. Supp. 2d at 418 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)).  However, mere disparities in law between the chosen forum and the alternative forum – such as the likelihood of a less favorable recovery or the unavailability of a particular kind of damages – cannot render an alternative forum inadequate.  *See Piper*, 454 U.S. at 255.

It is worth noting at the outset that U.S. courts have routinely held that the United Kingdom is an adequate alternative forum in the context of *forum non conveniens* motions.  *See, e.g.*, *Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., LTD*, 860 F. Supp. 1055 (D.N.J. 1994) (dismissing on *forum non conveniens* grounds in favor of U.K.); *Warn v. M/Y Maridome*, 169 F.3d 625 (9th Cir. 1999) (same); *Thomson Info. Servs. v. British Telcoms.*, 940 F. Supp. 20, 23 (D. Mass. 1996) (observing that "as suggested by a long line of cases, England is generally considered an adequate forum"); *see also* Tom McNamara, *International Forum Selection and Forum Non Conveniens*, 34 Int'l Law 558, 560-61 (2000) (listing the U.K. as one of the

jurisdictions consistently found to be an adequate alternative forum under federal *forum non conveniens* jurisprudence).

It is hard to imagine a case that more easily satisfies this test. First, the question of whether Cadbury is amenable to service in the U.K. needs little attention. Cadbury does not dispute, nor can Plaintiffs, that it is amenable to service in the U.K. (in a manner consistent with U.K. law) by virtue of its incorporation and residency in England. Likewise, nearly all of the individual Defendants are U.K. citizens who reside in England full-time and are amenable to service there. (*See* Compl. ¶¶ 10-18.)[4]  In addition, the affidavits of service that were filed in the *Steward* action on December 9, 2009 demonstrate that Steward is at least capable of purportedly serving Defendants in the U.K. without undue hardship.[5]  The first prong is therefore satisfied.

The second element requires that the subject matter of the suit must be cognizable in the alternative forum in order to provide the plaintiff with redress. This too is readily met. As explained in the accompanying Watkins Declaration, the Takeover Code is designed to ensure that shareholders are treated fairly and are not denied an opportunity to decide on the merits of a takeover, and that shareholders of the same class are afforded equivalent treatment by an offeror. (Watkins Decl. ¶¶ 7, 8.)  A shareholder who wishes to lodge a complaint against a Cadbury director relating to the offer can file a complaint under the Takeover Panel process. (*Id.* ¶ 17.) Shareholder complaints of this type are received and reviewed by the Panel Executive and, on further review, the Hearing Committee. (*Id.* ¶ 18.)  Rulings of the Hearings Committee may be

---

[4]  The Complaint pleads that six of the nine individual defendants are citizens of the U.K.  The Complaint incorrectly pleads that Defendant Andrew Bonfield is a New Jersey citizen.  He is a U.K. citizen.

[5]  The Defendants who were purportedly served process in the *Steward* action do not waive any rights or defenses with respect thereto, including the defense of insufficient service and lack of personal jurisdiction.

12

appealed as of right to an independent body, the Takeover Appeal Board.  (*Id.* ¶ 19.)  The Takeover Panel is empowered to issue "compliance rulings" when a rule of the Takeover Code has been contravened or when there is a reasonable likelihood that a rule will be contravened. The Takeover Panel may also give direction that appears to it to be necessary in order to restrain a person from acting (or continuing to act) in breach of rules, to restrain a person from doing (or continuing to do) a particular thing, pending determination of whether that or any other conduct is or would be a breach of the rules, or otherwise to secure compliance with the rules.  (*Id.* ¶ 20.)

In addition to lodging a complaint with the Takeover Panel, a shareholder can also file a derivative complaint in the Chancery Division of the High Court of England & Wales pursuant to the Companies Act 2006, which recognizes a shareholder derivative claim as an independent and cognizable cause of action.  (*Id*. ¶ 51.)  The Companies Act provides a statutory procedure pursuant to which a shareholder can commence an action against a director seeking damages on behalf of the company.  (*Id.*); *see also In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 311 (S.D.N.Y. 2007) (observing that "the United Kingdom has recently passed the Companies Act 2006, which recognizes a shareholder's derivative claim as a cognizable cause of action").  Thus, the second element is also satisfied.

Significantly, a plaintiff cannot defeat a *forum non conveniens* motion by showing that the potential recovery in the competing forum is uncertain or less favorable, or that the scope of discovery is less broad:  "Determining the adequacy of an alternative forum does not rest on whether that forum offers the full panoply of remedies available in the plaintiff's chosen forum under the operative facts of the case . . . Instead, the inquiry should be whether the remedies provided by an alternative forum *are so clearly inadequate or unsatisfactory that it is no remedy at all.*"  *Thomson Info. Servs.*, 940 F. Supp. at 23 (quoting *Piper*, 454 U.S. at 254) (emphasis

13

added).  Thus, as long as the English legal system is capable of providing fair consideration under English law, any disparities in the scope of available remedies or discovery are not a basis to deny a *forum non conveniens* motion.  *Kultur*, 860 F. Supp. at 1064 ("[U]nless the law applied by the English court would be 'so inadequate or unsatisfactory that it is no remedy at all,' the possibility that [plaintiff] may receive less favorable results is not a factor to be considered.")(citation omitted); *see also In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 957-58 (7th Cir. 2007) (noting the U.K. was an adequate forum even though its approach to resolving plaintiff's claim was uncertain).

In this regard, at the hearing before the Court on January 5, 2010, counsel for Steward stated that the U.K. was not an appropriate forum because the Takeover Panel is "slightly informal . . . slightly mysterious . . . it certainly isn't a body that is looking into the fairness of the transaction in any way."  (Hr'g Tr. 14:6-9, Jan. 5, 2010, Ex. 5 to the Eakeley Decl.)  There are at least three problems with this statement.  First, it is directly contradicted by the statement in the Complaint admitting that the Takeover Panel's "central objective is to ensure fair treatment for all shareholders in takeover bids."  (Compl. ¶ 45 n.1.)  Second, it proves nothing under the *forum non conveniens* analysis because neither formality nor certainty are required for an alternative forum to be adequate.  Finally, it ignores the fact that, apart from the Takeover Panel, British courts also hear shareholder complaints pursuant to the Companies Act, providing another avenue of recourse.  Under these circumstances, Plaintiffs cannot realistically dispute that England is an adequate alternative forum for this dispute.

2.     Plaintiffs' Choice Of Forum Should Be Afforded Little Deference.

The second step in the *forum non conveniens* analysis is to determine "the amount of deference due to plaintiff's choice of forum."  *Windt*, 529 F.3d at 190.  Ordinarily, the greater a plaintiff's connection to the chosen forum – and the more it appears that considerations of

14

convenience favor keeping the lawsuit in that forum – the more likely a court will afford

plaintiff's choice substantial deference.  *Miller v. Boston Scientific Corp.*, 380 F. Supp. 2d 443,

450 (D.N.J. 2005).  Conversely, the more attenuated a plaintiff's connection to the forum, the

less deference is afforded to plaintiff's choice of forum, which weighs in favor of dismissal.

Where a plaintiff is from outside the forum, or from another country, for instance, courts will

afford less deference to its chosen forum.  *See id.*; *see also Piper*, 454 U.S. at 256 ("Because the

central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a

foreign plaintiff's choice deserves less deference.")  In addition, a court will afford a lower

degree of deference to a plaintiff's choice of forum where it appears that the evidence is not

concentrated there and the conduct did not substantially occur there.  *See Windt*, 529 F.3d at 191.

   In *Windt*, the Third Circuit affirmed Chief Judge Brown's decision to accord

plaintiffs' choice of forum a low degree of deference, even though two individual defendants

were residents of New Jersey, because there was "little evidence of any convenience to

Plaintiffs."  There, New Jersey was "not the home forum of the corporate defendant or another

individual defendant . . . .  There [was] also no indication that evidence is concentrated in New

Jersey, nor [was] there an indication that a substantial amount of conduct giving rise to the

instant dispute occurred in New Jersey."  *Id.*  Under these circumstances, it was appropriate to

accord a low degree of deference to plaintiffs' chosen forum.

   Here, there is even *less* connection to New Jersey than in *Windt*.  No defendant in

this case is a citizen of New Jersey.  Likewise, neither Plaintiff is a New Jersey resident:

Steward is a citizen of Texas (Steward Complaint ¶ 17), and Dougherty is a citizen of

Washington (Compl. ¶ 8).[6]  There is no conceivable evidence located in the state of New Jersey,

and the conduct alleged in the Complaint occurred primarily, if not exclusively, in the U.K.

Therefore, the Court should accord a low degree of deference to Plaintiffs' chosen forum, which,

together with the public and private interest factors discussed immediately below, weighs heavily

in favor of dismissal.

> 3.    Public and Private Interest Factors Favor Dismissal.

The third and final step in the *forum non conveniens* analysis requires a balancing

of the following public and private interest factors:

> The public interests to be considered are (1) having local disputes settled
> locally; (2) avoiding problems of applying foreign law; and (3) avoiding
> burdening jurors with cases that have no impact on their community.
>
> The private interests embrace: (1) ease of access to evidence; (2) the cost
> for willing witnesses to attend trial; (3) the availability of compulsory
> process; and (4) other factors that might shorten trial or make it less
> expensive.

*Windt*, 544 F. Supp. 2d at 419 (citing cases).

> ### a.    *Public Interest Factors*

The first factor is the public interest in "having local disputes settled locally."

This inquiry overlaps to some degree with the deference analysis discussed above.  In *Windt*, the

Third Circuit analyzed this factor as follows:

> We agree with the District Court that the Trustee's complaint does not
> raise a local dispute.  The Trustees' amended complaint alleges fraud and
> mismanagement perpetrated on a Dutch company by executives, board
> members and a corporate shareholder of that Dutch company.  Although
> two of the defendants are residents of New Jersey, there are no allegations
> that actions or events occurring in New Jersey gave rise to the fraud and
> mismanagement at issue in this case.  Moreover, without a dispute local to

---

[6]  To the extent that Plaintiffs intend to rely on the presence of Cadbury Adams LLC's office in New Jersey, that company is not a party to this action and has no connection to this dispute.

NYDOCS04/516338.4

the community of New Jersey, there is little public interest in subjecting
that community to the burdens of jury service . . . .

It cannot be denied that the Netherlands has a substantial interest in
resolving this dispute as it involves the alleged mismanagement of a Dutch
company by Supervisory Board members and executives of the Dutch
company . . . .  In light of New Jersey's lack of associations with this case
and the Netherlands' substantial associations with this case, the District
Court reasonably concluded that the non-local nature of the dispute and
the burdens of jury service on the local community in resolving this non-
local dispute favored dismissal of the Trustees' amended complaint.

*Windt*, 529 F.3d at 193.

Similarly, New Jersey has no connection whatsoever to this action, while the U.K.
has a substantial interest because the Complaint alleges a breach of English law by board
members of an English company, most of whom are U.K. citizens.  *See Kultur*, 860 F. Supp. at
1068 (dismissing on *forum non conveniens* grounds and finding that "England certainly has an
interest in ensuring its corporations are not engaged in wrongful business practices").  Thus, this
factor weighs in favor dismissal.

The next factor is the public interest in "avoiding problems of applying foreign
law."  Here, the internal affairs of Cadbury, including the conduct of its directors, are governed
by English law.  *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 90 (1987) (internal
affairs of corporation are governed by the law of state or country of organization).  Defendants'
conduct as board members is governed by the Companies Act 2006.  If the Court were to retain
this action, however, it would also be required to interpret and apply the Takeover Code, a highly
specialized and complex law that is often at odds with principles of U.S. takeover regulation.
*See* John Armour and David A. Skeel, Jr., *Who Writes the Rules for Hostile Takeovers, and
Why?—The Peculiar Divergence of U.S. and U.K. Takeover Regulation,* 95 Geo. L.J. 1727
(2007) (contrasting U.S. and U.K. takeover regulation and noting significant disparities and
conflicts between the two regimes).  In such a highly regulated space, it would be both inefficient

and unnecessary – not to mention more than a little challenging – for this Court to entangle itself in thorny considerations of U.K. takeover law.  Accordingly, this public interest favors dismissal. *See Windt*, 529 F.3d at 193 ("Were this case to remain in New Jersey, the District Court would be required to examine and apply eleven provisions of the Dutch Civil Code.  On this basis, we cannot say that the District Court was unreasonable in concluding that avoiding problems in the application of foreign law favored dismissal.").

The next factor is the public interest in "avoiding burdening jurors with cases that have no impact on their community."  It is highly unlikely that this case will proceed beyond a preliminary stage, and even more unlikely that it will advance to trial.  But if it did, it would be a burden on New Jersey's jurors, and would have no impact on this State other than to waste precious judicial resources that belong more rightly to its citizens.  *See Kultur*, 860 F. Supp. at 1068 ("the burden of resolving a legal dispute should not be 'imposed upon the people of a community which has no relation to the litigation'") (citation omitted).  This public interest factor also favors dismissal.

> **b.    *Private Interest Factors***

The first private interest factor to consider is the "ease of access to evidence."  As noted above, all of the relevant evidence in this case is located in the U.K.  A good illustration of this is Plaintiffs' discovery letter to the Court, dated January 5, 2010 (09-5006, Docket No. 25), which requests the production of materials such as board meeting minutes, financial projections and summaries of discussions with third parties.[7]  Without exception, these documents are located in the U.K. and their disclosure here is subject to strict limitations under English law, as well as the procedures set forth in the Hague Convention on the Taking of Evidence Abroad in

---

[7]  In conjunction with this motion, Defendants are submitting a brief in opposition to the expedited discovery requests in Plaintiffs' January 5 letter.

Civil or Commercial Matters, 23 U.S.T. 2555, T.I.A.S. No. 7444.  Finally, Plaintiffs have also

indicated that they intend to take depositions (*see* Hr'g Tr. 14:23-24, Jan. 5, 2010, Ex. 5 to the

Eakeley Decl.), which would be far more complicated and costly in the United States since all

potential witnesses reside in the U.K.  The ease of access to evidence therefore clearly favors

dismissal.

   The next two private interest factors are "the cost for willing witnesses to attend

trial" and "the availability of compulsory process."  The first factor unquestionably favors

dismissal in light of the significant cost to produce witnesses who reside abroad for depositions

or trial in the United States.  Regarding the second factor, English Courts have a wide array of

powers to compel the production of documents from parties and non-parties as well as to

summon witnesses to give evidence (*see* Watkins Decl. ¶ 52), so the U.S. and U.K. interests are,

at the very least, in equipose.

   Finally, a court may consider "other factors that might shorten trial or make it less

expensive."  As noted above, it is highly unlikely that this matter will proceed to trial; however,

if it went that far, it is virtually certain that a trial of this case in the United States would be far

more expensive and less expedient than in Cadbury's home jurisdiction of England, especially

given the location of the witnesses and documentary evidence.

*      *      *

   When viewed separately, each one of the three steps in the *forum non conveniens*

analysis weighs decidedly in favor of dismissal.  Taken together, as they must, the scales tip

overwhelmingly towards England as the more appropriate forum for this dispute.  Under these

circumstances, the Third Circuit has instructed that retaining jurisdiction in this forum would

19

result in "oppression or vexation" to the Defendants that outweighs the convenience to Plaintiffs, if any, of litigating the action in New Jersey.  *Windt*, 529 F.3d at 197.

   If all that were not enough, this case presents a textbook example of where a U.S. court may properly dismiss a case in favor of a foreign jurisdiction under principles of international comity.  *See Frumkin v. JA Jones*, 129 F. Supp. 2d 370 (D.N.J. 2001).  These principles are particularly pertinent here, where the jurisdictions involved are the United States and England.  *See, e.g.*, *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 254-255 (D. Mass. 1999) ("Because the United States and England share the same common law heritage, deference to British proceedings is consistent with notions of international comity."); *Plessy Co. plc v. Gen. Elec. Co. plc*, 628 F. Supp. 477, 496 (D. Del. 1986) (denying request for preliminary injunction based on principles of comity and noting that "American interference with a transaction of such enormous magnitude to the British economy would contravene traditional international notions of non-interference in a matter of strong British interest.").  Thus, under both *forum non conveniens* and considerations of international comity, the Court should exercise its discretion to dismiss the Complaint with prejudice.

  **B.**  **U.S. Law Has Only A Very Limited, Secondary Application Here, Which Has Not Been Invoked By Plaintiffs.**

   To date, neither Plaintiff has asserted a single claim under U.S. law.  The Complaint repeatedly refers to breaches of generic "fiduciary duties," with no indication of which source of law such duties arise under.  Plaintiffs have also alleged that Cadbury's communications to shareholders contained material omissions, but they fail to point out which law(s) they are relying on and what the specific disclosure requirements are of such law(s).  Apart from further illustrating that this action belongs in England, the utter absence of any U.S. claims demonstrates that U.S. law has, at best, a very limited and secondary role in this action.

First, this is a quintessentially U.K. dispute.  As noted above, Cadbury's internal affairs – including matters of corporate governance and fiduciary duties – are governed by English law.  *See CTS Corp.*, 481 U.S. at 90.  In addition, the Takeover Panel and the Takeover Code rightly occupy center stage in regulating the substance and procedure of takeover offers involving U.K. companies.  Furthermore, Cadbury's principal place of business is in the U.K., its shares are listed on the London Stock Exchange (with a secondary listing on the New York Stock Exchange), and nearly all of the individual defendants are U.K. citizens and reside year-round in England.  The absence of U.S. law is not surprising in light of these facts.

Second, the U.S. laws that might conceivably apply in this action are Section 14(d) of the Securities Exchange Act of 1934 Act, as amended (the "34 Act"), and Rule 14d-9 promulgated thereunder, which govern recommendations and solicitations by the subject company in connection with a tender or exchange offer for covered classes of securities.  Had they been invoked by Plaintiffs, these laws would apply only to Cadbury's shareholder communications published in the United States – which consist of a single Solicitation/ Recommendation Statement on Schedule 14D-9 published on December 14, 2009, and amended thereafter (and even that was only published in response to Kraft's tender offer to Cadbury's U.S. shareholders).  (Schedule 14D-9, Ex. 6 to the Eakeley Decl.)  In any event, however, the critical fact is that Plaintiffs have admittedly chosen *not* to invoke these laws.[8]

Other than Plaintiffs' makeweight disclosure claims (which fail to invoke any source of law), there have been no indications, reports, allegations or accusations that Defendants have run afoul of any U.S. or U.K. disclosure laws.  Given the complete absence of any

---

[8]  In her motion to consolidate, Dougherty correctly observed that "neither plaintiff has asserted claims under the [34] Act."  (Memorandum of Points and Authorities in Support of Motion to Consolidate Related Actions and Appoint Interim Class and Lead Derivative Counsel at 6 n.4 (09-5006, Docket No. 23).)

violations of U.S. law (or even allegations of same), the U.K. is clearly the more appropriate for this dispute.

## II.   THIS ACTION SHOULD BE DISMISSED UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM.

If this Court does not dismiss the action pursuant to *forum non conveniens*, it should dismiss the Complaint for failure to state a claim.  A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) where the alleged facts, even if true, fail to state a claim upon which relief may be granted.  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (to avoid dismissal, "'[f]actual allegations must be enough to raise a right to relief above the speculative level'" (quoting *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Viewed even in the most favorable light, the facts alleged by Plaintiffs are unable to state a claim for relief.

The Complaint asserts two counts of breach of fiduciary duties primarily based on Defendants' alleged failure to negotiate a favorable merger with Kraft.  (Compl. ¶ 86-98.)  In their own words, Plaintiffs "seek[] to compel the Board to fulfill its fiduciary duties to the Company and its shareholders by engaging in good faith negotiations with Kraft in order to promote the success of the Company for the benefit of the Company and its shareholders."  (*Id.* ¶ 2.)  The fatal flaw with Plaintiffs' case is that, under English law, the *shareholders* – not the board – have the absolute power to accept or reject an offer from Kraft, and the board is literally powerless to stop them.  This is because, in contrast to U.S. takeover law, English law does not generally permit structural defenses against a hostile takeover bid.  (Watkins Decl. ¶ 24); *see Who Writes the Rules for Hostile Takeovers, and Why*, 95 Geo. L.J. at 1736 (noting that, in the U.K., "[p]oison pills are strictly forbidden and so is any other defense that will have the effect of impeding target shareholders' ability to decide on the merits of a takeover offer, such as buying

or selling stock to interfere with a bid, or agreeing to a lockup provision with a favored bidder."). Thus, the board cannot compel any outcome with respect to Kraft's offer – rejection, acceptance or otherwise – because that power lies exclusively with the shareholders whom Plaintiffs purport to represent. *See id.* at 1738 ("The U.K. ban on defensive tactics by managers clearly makes it easier for hostile bids to succeed."). As a result, the allegation that Cadbury and its shareholders were injured by Defendants' failure to cause a merger with Kraft simply cannot state a claim for breach of fiduciary duty.

Furthermore, Plaintiffs are seeking to impose extraordinary private U.S. remedies, such as expedited discovery and a preliminary injunction, on the U.K. takeover process. These demands are not consistent with the U.K. takeover system, and exporting them wholesale would significantly interfere with the Takeover Panel's oversight and the free choice of Cadbury's shareholders (the majority of whom are not in the United States). *See Plessy*, 628 F. Supp. at 496 (denying preliminary injunction in connection with U.K. tender offer, observing that "the British have their own sophisticated regulatory structure for takeovers which does not impose the requirements sought by [plaintiff]" and noting that "American interference with a transaction of such enormous magnitude to the British economy would contravene traditional international notions of non-interference in a matter of strong British interest"). Even English courts are reluctant to interfere with the primacy of the Takeover Panel and its administration of the Takeover Code. *See, e.g., R. v Panel on Takeovers and Mergers Ex p. Datafin Plc*, 1987 QB 815, 842 (Watkins Decl. Ex. 5) (declining to interfere with Takeover Panel's administration of the Takeover Code "in the light of the special nature of the Panel, its functions, the market in which it is operating, the timescales which are of interest in that market and the need to safeguard the position of third parties").

Finally, Plaintiffs' case rests on the conclusion that the board's rejection of Kraft's offer resulted in a loss of value to Cadbury shareholders. (*See, e.g.*, Compl. ¶ 39-41.) But that premise vanishes in light of the indisputable fact that Cadbury's shares have traded consistently *above* Kraft's offer price since the offer was first announced in September 2009 – and continue to do so as of the date of this brief.[9]  It would be a strange world indeed if Defendants were forced to recommend a deal that offered shareholders *less* than the current market value of their Cadbury shares, yet that is what Plaintiffs' argument means.  Plaintiffs themselves even acknowledge in the Complaint that "[o]n Monday, November 23, 2009, Cadbury shares hit a record high" on news of potential competing bids, and that the share price rose "as high as 819.5 pence before closing at 815 pence."  Meanwhile, Kraft's offer announced on November 9, 2009 valued Cadbury shares at 717 pence.  Surely, there was no loss of value resulting from the board's decision not to accept Kraft's offer in November.  Thus, the allegation that the board's failure to enter into an agreement with Kraft caused injury to Cadbury and its shareholders does not state a claim for breach of fiduciary duty.[10]

---

[9] *See* David Jones, *Cadbury shares dip below Kraft bid for first time,* Reuters, Jan. 7, 2010 (noting that January 7 was the first date since Kraft's offer was announced that Cadbury's shares traded below Kraft's implied offer price), available at http://www.reuters.com/article/ idUSTRE6054E120100107.  Based on Kraft's stock price and the USD/GBP exchange rate at midday (EST) on January 11, 2010, Kraft's implied offer was worth 762 pence per share, and Cadbury closed at 781 pence per share on the London Stock Exchange.  A court may take judicial notice of stock prices on a motion to dismiss "because these facts are 'not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.'"  *In re Merck & Co. Sec. Litig.* 432 F.3d 261, 264 n.3 (3d Cir. 2005) (quoting *Ieradi v. Mylan Lab., Inc.* 230 F.3d 594, 600 n.3 (3d Cir. 2000)).

[10] The fact that Cadbury's shares have been consistently trading above Kraft's offer also presents troubling damages issues for Plaintiffs to the extent they seek monetary damages.  The Court described these issues as "significant" at the January 5 hearing.  (Hr'g Tr. 11:20-12:3, Jan. 5, 2010, Ex. 5 to the Eakeley Decl.)  Defendants view this as yet another critical flaw in Plaintiffs' case, but one which need not be addressed at this preliminary stage in view of the compelling reasons to dismiss their case on the threshold grounds set forth herein.

NYDOCS04/516338.4

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice under *forum non conveniens* or, alternatively, under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Douglas S. Eakeley
Jason Halper
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey  07068
973.597.2500
973.597.2400 (Fax)
deakeley@lowenstein.com
*Attorneys for Defendants*

*Of Counsel:*

Alan S. Goudiss
Alexandra Dosman
Brian G. Burke
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, New York  10022
212.848.4000

By:  /s  Douglas S. Eakeley

Dated:  January 11, 2010

25