Douglas S. Eakeley
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE CADBURY PLC SHAREHOLDER LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br>ALL CASES | **DOCUMENT ELECTRONICALLY FILED**<br><br>Civil Action No. 09-5006 (DMC) (MF)<br><br>**DECLARATION OF DOUGLAS S. EAKELEY, ESQ. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, **DOUGLAS S. EAKELEY**, of full age, do hereby declare as follows:

1.     I am a member of Lowenstein Sandler PC, counsel to the individual defendants and nominal defendant Cadbury plc (collectively, "Defendants") in this matter.  I respectfully submit this Declaration to provide the Court with a summary of the procedural history of this case and copies of certain documents that are referenced in Defendants' Brief in support of their motion to dismiss the Amended Verified Shareholder Class Action and Derivative Complaint, dated December 23, 2009.

2.     On September 30, 2009, Plaintiff Steward International Enhanced Index Fund ("Steward") filed this purported shareholder derivative action against the Cadbury board of directors and Cadbury plc (as a nominal defendant) in connection with a tender offer by Kraft

Foods Inc. ("Kraft") for all of the outstanding ordinary shares of Cadbury plc.  The *Steward* case was assigned Civil Action Number 09-5006.

        3.      To date, Steward has purportedly effectuated service on eight of the ten Defendants.  The eight Defendants on whom service was purportedly effected do not concede that such service was effective.  No substantive activity took place in the *Steward* case in the months after the complaint was filed.  On December 17, 2009, the parties submitted a joint Stipulation and proposed Order to U.S. Magistrate Judge Mark Falk extending the time for Defendants to move, answer or otherwise respond to the complaint to January 15, 2010.  Judge Falk entered that Order on December 30, 2009.  (09-5006, Docket No. 24.)

        4.      On November 9, 2009, Plaintiff Susan Dougherty ("Dougherty") filed a similar complaint against Defendants in the Superior Court of New Jersey, Morris County, Chancery Division (MRS-C-171-09).  To date, no defendant in that action has been served with process.

        5.      Kraft is not named as a party in either the *Steward* or *Dougherty* actions.

        6.      On December 18, 2009, Defendants removed the *Dougherty* action to this Court on diversity grounds, which was assigned Civil Action No. 09-6406.  In the Local Rule 11.2 certification accompanying their notice of removal, Defendants requested that the *Dougherty* action be consolidated with the *Steward* action.  (09-6406, Docket No. 1.)

        7.      On December 23, 2009, Plaintiff Dougherty filed an Amended Verified Shareholder Class Action and Derivative Complaint (09-6406, Docket No. 3), and also filed a proposed order to show cause seeking temporary restraints and expedited discovery (09-6406,

Docket No. 4). For the Court's convenience, attached hereto as **Exhibit 1** is a true and correct copy of the amended complaint in *Dougherty*.

8.    On December 28, 2009, Defendants submitted a letter to this Court (09-5006, Docket No. 1; 09-6406, Docket No. 7), opposing the relief sought by Dougherty in her proposed order to show cause and requesting a Rule 16 conference to consolidate the *Steward* and *Dougherty* matters.

9.    On December 30, 2009, counsel for Dougherty responded (09-5006 Docket No. 20; 09-6406, Docket No. 8), noting, among other things, that she did not oppose consolidation of these two putative shareholder derivative matters.

10.    The following day, on December 31, 2009, Plaintiff Dougherty filed a motion to consolidate the *Steward* and *Dougherty* matters under *Fed. R. Civ. P.* 42(a), and also sought the appointment of interim counsel and lead derivative counsel. (09-6406, Docket No. 14.)

11.    Meanwhile, on December 29, 2009, Plaintiff Steward sent a letter to Defendants requesting that Defendants make certain public disclosures on behalf of Cadbury in connection with the Kraft tender offer, and further requested that Defendants immediately produce various documents. Attached hereto as **Exhibit 2** is a true and correct copy of Steward's December 29 letter. Defendants responded on December 31, 2009 objecting to Steward's premature and unwarranted requests. Attached hereto as **Exhibit 3** is a true and correct copy of Defendants' December 31 response.

12.    On December 31, 2009, Plaintiff Steward sent a letter to this Court, stating – in contrast to the Dougherty letter – that the two putative shareholder actions should not be

consolidated so long as Dougherty continued to seek an order preventing Cadbury's shareholders from tendering their shares to Kraft.  (09-5006, Docket No. 22; 09-6406, Docket No. 11.)

13.     Plaintiffs Steward and Cadbury subsequently reached an agreement on lead and liaison counsel and agreed that the *Steward* and *Dougherty* actions should be consolidated for all purposes.  On January 5, 2010, this Court entered an Order consolidating the cases and appointing lead and liaison counsel.  The Order states that the *Dougherty* Amended Verified Shareholder Class Action and Derivative Complaint, dated December 23, 2009 (which is attached hereto as Exhibit 1) "shall be the operative complaint in the Consolidated Action." (Order, ¶ 6.)  A true and correct copy of the Order is attached hereto as **Exhibit 4**.

14.     On January 5, 2010, this Court heard arguments on the various issues raised by the parties.  Attached hereto as **Exhibit 5** is a true and correct copy of the transcript of that hearing.

15.     On December 14, 2009, Cadbury filed its Schedule 14D-9 with the Securities and Exchange Commission (Solicitation/Recommendation Statement under Section 14(d)(4) of the Securities Exchange Act of 1934).  A true and correct copy of the Schedule 14D-9 along with its exhibits is attached hereto as **Exhibit 6**.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Douglas S. Eakeley, Esq.

Dated:   January 11, 2010

**EXHIBIT 1**

**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma
Katrina Carroll
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
Lee D. Rudy
Michael Wagner
James Miller
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | | |
|---|---|---|
| SUSAN DOUGHERTY, on Behalf of Herself and All Others Similarly Situated, and Derivatively on Behalf of Nominal Defendant CADBURY PLC, | : : : : | Civil Action No. 09-6406 (DMC) |
| Plaintiff | : : : | |
| v. | : : | **AMENDED** |
| ROGER CARR, TODD STITZER, ANDREW BONFIELD, WOLFGANG BERNDT, GUY ELLIOT, LORD PATTEN, RAYMOND VIAULT, BARONESS HOGG, and COLIN DAY, | : : : : : : | **VERIFIED SHAREHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT** |
| Defendants, | : : : | |
| and | : : | |
| CADBURY PLC, | : : : | |
| Nominal Defendant | : : : | |
| | : | |

226847 v1

Plaintiff Susan Dougherty, by and through her undersigned counsel, having previously filed an action in the Chancery Division of Morris County, New Jersey, captioned *Dougherty v. Carr et al.*, Docket No.MRS-C-171-09 (the "State Court matter"), which matter was subsequently removed to this Court, and Plaintiff incorporating by reference the allegations of the previously filed Verified Complaint in the State Court matter and all other pleadings and papers filed therein, upon knowledge as to herself and upon information and belief as to all other matters, alleges in this Amended Complaint as follows:

## NATURE OF THE ACTION

1.     Plaintiff is a holder of Cadbury plc ("Cadbury" or the "Company") stock. Plaintiff brings this action individually and as a class action on behalf of all holders of Cadbury stock, other than the defendants and their affiliates, and derivatively on behalf of Cadbury and against the Company's board of directors (the "Board"), to remedy the Board's breaches of its fiduciary duties in connection with its meritless outright rejection of multiple buyout proposals by Kraft Foods, Inc. ("Kraft"), including Kraft's recent formal offer on November 9, 2009 to acquire Cadbury for approximately 717 pence per share (the "Offer").

2.     Through this action Plaintiff seeks to compel the Board to fulfill its fiduciary duties to the Company and its shareholders by engaging in good faith negotiations with Kraft in order to promote the success of the Company for the benefit of the Company and its shareholders.  Rather than negotiate with Kraft in good faith in order to maximize value in a possible going-private transaction, the Board has breached its fiduciary duty by spurning Kraft's offer to acquire the Company for a significant premium.  Cadbury's purported justification for such conduct is untenable.

226847 v1

2

3.     On December 14, 2009, Cadbury published its stockholder circular (the "Circular" or the "Proxy") in response to Kraft's December 4, 2009 tender offer. The Circular is contained in a Form SC14D9 filed with the United States Securities and Exchange Commission ("SEC") and sets forth Cadbury's opinion that shareholders should reject Kraft's Offer. However, while Cadbury Chairman Roger Carr stated in a press conference that "our argument is not for independence for its own sake – but a clinical and factual case for ensuring our shareholders either retain the full benefits of continued ownership or receive fair value for surrendering control," the Proxy demonstrates that Cadbury's "factual case" is a highly speculative, best-case-scenario "Profit Forecast" that provides shareholders with no meaningful way to translate potential future success into net present value of their investments.

4.     In addition, Cadbury has been engaging in secret negotiations with third party bidders while it has put on ice Kraft's existing bid and offer to negotiate. Not only has Cadbury treated bidders differently during a time when it is considering change-in-control transactions, but at least one of these bidders, The Hershey Company ("Hershey"), has long been sought by Cadbury as a potential merger partner.

5.     Lastly, Plaintiff also seeks to compel defendants to fulfill their fiduciary obligation to disseminate to Cadbury shareholders proxy materials that are not materially misleading or incomplete. The Proxy by which the Board recommends that Cadbury shareholders reject Kraft's Offer is replete with misstatements and/or omissions that render the Proxy materially misleading. Indeed, the Proxy sets forth little more than the Board's colorful rhetoric about why shareholders should reject Kraft's Offer rather than explain to shareholders how the Profit Forecast will benefit them, and why the Board has abandoned its obligation to negotiate a transaction at the highest price possible.

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.      Venue is proper in this District because one or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

8.      Plaintiff Susan Dougherty ("Plaintiff") is a Cadbury shareholder and has been a Cadbury shareholder continuously since prior to the wrongs complained of herein.  Plaintiff is a citizen of the State of Washington.

9.      Nominal Defendant Cadbury is a Public Limited Company incorporated in the United Kingdom ("U.K."), with its principal executive offices located at Cadbury House, Sanderson Road, Uxbridge, Middlesex, U.K.   Cadbury North America, a business unit of Cadbury, is headquartered in Parsippany, New Jersey.  Cadbury is a leading global confectionery company with a portfolio of chocolate, gum and candy brands.  The Company's brands include Cadbury, Trident and Halls.  Cadbury common shares are traded on the London Stock Exchange under the symbol "CBRY."  Cadbury American Depository Shares ("ADS") are, and at all times relevant hereto were, listed and traded on the New York Stock Exchange under the symbol "CBY."

226847 v1                                                    4

10.     Defendant Roger Carr ("Carr") has served as a director of Cadbury since January 2001 and as the Chairman of the Board since July 2008.  Upon information and belief, Carr is a citizen of the U.K.

11.     Defendant Todd Stitzer ("Stitzer") has served as a director of Cadbury since March 2000, and as the Company's Chief Executive Officer ("CEO") since May 2003.  Upon information and belief, Stitzer is a citizen of the U.K.

12.     Defendant Andrew Bonfield ("Bonfield") has served as a director of Cadbury since April 3, 2009, and as the Company's Chief Financial Officer ("CFO") since February 2009.  Upon information and belief, Bonfield is a citizen of the State of New Jersey.

13.     Defendant Wolfgang Berndt ("Berndt") has served as a director of Cadbury since 2002.  Upon information and belief, Berndt is a citizen of the Republic of Austria.

14.     Defendant Guy Elliot ("Elliot") has served as a director of Cadbury since 2007.  Upon information and belief, Elliot is a citizen of the U.K.

15.     Defendant Lord Patten ("Patten") has served as a director of Cadbury since 2005.  Upon information and belief, Patten is a citizen of the U.K.

16.     Defendant Raymond Viault ("Viault") has served as a director of Cadbury since 2006.  Upon information and belief, Viault is a citizen of the State of Florida.

17.     Defendant Baroness Hogg ("Hogg") has served as a director of Cadbury since October 2008.   Upon information and belief, Hogg is a citizen of the U.K.

18.     Defendant Colin Day ("Day") has served as a director of Cadbury since December 2008.  Upon information and belief, Day is a citizen of the U.K.

19.     The defendants referred to in paragraphs 6 through 14 are collectively referred to herein as the "Individual Defendants."  The defendants referred to in paragraphs 7 through 14 are

collectively referred to herein as the "Cadbury Defendants", and together with Kraft, "Defendants".

20.     As members of the Board, each of the Individual Defendants receives substantial remuneration for their service to Cadbury.  Defendant Carr receives £390,000 annually, plus a £60,000 director fee, which is equal to more than $700,000 in compensation.  Each of the non-management Board members receives £60,000 per year if they are non-U.S. residents, and $150,000 per year if they are U.S. residents.  Senior directors and the chairmen of the Board's committees receive an additional £15,000-£20,000 annually.  In total in 2008, Cadbury's non-management directors received £939,000 in fees, and the Board's three management directors totaled more than £11,000,000.

21.     By reason of the above Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with the Company, Plaintiff, and the other public shareholders of Cadbury.  Accordingly, the Individual Defendants owe Cadbury, Plaintiff, and the Company's other public shareholders and the other members of the Class the highest obligations of good faith, fair dealing, due care, loyalty, and full and candid disclosure.  The Individual Defendants are further under an obligation to exercise independent judgment, exercise reasonable care, skill and diligence in the administration of their responsibilities, and avoid conflicts of interest.  As discussed in detail herein, the Individual Defendants have not fulfilled their obligations as directors of Cadbury.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Cadbury traces its origins back to 1824, when John Cadbury first opened a shop in Birmingham, U.K., and thereafter focused on manufacturing and selling chocolate and

226847 v1                                                    6

confectionary. By 1847 the Company was known as "Cadbury Brothers," and thereafter it added additional product lines to the business, including chewing gum and milk. In 1919 Cadbury Brothers merged with JS Fry & Sons, acquiring a complementary range of chocolate. In 1969 Cadbury Group Ltd. merged with Schweppes Ltd. In the 1990's, Cadbury made a series of acquisitions, including Dr. Pepper/Seven Up and Hawaiian Punch, and became the largest independent bottler in the U.S. In 2003, Cadbury acquired Adams Confectionary, making it the leading world-wide confectionery company and the world's number two in chewing gum. After demerging several beverage businesses in May 2008, Cadbury was created "with a vision to be the biggest and best confectionery company in the world."

23.     Kraft is a publically traded holding company (NYSE: KFT) based in Northfield, Illinois, with hundreds of subsidiaries. The Company manufactures and markets packaged food products, including snacks, beverages, cheese, convenient meals and various packaged grocery products. Through a series of mergers and acquisitions, in the 1980s Kraft became a wholly owned subsidiary of Altria Group, Inc. ("Altria"). Altria partially spun off Kraft in an initial public offering in June 2001, and in March 2007 completed the spin off by selling its remaining interest in Kraft. The Company has operations in more than 70 countries and sells its products in approximately 150 countries. Kraft has nine brands with revenues exceeding $1 billion, and more than 50 brands with revenues of at least $100 million.

24.     Kraft, Cadbury, and their respective managements, are not strangers to each other. In fact, among other deals between the Companies, in August 2001, Cadbury Schweppes purchased Kraft's chewing gum and candy business in France.

25.     Given Kraft and Cadbury's complementary businesses, the potential of a successful business combination between Cadbury and Kraft had prompted many analysts and

shareholders to speculate about a potential business combination of the two companies for several years. Most recently, and as reported by *Bloomberg*, according to "two people familiar with the matter," Kraft has been interested in Cadbury since before Kraft was spun off from Altria in 2007.

**Kraft's Proposed Offer and Cadbury's Baseless Refusal to Negotiate**

26.     Throughout the summer months of 2009, Kraft sought to pay a substantial premium to acquire Cadbury on terms agreeable to both companies, and beneficial to Cadbury's shareholders. Rather than negotiate with Kraft, the Individual Defendants have patently refused to even consider a strategic transaction that would promote the success of the Company and provide substantial cash consideration to the Company's shareholders while at the same time permitting them to retain an equity interest in Kraft in order to participate in the future growth of the Company.

27.     On August 28, 2009, Irene B. Rosenfeld ("Rosenfeld"), Kraft's Chairman and CEO, met with Carr to discuss a business combination between Kraft and Cadbury. This meeting followed a telephone conversation between Rosenfeld and Carr one week earlier. On August 28, 2009, and in follow up to their meeting earlier in the day wherein they discussed the proposed offer by Kraft to acquire Cadbury, Rosenfeld sent Carr a letter (the "August 28 letter") reiterating the numerous benefits that Cadbury and its shareholders would realize from the business combination. As Rosenfeld stated, Cadbury and Kraft are "two great companies [that] are highly complementary and a combination makes a great deal of strategic and financial sense." In addition to expressing a desire to engage in "constructive, friendly discussions," the August 28 letter stated, in relevant part:

> I very much enjoyed meeting you this morning. As I explained, we believe that the combination of our companies would provide a compelling value proposition for both our shareholders. *As analysts and industry observers have long speculated, our two great companies are highly complementary and a combination makes a great deal of strategic and financial sense.* We believe that now is the time to pursue a transaction as a result of the significant opportunities available to both of us. *We look forward to engaging in constructive, friendly discussions and working toward a positive outcome on a recommended basis.*

We have great respect and admiration for Cadbury plc ("Cadbury"), its employees, its leadership and its proud heritage. We have also taken note of your recent performance and the successful ongoing implementation of your Vision Into Action programme. However, *we believe that Cadbury's prospects, ability to fully realise operational efficiencies and capacity to invest are necessarily constrained given its limited scale and scope relative to larger global competitors. We see few catalysts for sustained future value creation for Cadbury as a standalone entity.* In contrast, we have concluded that we can strengthen both our companies by bringing them together, enhancing our worldwide scale and scope, and capitalising on significant opportunities to build a global leader in the food and snacking industry for the benefit of all of our respective stakeholders. In so doing, we are eager to build upon the success of your iconic brands and strong British heritage through increased investment and innovation.

(Emphasis added.)

28.     Rosenfeld's August 28 letter also detailed the substantial premium that Kraft's proposed offer would provide to Cadbury's shareholders. Rosenfeld's proposed offer, which had already been approved by Kraft's Board of Directors, promised to reward Cadbury's shareholders with a blend of cash and Kraft stock that represented a 31% premium over Cadbury's prior day's close. The proposed offer thus presented a valuable and unique opportunity for Cadbury's shareholders not only receive cash now, but also to share in the future profitability of Cadbury through an equity interest in Kraft. Rosenfeld's description of the financial component of the proposed offer is stated as follows:

Subject to the pre-conditions set out below, *Kraft Foods is prepared to offer 300 pence in cash and 0.2589 new Kraft Foods shares per Cadbury share, which values each Cadbury share at 755 pence (based on yesterday's closing price of $28.42 for a Kraft Foods share and an exchange rate of 1.617 $/£). This price represents an attractive premium to any measure of the standalone value of Cadbury and fully reflects your recent performance and prospects.* Specifically, this price represents a premium of:

- *44% over Cadbury's share price of 524 pence on 3 July 2009,* prior to recent analyst suggestions regarding potential sector consolidation;

- *37% over Cadbury's 90-day average share price of 553 pence in the period up to 27 August 2009,* the last business day preceding this letter; and

- *31% over Cadbury's share price of 578 pence at close yesterday.*

*We would also point out that this price is beyond any price at which Cadbury's shares have traded since the demerger.*

*The Possible Offer would provide your shareholders with both value certainty and the opportunity to enjoy the significant value upside in the combined entity's attractive growth prospects and considerable synergies. Kraft Foods would also offer a mix and match facility under which Cadbury shareholders could elect, subject to availability, to vary the proportions in which they would receive cash and new Kraft Foods shares.*

*        *        *

The consideration required for the Possible Offer would be provided from a combination of Kraft Foods' existing funds, new debt and the issuance of equity. Financing would be on the basis that Kraft Foods would maintain an investment-grade credit rating. The significant cash flow of the enlarged entity following a combination would allow for rapid debt paydown and the continued funding of growth initiatives.

(Emphasis added.)

29.    According to the August 28 letter, Kraft stock stands to provide significant value to the Company's shareholders, and the proposed strategic combination promises to substantially enhance the Company's future operations, because of strong synergies that would be achieved by the Kraft-Cadbury business combination:

I believe that the strategic and financial rationale for this transaction is compelling. The transaction would create:

- a company with approximately $50 billion in revenues, with leading shares in snacking and an exceptional portfolio of confectionery and biscuit brands around the world;

- a geographically diversified combined business, with leading positions and significant scale in key developing markets including India, Mexico, Brazil, China and Russia;

- a strong presence in instant consumption channels in both developed and developing markets, expanding the reach and margin potential of the combined business; and

- the potential for meaningful revenue synergies over time from investments in distribution, marketing and product development, as well as a significant opportunity to realise pre-tax cost savings of at least $625 million annually through increased operational efficiencies.

Kraft Foods has a proven track record of successfully completing and integrating strategic combinations to build iconic brands and multi-national businesses, including the acquisitions of LU in 2007 and Nabisco in 2000.

A combination with Cadbury is consistent with Kraft Foods' stated strategic objective to build a high-performing global company by reframing our categories, capitalising on our established sales capabilities and driving down costs without compromising our commitment to high quality. Over the past three years, we have successfully positioned Kraft Foods for sustainable, profitable growth. A combination with Cadbury would mark a logical next step in our transformation as we shape the company into a more global, higher-growth and higher-margin entity.

Together, we would draw on the collective strengths of our two organizations and create a stronger, more competitive global company for the benefit of all stakeholders. We believe that the growth prospects and global scope of the enlarged entity should lead to increased opportunities for talented employees and managers of both companies. In addition, we confirm that the existing contractual employment rights, including pension rights, of all employees of Cadbury would be fully safeguarded.

30.    The reason why Rosenfeld and Kraft were able to make such a bold, valuable offer to Cadbury and its shareholders is that Kraft had already completed significant due diligence on Cadbury. Not only did this due diligence facilitate Kraft's proposed offer, but it ensures that any business combination between the two companies will be achieved as quickly and smoothly as possible, thus minimizing risk for the Company and its shareholders. According to the August 28 letter:

We, together with our legal advisers, have undertaken an analysis in relation to anti-trust matters. The complementary nature of our two businesses means that any antitrust concerns will be few, and limited in scope: we are confident that any issues can be appropriately addressed within the envisaged implementation timeframe. In this regard, we would suggest that our respective legal advisers meet at your earliest convenience, in order for our advisers to explain their analysis, and for next steps to be identified.

*We believe it is in all parties' interests to progress this transaction as swiftly as possible.  Our senior management and advisers have already completed extensive analysis and due diligence based on publicly available information.  Accordingly, our due diligence requirements are limited, confirmatory in nature and capable of being addressed within a compressed timeframe.* Lazard is acting as our lead financial adviser.  We have also retained Centerview Partners, Citigroup and Deutsche Bank as financial advisers.  Our legal advisers are Clifford Chance; Cravath, Swaine & Moore; Gibson, Dunn & Crutcher; and Arnold & Porter.

It is Kraft Foods' preference to implement any offer by means of a scheme of arrangement but we reserve the right to change this to a general offer.  Any offer, if made, would be subject to the terms and conditions usually attaching to a scheme of arrangement, or offer, involving a UK public company.

*        *        *

We trust that our proposal makes clear our level of seriousness and enthusiasm for pursuing this opportunity.  We are willing to commit substantial time and financial resources to do so.  This matter has the highest priority for Kraft Foods and we are keen to have our advisers and executive team engage with yours so that we can progress this proposal in an expeditious manner.

(Emphasis added.)

31.     Further demonstrating the minimal risk inherent in Kraft's proposed offer is that the August 28 letter detailed only three pre-conditions that would have to be met prior to Kraft making a formal offer for Cadbury:

The making of any offer would be subject to the following pre-conditions:

- satisfactory completion of a limited due diligence review by Kraft Foods, including access to Cadbury's internal plan and projections;

- Kraft Foods obtaining satisfactory financing; and

- a unanimous recommendation by the directors of Cadbury to vote in favour of the scheme, or if relevant, to accept the offer.

For the avoidance of doubt, this letter should not be construed in any regard as constituting an offer or evincing an intention to make an offer or inviting an offer or imposing an obligation to make an offer for Cadbury and any of its securities or otherwise giving rise to legal relations (save for the obligation to keep its terms confidential) and, in particular, does not constitute a firm intention to make an offer for the purposes of Rule 2.5 of The City Code on Takeovers and Mergers.

226847 v1                                          13

> This proposal is made on a strictly private and confidential basis. This letter shall be governed by and construed in accordance with English law.

32.     Despite the attractiveness of Kraft's proposed offer, Carr's reaction to Kraft's proposed offer was a swift "no." A mere three days after receiving the August 28 letter, Carr sent to Rosenfeld a letter on August 31, 2009 dismissing Kraft's proposal out of hand. Notably, despite Kraft's invitation of friendly negotiations in an effort to structure a transaction that maximized benefit to Cadbury and its shareholders, Carr's letter refused to discuss the matter further.

33.     On September 7, 2009, Kraft disclosed to the market that it had made the proposed offer to Cadbury. The press release stated:

> Kraft Foods Inc. ("Kraft Foods") today announces that it has made a proposal to the Board of Cadbury plc ("Cadbury") to combine the two companies. *The Board of Cadbury has rejected this proposal.* Kraft Foods is committed to working toward a recommended transaction and to maintaining a constructive dialogue and is announcing this proposal as a means to encourage and further that process. Included in Appendix I are two letters to the Chairman of Cadbury which set out the strong strategic rationale for the proposed combination and the attractive premium and compelling value proposition for Cadbury's shareholders.

> *Kraft Foods is proposing an offer for Cadbury (the "Possible Offer") of 300 pence in cash and 0.2589 new Kraft Foods shares per Cadbury share. This values each Cadbury share at 745 pence (based on the closing price of USD 28.10 for a Kraft Foods share on 4 September 2009 and an exchange rate of 1.6346 USD /GBP) and values the entire issued share capital of Cadbury at GBP 10.2 billion.* The combination would build on Kraft Foods' position as a global powerhouse in snacks, confectionery and quick meals with a rich portfolio of iconic brands.

> *The Possible Offer represents a premium of:*

> - *42 per cent over Cadbury's share price of 524 pence on 3 July 2009,* prior to recent analyst suggestions regarding potential sector consolidation;

> - *34 per cent over Cadbury's 90-day average share price of 555 pence in the period up to 4 September 2009,* the last business day preceding this announcement; and

- ***31 per cent over Cadbury's closing share price of 568 pence on 4 September 2009***, the last business day preceding this announcement.

***Kraft Foods would also offer a mix and match facility under which Cadbury shareholders could elect, subject to availability, to vary the proportions in which they would receive cash and new Kraft Foods shares.*** Kraft Foods reserves the right to change the terms of the Possible Offer and the consideration mix in the future as explained in the Important Notice below.

Financing would be on the basis that Kraft Foods would maintain an investment-grade credit rating.

Kraft Foods believes that the strategic and financial rationale for the transaction is compelling. The transaction would create:

- a company with approximately USD 50 billion in revenues;

- a global powerhouse in snacks, confectionery and quick meals, with an exceptional portfolio of leading brands around the world;

- a geographically diversified combined business, with leading positions and significant scale in key developing markets including India, Mexico, Brazil, China and Russia;

- a strong presence in instant consumption channels in both developed and developing markets, expanding the reach and margin potential of the combined business;* and

- the potential for meaningful revenue synergies over time from investments in distribution, marketing and product development. In addition, there is a significant opportunity to realise pre-tax cost savings of at least USD 625 million annually. This is expected to be achieved through increased operational efficiencies over and above the current performance improvement programmes at Kraft Foods and Cadbury (including Cadbury's Vision Into Action ("VIA") programme). Kraft Foods expects that it will achieve the run-rate on these cost savings by the end of the third year following completion. Total one-off implementation cash costs of approximately USD 1.2 billion would be incurred in the first three years following completion.

Kraft Foods has a proven track record of successfully completing and integrating strategic combinations to build iconic brands and multi-national businesses, including the acquisitions of LU in 2007 and Nabisco in 2000.

In addition, Kraft Foods expects that the combination would enhance its growth and margin profile, and be accretive to earnings in the second year following completion on a cash basis (which excludes the one-time expenses related to the

transaction and the impact of non-cash items such as the amortisation of intangibles after acquisition). Should the combination with Cadbury be completed, Kraft Foods would expect to revise its long-term growth targets to 5+ per cent for revenue and 9-11 per cent for earnings per share, from 5+ its previously announced 4+ per cent and 7-9 per cent respectively.

(Emphasis added. Internal references omitted.)

34.     The September 7 press release went on to discuss further benefits of a business combination between Cadbury and Kraft.  Indeed, the September 7 press release acknowledged that the "proposed combination is about growth[,]" growth in which Cadbury's shareholders will participate by virtue of their continuing equity interests in Kraft, and of which Cadbury will be the direct beneficiary as a result of its integration into Kraft's global business network:

"This proposed combination is about growth. We are eager to build upon Cadbury's iconic brands and strong British heritage through increased investment and innovation. We have great respect and admiration for Cadbury, its employees, its leadership and its proud heritage. As we have done, Cadbury has built wonderful brands by focusing on quality, innovation and marketing, but we believe the next stage in Cadbury's development will be challenging, given the increased importance of scale in the industry. Cadbury's brands, which are highly complementary to our portfolio, would benefit from Kraft Foods' global scope and scale and array of proprietary technologies and processes.

"Our extensive combined global business network would create opportunities for talented Cadbury employees and managers across all areas of the combined enterprise. We would augment Kraft Foods' and Cadbury's world-class capabilities by employing a 'best of both' focus, from sales and marketing to distribution and manufacturing.

"Our current plans contemplate that the UK would be a net beneficiary in terms of jobs. For example, we believe we would be in a position to continue to operate the Somerdale facility, which is currently planned to be closed, and to invest in Bournville, thereby preserving UK manufacturing jobs.

"We have taken note of Cadbury's recent performance and the ongoing implementation of its VIA programme. We believe that Cadbury's share price already reflects its prospects as a standalone entity and the benefits of VIA.

Our proposal therefore not only takes into account these factors, but also provides a compelling premium and, we believe, significantly more value for Cadbury shareholders than Cadbury could create independently.

"We hope to engage with the Board of Cadbury on a constructive basis with the goal of consummating a recommended transaction."

35.     The very same day, and without any meaningful opportunity for the Board to consider the September 7 press release, Cadbury issued a statement again rejecting Kraft's proposal.  According to Cadbury's statement, "The Board of Cadbury reviewed the proposal with its advisers and rejected it. ...  The Board believes that the proposal fundamentally undervalues the Group and its prospects."  Cadbury's statement demonstrates the irrationality of the Individual Defendants' conduct.  Although the Board purportedly rejected the proposal because it undervalued the Company, the Individual Defendants refused to engage in value maximizing negotiations with Kraft.  By rejecting Kraft's proposal, the Individual Defendants have refused to negotiate with Kraft for a transaction that would benefit the Company, its shareholders, and all of its stakeholders.

36.     Also on September 7, 2009, Rosenfeld sent Carr a letter in response to Carr and Cadbury's flat out rejection of Kraft's proposed business combination.  This letter stated Kraft's disappointment with Cadbury's unequivocal rejection of Kraft's value-maximizing proposal and continued to implore Cadbury for an opportunity to open a constructive dialogue to discuss a possible strategic transaction between the two companies:

> Thank you for your letter in response to our discussion on 28 August and the letter I sent to you as a follow-up outlining our possible offer (a "Possible Offer") for Cadbury plc ("Cadbury").  I have given careful consideration to your response.
>
> Although *I am disappointed that you rejected unequivocally our proposal, I remain committed to working toward a recommended offer and to maintaining a constructive dialogue.  We are therefore disclosing publicly our Possible Offer as a means to encourage and further that process.*
>
> I continue to believe strongly in the strategic rationale for combining our two companies and that *our Possible Offer represents an attractive premium and a compelling value proposition for your shareholders.*

As I outlined during our meeting, I believe we can strengthen both of our companies by bringing them together, enhancing their worldwide scale and scope, and capitalising on significant opportunities, building on the position of Kraft Foods Inc. ("Kraft Foods") as a global powerhouse in snacks, confectionery and quick meals for the benefit of all of our respective stakeholders.

We understand the great sense of pride that you and your team have for Cadbury and its brands. We also have a long history of respecting and building iconic brands like Oreo, LU, Milka, Toblerone, Kenco, Philadelphia and Dairylea to name just a few. Kraft Foods is committed to building upon Cadbury's success and strong British heritage through increased investment and innovation.

Our extensive combined global business network would create opportunities for talented Cadbury employees and managers across all areas of the combined enterprise. We would augment Kraft Foods' and Cadbury's world-class capabilities by employing a "best of both" focus, from sales and marketing to distribution and manufacturing. For example, we believe we would be in a position to continue to operate the Somerdale facility, which is currently planned to be closed, and invest in Bournville, thereby preserving UK manufacturing jobs.

*I also want to reiterate that our Possible Offer represents a compelling value proposition for your shareholders. Given the proposed consideration mix of cash and shares, they would enjoy both value certainty and significant potential upside in the combined entity's attractive growth prospects and meaningful synergies.* As we discussed, and as I noted in my previous letter to you, we commend you on your successful ongoing implementation of Vision Into Action ("VIA"). I believe Cadbury's share price already reflects its prospects as a standalone entity and the benefits of VIA. Our Possible Offer therefore not only takes into account these factors, but also provides a significant premium and, I believe, significantly more value for your shareholders than Cadbury could create independently.

Together, we can draw on the collective strengths of our two organisations to create a stronger, more competitive global company for the benefit of all our stakeholders. *I would ask you to reconsider your rejection of our Possible Offer and would welcome a constructive dialogue.*

(Emphasis added.)

37.     Unfortunately for Cadbury and its shareholders, Kraft's repeated efforts to engage

in a constructive dialogue were again met with unequivocal rejection. On September 12, 2009,

Carr sent Rosenfeld a letter, a copy of which Cadbury adopted and issued to the market in a press

release entitled "Cadbury statement re Kraft Foods proposal." Although the letter purports to

protect Cadbury and its shareholders by rejecting Kraft's acquisition efforts, the text of the letter fundamentally contradicts Carr's purported intention.  While posturing that "the delivery of value to our shareholders remains at the top of our agenda," Carr continues to refuse to engage in meaningful negotiations with Kraft in order to possibly improve Kraft's purportedly "unattractive" offer.  Furthermore, while Carr accuses Kraft of being a "low growth[] conglomerate," Carr conveniently ignores that Cadbury's own stock price growth has been stagnant for five years and that the Company has sparingly paid dividends to its shareholders. Meanwhile, Kraft has routinely paid valuable quarterly dividends to its shareholders, thus further increasing the value of Kraft's common stock that would be exchanged in connection with a proposed transaction between the two companies.

38.     In the midst of the public battle between Kraft and Cadbury, Bloomberg.com reported on September 23, 2009 that defendant Stitzer was being foolish in his negotiation strategy.  According to Bloomberg, the deal with Kraft is "already there."  However, for some inexplicable reason, Stitzer is "trying to force a bid so high that Kraft shareholders will say no[.]" Furthermore, the article noted that Kraft would likely not play along with Stitzer's game as "no-one else is coming in," it wouldn't make any sense for Kraft to bid against itself.  Subsequently, on September 25, 2009, Cadbury issued a strongly worded press release entitled "Cadbury plc – Clarification Regarding Press Commentary," which stated that "Mr. Stitzer does not believe that Kraft's proposal makes strategic or financial sense for Cadbury and his comments should not be interpreted any other way."

**Kraft's Proposed Offer Is Highly Attractive to Cadbury's Shareholders**

39.     Despite defendant Stitzer's belief that Kraft's proposal makes no strategic or financial sense for Cadbury, Rosenfeld's September 7, 2009 letter to Carr expressly states that

Kraft's proposed offer to acquire Cadbury "represents a premium of: 42 per cent over Cadbury's share price of 524 pence on 3 July 2009, prior to recent analyst suggestions regarding potential sector consolidation, 34 per cent over Cadbury's 90-day average share price of 555 pence in the period up to 4 September 2009, the last business day preceding this announcement; and 31 per cent over Cadbury's closing share price of 568 pence on 4 September 2009," the last business day preceding the announcement." And Kraft is willing to improve upon this offer.

40.     Many investors and analysts alike believe that Kraft's offer provided substantial value to Cadbury and its shareholders, and that outright dismissal of Kraft's efforts is foolish. Most notably, Warren Buffet has publicly stated that Kraft's offer represents a "pretty full" price, a price that is enhanced further by what Buffet believes is Kraft's "undervalued stock" that will result in a more favorable exchange ratio for Cadbury's shareholders than if the market reflected Kraft's full value.

41.     Further demonstrating the "full" value offered by Kraft is that Stitzer, Carr, and the rest of the Individual Defendants have not been able to achieve the price reflected in Kraft's proposed offer in the prior calendar year.   Indeed, Kraft's 755 pence *opening negotiating position* is higher than any closing price of Cadbury stock over the past five years.   Yet the Individual Defendants have steadfastly maintained that the proposed offer from Kraft undervalues Cadbury as they continue to take home more than £11,000,000 in annual compensation.   In the face of their inability to achieve a comparable value for the Company's shares, the Individual Defendants' stance that Kraft's proposed offer undervalues Cadbury is preposterous, bested only by Individual Defendants' outright refusal to negotiate with Kraft for a higher price that Kraft has stated it will pay.   Kraft's willingness to negotiate necessitates that the Individual Defendants must fulfill their fiduciary duties to Cadbury and its shareholders by

engaging Kraft in meaningful dialogue in order to achieve a transaction that promotes the success of the Company. Should they continue to refuse to do this, the value of Cadbury's shares will again plummet to, if not below, the level they traded at prior to Kraft's offer emerging.

**Cadbury Undertakes Measures To Thwart Kraft's Proposed Offer**

42.     In order to further stonewall Kraft and further entrench themselves at Cadbury, Stitzer, Carr and the rest of the Individual Defendants, immediately after receiving Kraft's proposed offer, started taking measures that are designed to prevent Kraft from acquiring Cadbury .

43.     For example, on September 14, 2009, the U.K.'s *The Times* reported:

> *Cadbury will this week bolster its defenses against a £10.2 billion takeover offer from America's Kraft Foods as management prepares to urge shareholders on Wednesday to reject the deal.*
>
> In a robust letter published in full today, Roger Carr, chairman of the Dairy Milk-maker, tells Irene Rosenfeld, chairman and chief executive of Kraft, that the proposal is *"unappealing" and a threat to Cadbury's plan* of becoming the world's pre-eminent pure-play confectionery and chewing gum company.
>
> The letter has emerged days before Todd Stitzer, chief executive of Cadbury, will announce fresh details of Cadbury's takeover defense when he addresses investors at a Sanford C. Bernstein analyst conference in London on Wednesday.
>
> In the letter, Mr Carr said: "Under your proposal, Cadbury would be absorbed into Kraft's low-growth, conglomerate business model, an unappealing prospect which contrasts sharply with our strategy to be a pure-play confectionery company."
>
> "Your proposal fundamentally fails to reflect the current value of Cadbury as a standalone business, its growth prospects and the potential synergies of a combined entity."

(Emphasis added.)

44.     Similarly, on September 14, 2009, in an article entitled "Cadbury Lays Out Kraft Rejection," *The Wall Street Journal* reported:

Cadbury PLC said Kraft Foods Inc.'s roughly £10 billion ($16.7 billion) takeover bid "contrasts sharply" with its existing strategy.

Cadbury issued a terse statement rejecting the offer when it was unveiled a week ago. *Cadbury said then that the offer "fundamentally undervalues" the company,* indicating to some that price was its only objection.

But in a letter to Kraft chairman Irene Rosenfeld, Roger Carr, her counterpart at Cadbury, *suggested that a combination with Kraft isn't in Cadbury shareholders' best interests.*

(Emphasis added.)

45.    Thereafter, Cadbury requested assistance from The Panel on Takeovers and Mergers (the "Takeover Panel")[1] to thwart Kraft's proposed offer by putting a bid deadline on the Kraft offer.   Though it is unclear exactly when Cadbury sought the Takeover Panel's intervention, on September 21, 2009 the Takeover Panel notified Kraft of Cadbury's request.

46.    As *The Wall Street Journal* reported on September 23, 2009, "[Cadbury] has asked the U.K. Takeover Panel to give Kraft a deadline to put up a formal takeover offer or shut up for six months. But to do so only two weeks after Kraft Foods' informal offer became public has the whiff of panic."

47.    On September 30, 2009, the Takeover Panel issued a decision mandating that Kraft must, by November 9, 2009, "either announce a firm intention to make an offer for Cadbury under Rule 2.5 of the Code or announce that it does not intend to make an offer for Cadbury." Should Kraft now choose to walk away from the proposed business transaction with Cadbury, and determine that it does not now intend to make an offer for Cadbury, "Kraft Foods and any person(s) acting in concert with it will, except with the consent of the Panel Executive,

---

[1]     The Takeover Panel is an independent body, established in 1968, whose main functions are to issue and administer the City Code on Takeovers and Mergers (the "Code") and to supervise and regulate takeovers and other matters to which the Code applies. Its central objective is to ensure fair treatment for all shareholders in takeover bids.

226847 v1

be bound by the restrictions contained in Rule 2.8 of the Code for six months from the date of such announcement."

48.     Following the Takeover Panel's decision, on September 30, 2009, Cadbury again reiterated that it had no interest in negotiating with Kraft to obtain the highest price for its shareholders. Thus, with the Takeover Panel on their side, the Individual Defendants have positioned Cadbury to weather Kraft's acquisition efforts and preclude the Company and its shareholders from participating in a value maximizing transaction, thereby preserving for the Individual Defendants their valuable compensation packages as directors and officers of the Company.

**Kraft Revises it's Offer, Which is Rejected by Cadbury Mere Moments Later**

49.     As now forced by the Takeover Panel, on the morning of November 9, 2009, Kraft announced that it would take its offer directly to Cadbury's shareholders. As a result of Individual Defendants' refusal to negotiate with Kraft, Kraft formally offered 717 pence per Cadbury share in a hostile offer that values the Company at approximately £9.8 billion, or $16.46 billion. The decreased offer is attributable to a fall in Kraft's shares rather than a change in the terms of the offer. Still, Kraft's new offer still represents a 37% premium over Cadbury's close on July 3, 2009, but is clearly a marked decrease in the value that Cadbury's shareholders would have received had Cadbury's directors and officers fulfilled their fiduciary obligations to negotiate with Kraft in the first instance, rather than spurn Kraft's prior value-maximizing offer and willingness to negotiate. According to Kraft, the Offer is structured as follows: 300 pence in cash and 0.2589 new Kraft shares per each Cadbury share, and 1,200 pence in cash and 1.0356 new Kraft shares for each Cadbury ADS.

226847 v1

50.     Not surprisingly, within an hour of reports that Kraft had made its 717 pence per share Offer, the Individual Defendants rejected the offer as "derisory".  Cadbury's chairman Roger Carr said that "Kraft's offer does not come remotely close to reflecting the true value of our company ...."  Of course, had Carr and the other Individual Defendants been willing to negotiate with Kraft in the first instance, as Kraft had invited the Individual Defendants to do, Cadbury's shareholders could have received the "true value" of the Company that Mr. Carr purportedly seeks.

51.     In accordance with British law, Kraft's 717 pence per share offer obligated Kraft to formalize its offer to Cadbury's shareholders on or before December 7, 2009.

**Hershey And Others Mull Bids For Cadbury**

52.     On or about November 17, 2009, reports surfaced that Kraft was not the only horse in the Cadbury race.  According to *The Wall Street Journal*, U.S.-based Hershey and Ferrero S.p.A. ("Ferrero") of Italy were in preliminary talks to try to top Kraft's hostile $16 billion bid for Cadbury.

53.     According to a November 18, 2009 article by *The Wall Street Journal*, both Hershey and Ferrero were evaluating their options, but that Hershey was in talks with banks to line up billions of dollars of financing to pursue a bid on its own or with a partner, such as Ferrero.  In response to news reports of a possible bidding war for Cadbury, Cadbury stated that it would consider any takeover bid "that delivers full value for the company" but that it had not yet received such an offer.

54.     A potential transaction with Hershey would be appealing to Cadbury.  Not only is the culture of each company similar, Cadbury has previously sought a merger with Hershey, though such efforts were rebuffed by the Hershey Trust, the charitable organization that controls

Hershey.  In addition, Hershey holds the license to make and sell Cadbury chocolate brands in the United States.  News of a possible Hershey and/or Ferrero bid catapulted Cadbury's share price to nearly 800 pence, about 10% above Kraft's Offer price.

55.     Still, there are impediments to a potential bid by Hershey and/or Ferrero.  Both are closely-held companies the controlling shareholders of which risk losing outright control if stock is used as a major component of a bid.  In addition, both companies' balance sheet and capital structure likely require substantial external financing in order to fund a takeover proposal.  According to *The Wall Street Journal*, Kraft may not be shaking in its boots about the danger of a counterbid so long as Nestle S.A. ("Nestle") and Unilever N.V. ("Unilever"), two companies that could acquire Cadbury autonomously, stay out of the picture.

56.     Nestle did not stay out of the mix for long.  On Monday, November 23, 2009, Cadbury shares hit a record high on new reports that Hershey, Nestle, and Ferrero were all considering competing offers to that of Kraft.  Cadbury's shares reached record highs in intraday trading, climbing as high as 819.5 pence before closing at 815 pence.  According to a November 22, 2009 report by *Bloomberg.com*, Nestle is weighing options including a possible bid for Cadbury that would challenge Kraft's Offer and a potential move by Hershey.  According to Morningstar Inc. ("Morningstar") analyst Erin Swanson, it is not surprising that there are rival bidders for Cadbury "given the attractiveness of Cadbury's portfolio."

57.     On November 27, 2009, *The Wall Street Journal* reported that the Hershey Trust was in the process of seeking approval from the Pennsylvania government to pursue a $17 billion bid for Cadbury.  According to the report, Hershey has received indications from two banks, J.P. Morgan Chase and Bank of America Merrill Lynch, that at least $10 billion in cash could be raised to help finance a Hershey bid, with other financing available too.

226847 v1                                                 25

58. On December 10, 2009, *The Wall Street Journal* reported that Hershey is nearing a final decision on whether to bid on Cadbury. On December 14, 2009, Cadbury confirmed that it had received "indications of interest from a number of third parties."

**Kraft Seeks to Block Competitive Bids**

59. According to a November 24, 2009 report by *The Wall Street Journal*, Kraft has taken unusual measures to make competing bids for Cadbury much more difficult to formulate. Kraft has done this by extracting exclusivity agreements from the banks it is using to finance its bid, the effect of which is to leave competitors with few other banks to choose from.

60. According to Kraft's SEC filings and additional news reports, Kraft is being advised by Lazard Ltd. ("Lazard") and has secured a £5.5 billion bridge loan from a group of nine banks led by Citigroup Inc. ("Citigroup"), Deutsche Bank AG ("Deutsche"), and HSBC Holdings PLC ("HSBC"). Other banks contributing to the bridge loan include BNP Paribas SA, Barclays Capital, Royal Bank of Scotland Group PLC, Credit Suisse, Societe Generale SA, and Banco Bilbao Vizcaya Argentaria SA.

61. The aforementioned banks have signed exclusivity agreements that prevent them from jumping ship to finance any rival bidders, notes *The Wall Street Journal*, citing people familiar with the situation. These types of exclusivity agreements for financing banks – except those leading the debt package (i.e., Citigroup, Deutsche, and HSBC) are rare in M&A transactions because they tie up the financing banks and prevent them from working on competing bids.

**Kraft Puts Its Offer To Cadbury Shareholders**

62. On December 4, 2009, Kraft formally commenced its tender offer to acquire Cadbury stock from Cadbury's shareholders. The terms of the Offer did not change – Kraft's

Offer still contemplates that Kraft will pay 300 pence in cash and 0.2589 shares of Kraft Foods

Class A common stock in exchange for each outstanding Cadbury share.  The tender offer is set

to expire on January 5, 2010.

63.     According to a Form S-4 (the "Registration Statement") filed by Kraft with the

SEC on December 4, 2009, Cadbury has still refused to engage in negotiations with Kraft.

Indeed, the last communication that Kraft received from Cadbury was a letter on September 12,

2009 to Kraft's Chairwoman and CEO Rosenfeld from defendant Carr.

**Cadbury Continues to Reject Kraft's Offer and Refuses to Negotiate**

64.     On December 14, 2009, Cadbury issued a press release entitled "Cadbury Issues

Defence Document" pursuant to which Cadbury outlined its defense strategy to Kraft's Offer.

According to the press release, "the [Cadbury] Board unanimously rejects Kraft's wholly

inadequate offer as it substantially undervalues Cadbury and recommends shareholders reject the

Offer."

65.     In support of its rejection, Cadbury outlined certain improved financial

projections (the Profit Forecast) that purportedly demonstrate that the Offer is substandard.

According to Cadbury, it expects to achieve organic revenue growth of 5-7% per annum,

improved margins of 16-18% by 2013, 80-90% operating cash conversion from 2010, and

double digit growth in dividends per share from 2010 onwards.  According to defendant Carr:

> Cadbury is an exceptional business worth much more than the offer purt forward
> by kraft.  It is clear to all that Cadbury is a particularly attractive asset in the
> sector with iconic brands, a sharp category focus and an enviable geographic
> footprint.
>
> * * * * *
>
> We believe our shareholders should have the opportunity to reap the full rewards
> of the investment that has already been made in creating a platform for future
> improved revenue growth, enhanced profitability and high cash returns.  Cadbury
> will have delivered average revenue growth of 6% per annum and improved

margins by 350bps for the period 2007-09.  We are committed to the achievement of the higher Vision into Action targets and the creation fo significant value – benefits that should fully accrue to our shareholders.

* * * * *

Kraft is trying to buy Cadbury on the cheap to provide much needed growth to their unattractive low-growth conglomerate business model.  Don't let Kraft steal your company with its derisory offer.

66.    Despite defendant Carr's rosy projections and forceful rhetoric, Cadbury's new Profit Forecast, which it has purportedly been working on for months and would have been presenting next spring anyway, are aggressive.  In fact, at least one analyst believes that Cadbury has "gone all out" with its projections, and finds it "difficult to see how it could have been better."  Indeed, this analyst believes that Cadbury's investors "will say [the projections are] probably good enough to see off Kraft," thus raising questions about whether Cadbury's Profit Forecast is in fact achievable rather than an unsupportable ploy to ward off Kraft's advances.

67.    Although defendant Carr and Cadbury continue to assert that Kraft's Offer is "derisory," Cadbury's press releases and other public documents provide no indication that the Board has attempted to negotiate with Kraft to improve the value of the Offer beyond what is purportedly achievable through Cadbury's revised projections.

68.    Also on December 14, 2009, Cadbury filed with the SEC the Proxy in which the Company sets forth in greater detail its purported basis for the rejection of Kraft's Offer. However, the Proxy simply tacks on to Carr's statement a slew of optimistic and best-case-scenario forecasts rather than provide a concrete estimation of the impact of the Profit Forecast on the Company's value.  Indeed, the Proxy is completely void of reference to the net present value of Cadbury's shares taking into account the Company's revised Profit Forecast. Essentially, the Proxy amounts to colorful propaganda, disseminated by Cadbury's Board in an unsupported plea to shareholders to trust the Board because it knows what it's doing.

226847 v1

69.     But why should shareholders trust the Board?  The Board has already repeatedly abandoned its fiduciary duty to maximize shareholder value by failing to negotiate with Kraft. Rather than negotiate with Kraft for a value-maximizing deal that removes from the shoulders of Cadbury's shareholders the risk associated with the Profit Forecast, the Board has dug in its heels and proclaimed to shareholders that future success is ahead so long as the Company continues to excel under optimum conditions.  Why not present Cadbury's future business plans to Kraft and negotiate a higher price?  The Board has failed to provide an answer to this question.

70.     Further, Cadbury's shareholders cannot comfortably rely on the Company's new Profit Forecast without some explanation of how, in light of the current economy and expected difficulty in future recovery, the Company intends to execute its plan.  Indeed, Cadbury's Profit Forecast has been prepared based upon five highly conditional assumptions.  According to the Proxy, the Profit Forecast has been prepared on the assumption that:

    a.    There will be no material acquisitions or disposals of business during the financial year ending 31 December 2009 other than those already reported.

    b.    There will be no material change in current levels of demand in the Group's principal markets caused by significant changes in economic or other factors.

    c.    There will be no major disruptions to the business of the Group, its suppliers or customers due to natural disaster, terrorism, extreme weather conditions, industrial disruption, civil disturbance or government action.

    d.    There will be no change in legislation or regulatory requirements that will have a material impact on the Group's operations.

    e.    There will be no material change in the present management or control of the Group or its existing operational strategy.

71.     According to defendant Carr, "Cadbury may be the catalyst for growth that Kraft management so desperately crave.  We believe however that Kraft's ownership of Cadbury

226847 v1                                    29

would dilute the culture and damage the prospects of ever delivering the performance growth necessary to drive the share price improvements that Kraft shareholders have waited for – so patiently -- for so long." Yet these price improvements, by admission in the Proxy, are highly speculative and conditioned upon future performance. Furthermore, any price improvements presently realized by Cadbury's shareholders can be attributable to Kraft's Offer – but for a stretch in 2008, the Company's stock has by and large traded between £5 and £6 per share since the beginning of 2005. Certainly, shareholders have waited. But the price maximization for which they have been waiting could be accomplished through arm's-length negotiation as well as prospective business execution if only the Board would do so.

72. The Board also steadfastly refuses to discuss in the Proxy any details of its negotiations with potential third party bidders, despite the fact that "Cadbury has received indications of interest from third parties with respect to possible business combination transactions involving Cadbury … and has had discussions regarding such transactions." This position taken by the Board is untenable. While baselessly and repeatedly rebuffing Kraft because of Kraft's business structure (and not because of potential value that Kraft *could* provide following arm's-length negotiations), the Board has engaged in discussions with other preferred suitors. At least one of these potential suitors, Hershey, has long captivated the interest of the Board. Cadbury has on multiple occasions in the past attempted to engage in a business transaction with the U.S. confectioner, but to no avail. Rather than engage in an open bidding process in order to maximize value, the Board has engaged in a secretive and selective negotiation process that turns on its head the adage *a bird in the hand is worth two in the bush*.

**Cadbury's Proxy is Misleading**

73.     Although the Proxy was presumably intended to inform shareholders of why they should reject Kraft's Offer, the Proxy raises more questions than it answers as it is littered with omissions and/or misstatements of fact that render the Proxy materially misleading.  As stated on page 1 of Appendix 1 to Exhibit 99.1 of the Proxy, "The Directors accept responsibility for the information contained in this document[.]"     Among these material omissions and/or misstatements are the following:

a.      On page 1 of Exhibit 99.1.A.1 of the Proxy, Cadbury states that "Kraft's offer completely misses the value we have already created for Cadbury."  However, the Proxy does not disclose the "value" that has been created for Cadbury and its shareholders.  Indeed, as discussed herein, Cadbury has refused to disclose a price at which it believes a takeover should take place.  The Proxy also fails to disclose the net present value of the Profit Forecast.

b.      On page 2 of Exhibit 99.1.A.1 of the Proxy, Cadbury states that "Kraft is only offering 11.6x Cadbury's 2009 forecast EBITDA. This is a very significant discount compared to the multiples of comparable transactions in the sector."  Cadbury has not disclosed its pre-transaction EBITDA multiple or the pre-transaction EBITDA multiples for the "comparable transactions" listed on page 10 of Exhibit 99.1 of the Proxy.

c.      On page 2 of Exhibit 99.1.A.1 of the Proxy, Cadbury states that Kraft's share price has "significantly underperformed versus its peer group over the lat eight years."  However, Cadbury has not defined Kraft's "peer group", nor has Cadbury disclosed Kraft's actual performance versus this "peer group".

d.      On page 3 of Exhibit 99.1.A.1 of the Proxy, Cadbury states that the Board, "which has been so advised by Goldman Sachs International, Morgan Stanley & Co. Limited and UBS Investment Bank ("the Advisers"), believes that Kraft's offer substantially undervalues Cadbury."  However, Cadbury has not disclosed the basis upon which the Advisers have reached this belief, including any fairness opinion(s) or equivalent materials.

e.      On page 1 of Appendix 1 to Exhibit 99.1.A.1 of the Proxy, Cadbury maintains that the Board "had given Kraft's proposal careful consideration" in late-August and early-September 2009.

However, the Proxy fails to disclose what the Board did to consider Kraft's Offer. Furthermore, the Proxy omits that this "careful consideration" took place over the course of only three days.

f.   On page 2 of Appendix 1 to Exhibit 99.1.A.1 of the Proxy, Cadbury fails to disclose any information concerning what, if anything, the Board did in connection with the Offer between September 24, 2009 and November 9, 2009.

g.   On at least page 2 of Appendix 1 to Exhibit 99.1.A.1 of the Proxy, Cadbury alleges that Kraft has a "low growth conglomerate business model" yet Cadbury fails to disclose its basis for this assertion.

h.   On page 14 of Appendix 1 to Exhibit 99.1.A.1 of the Proxy, Cadbury states "The Board notes the strategic importance to Kraft of seeking to acquire Cadbury. However, there is insufficient information in the Offer Documents about Kraft's plans in relation to Cadbury to comment further." However, Cadbury has not disclosed whether it sought to independently assess Kraft's plans in relation to Cadbury, nor has it disclosed the circumstances of such efforts or the reason(s) for not taking such efforts.

i.   On page 14 of Appendix 1 to Exhibit 99.1.A.1 of the Proxy, Cadbury states "Cadbury has received indications of interest from third parties with respect to possible business combination transactions involving Cadbury since Kraft's initial announcement of its intention to make an offer to acquire Cadbury and has had discussions regarding such transactions." The Board has not disclosed the identity of these third parties or the extent of discussions with third parties, nor has the Board disclosed why it engaged in discussions with third parties and not Kraft.

**Kraft Responds to Cadbury's Continued Rejection**

74.   On December 15, 2009, Kraft issued a press release in response to Cadbury's Proxy and rejection of Kraft's Offer. In Kraft's press release, it noted the high uncertainty of Cadbury's Profit Forecast, stressing that Cadbury shareholders still have not been told the answer to the following four questions:

a.   How will Cadbury deliver its new revenue growth targets?

226847 v1                                    32

b.      How will Cadbury deliver its margin targets without further spending on restructuring?

c.      Are Cadbury's margin goals achievable?

d.      What is Cadbury's underlying cash flow?

Of course, Cadbury has not answered these (and other) questions. The full text of Kraft's response is as follows:

> NORTHFIELD, Ill., Dec 15, 2009 /PRNewswire-FirstCall via COMTEX/ -- Kraft Foods has considered Cadbury's formal response to its offer to acquire all of the issued and to be issued share capital of Cadbury (the "Offer").
>
> Cadbury Shareholders are being asked to choose between having the value certainty and upside potential of the Offer versus taking the risk of continuing to own Cadbury Shares in the absence of any offer.
>
> *Certainty and upside potential of the Offer*
>
> As outlined in Kraft Foods' offer documentation:
>
> - the Offer represents a substantial premium to the unaffected share price of Cadbury;
>
> - Kraft Foods believes that Cadbury and Kraft Foods represent a uniquely complementary fit;
>
> - Kraft Foods believes that a combination with Cadbury will provide the potential for meaningful revenue synergies and significant cost savings, delivering substantially more value than Cadbury could achieve on its own;
>
> - Kraft Foods believes that its current trading and prospects are strong; however, since the announcement of its possible offer for Cadbury on 7 September 2009, Kraft Foods believes its share price performance has been adversely affected by a number of deal-related factors of a short-term nature, which are expected to dissipate once there is clarity over the outcome of Kraft Foods' Offer.
>
> *Risks of continuing to own Cadbury Shares*
>
> In contrast with the value certainty and upside potential provided by the Offer, Cadbury is asking its shareholders to put their faith in possible future value creation based on a set of long-term targets, never before achieved by Cadbury and subject to significant risk and uncertainty. Furthermore, Kraft Foods notes

that Cadbury has chosen to concentrate on long term targets, with very little information on its prospects for 2010.

In this context, Cadbury Shareholders might wish to ask Cadbury the following questions, which are not addressed in Cadbury's defence document (the "*Defence Document*"):

1. How will Cadbury deliver its new revenue growth targets?

What are the specific volume and price / mix assumptions underlying Cadbury's growth targets? Specifically, in a relatively low inflation environment, what are Cadbury's assumptions regarding price increases, given that Cadbury's revenue growth in the first three quarters of 2009 was price / mix driven? In addition, to the extent that revenue growth in developed markets requires underlying volume growth, how does Cadbury reconcile this requirement with its lack of volume growth to date in 2009? And what is Cadbury's expectation for volume growth in developed markets in 2010?

2. How will Cadbury deliver its margin targets without further spending on restructuring?

Cadbury has spent in excess of 1 billion pounds Sterling in "one off" costs during nearly seven years of its Fuel for Growth and Vision into Action restructuring programmes. And, it plans to keep spending until 2011. Cadbury has previously exceeded its restructuring cost targets. Kraft Foods notes that, by Cadbury's own admission, Cadbury has yet to deliver 55% of its expected annual savings from the Vision into Action programme even though it has incurred 80% of its targeted costs. How can Cadbury deliver its revised margin targets with only a 25-50 basis point increase in business improvement costs?

3. Are Cadbury's margin goals achievable?

Key input costs, such as cocoa, are expected to remain high. Why hasn't Cadbury provided guidance for expected input costs into 2010? Also, given its stated confidence in its long term margin targets, why has Cadbury not forecast its much more relevant and nearer term 2010 earnings?

4. What is Cadbury's underlying cash flow?

After excluding cash flow from discontinued operations and disposal proceeds, Cadbury has generated limited free cash flow since 2006. How much free cash flow (excluding discontinued operations and disposal proceeds) will Cadbury generate in 2009? How much free cash flow does Cadbury expect in 2010?

Commenting on Cadbury's Defence Document, the Chairman and CEO of Kraft Foods, Irene B. Rosenfeld, said:

"We have heard nothing from Cadbury that surprises us. Cadbury's Defence Document only reinforces our belief that there is a compelling strategic and financial rationale to combining these two companies and that doing so would be in the best interest of both companies' shareholders. Having said that, Kraft Foods will continue to maintain a disciplined approach with respect to the acquisition of Cadbury in line with the criteria outlined in our offer documentation."

*US Competition Clearance*

Kraft Foods is pleased to announce that the applicable waiting period under the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended) has now expired. Accordingly, the US competition condition to the Offer is now satisfied.

## CLASS ACTION ALLEGATIONS

75.   Plaintiff brings Counts I and II below individually and as a class action on behalf of all holders of Cadbury stock (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants.

76.   Counts I and II below are properly maintainable as a class action.

77.   The Class is so numerous that joinder of all members is impracticable.  According to Kraft's tender offer documents, there are approximately 1,413,616,467 Cadbury shares issued and outstanding, inclusive of shares subject to issuance pursuant to Cadbury stock options.

78.   There are questions of law and fact which are common to the Class including, *inter alia*, the following:

a.   whether Plaintiff and the other members of the Class would be irreparably damaged by defendants' defensive measures as complained of herein;

b.   whether defendants have breached their fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class;

c.   whether the Proxy contains material misstatements or omissions of fact; and

d.   whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by defendants.

226847 v1                                       35

79.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

80.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

81.     Individual Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

82.     Plaintiff brings Count IIII below derivatively to address injuries suffered by Cadbury as a result of the Individual Defendants' breaches of fiduciary duties.

83.     Demand on the Cadbury Board to pursue Count III below is excused because each member of the Board participated in the wrongs alleged herein and acted in a manner that promoted their personal interests over the interests of the Company and its shareholders.

84.     As set forth above, the Individual Defendants have lucrative economic interests that would be harmed by a takeover of Cadbury.  These directors could not be expected to

objectively and independently consider Kraft's proposed offer, or otherwise serve the interests of Cadbury in responding to Kraft's proposed offer.

85.    Indeed, the Individual Defendants have already demonstrated their inability to act in the best interests of the Company by, *inter alia*, repeatedly refusing to fulfill their fiduciary obligations and negotiate with Kraft.  Such conduct demonstrates that the Individual Defendants cannot and will not act in the best interests of the Company by considering a demand to pursue this litigation on behalf of Cadbury.

## COUNT I

### Individual and Class Claim for Breach of Fiduciary Duty of Care, Loyalty, and Good Faith Against the Individual Defendants

86.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

87.    Plaintiff brings this Count on behalf of herself and the Class as a direct claim.

88.    The Individual Defendants, as directors of Cadbury, owe Plaintiff and the Class the utmost fiduciary duties of care, undivided loyalty, and good faith.  These duties required the Individual Defendants to consider offers to acquire Cadbury rather than to simply reject such offers.

89.    The Individual Defendants breached their fiduciary duties by favoring their own interests over those of Cadbury and its shareholders, by seeking to perpetuate their own lucrative executive and director positions at the direct expense of Cadbury and its shareholders.  The Individual Defendants are engaging in defensive and entrenchment tactics, and are not acting in good faith in representing Plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to Plaintiff and the Class.

226847 v1

90.     The Individual Defendants are obligated to consider and respond in good faith to Kraft's proposal to acquire Cadbury, and to treat all potential bidders equally in the negotiation process.   Rather than negotiate with Kraft to maximize shareholder value, the Individual Defendants baselessly rejected Kraft's Offer, and refused to negotiate while holding discussions with other potential bidders.

91.     As a result of the Individual Defendants' breaches of fiduciary duties discussed herein, including the obligations of loyalty, good faith, fair dealing, and due care, the Class has been and will continue to be harmed by being denied the opportunity to benefit from an acquisition of Cadbury by Kraft at a significant premium.   The Individual Defendants' conduct has served only to benefit themselves at the expense of Cadbury and its shareholders.

92.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Derivative Claim for Breach of Fiduciary Duty Against the Individual Defendants

93.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

94.     Plaintiff brings this Count on behalf of Cadbury as a derivative claim.

95.     The Individual Defendants, by reason of their positions as fiduciaries of the Company, owe the duties of loyalty, good faith, fair dealing, and due care.   Each of the Individual Defendants has a fiduciary duty to refrain from unduly benefiting themselves at the expense of Cadbury.

96.     The Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, fair dealing, and due care owed to Cadbury.

97.     The conduct of the Individual Defendants as alleged herein was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves as the expense of Cadbury and its shareholders.

98.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained, and will sustain, substantial harm.  The Individual Defendants are liable to Cadbury as a result of the acts alleged herein.

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class and against defendants as follows:

1)   Declaring that Count I is properly maintainable as a class claim;

2)   Declaring that Count II is properly maintainable as a derivative claim;

3)   Finding the Individual Defendants liable for breaching their fiduciary duties, including the fiduciary duties of loyalty, good faith, fair dealing, and due care by, *inter alia*, refusing to consider and respond in good faith to Kraft's offers to acquire Cadbury;

4)   Preliminarily and permanently enjoining the Individual Defendants from placing their own interests ahead of those of Cadbury and the Class by refusing to consider and respond in good faith to Kraft's pending offer that would maximize value to Cadbury shareholders;

5)   Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

6)      Granting such other and further relief as this Court may deem just and

proper.

Date: December 22, 2009              **LITE DEPALMA GREENBERG & RIVAS, LLC**

By:           */s/ Joseph J. DePalma*
              Joseph J. DePalma
              Bruce D. Greenberg
              Katrina Carroll
              Two Gateway Center, 12th Floor
              Newark, New Jersey
              Tel: (973) 623-3000

              **BARROWAY TOPAZ KESSLER ELTZER &
              CHECK, LLP**
              Lee D. Rudy
              Michael Wagner
              James Miller
              280 King of Prussia Road
              Radnor, Pennsylvania  19087
              Tel: (610) 667-7706

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by her attorneys, hereby certifies that the matter in controversy is related to

*Steward International Enhanced Index Fund v. Carr*, Civil Action No. 09-cv-5006 (D.N.J.).

Plaintiff is not currently aware of any other party that should be joined in this action.


Dated: December 23, 2009          **LITE DEPALMA GREENBERG & RIVAS, LLC**


By:    /s/ Joseph J. DePalma
       Joseph J. DePalma
       Katrina Carroll
       Two Gateway Center, 12th Floor
       Newark, New Jersey   07102
       (973) 623-3000

**EXHIBIT 2**



**COUGHLIN
STOIA
GELLER
& RUDMAN
ROBBINS** LLP

SAN DIEGO • SAN FRANCISCO
NEW YORK • BOCA RATON
WASHINGTON, DC • ATLANTA
LOS ANGELES • PHILADELPHIA

Mark Solomon
MSolomon@csgrr.com

December 29, 2009

<u>VIA OVERNIGHT DELIVERY</u>

Alan S. Goudiss
Brian G. Burke
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Re:    *Steward International Enhanced Index Fund v. Carr, et al.,*
       *Civil Action No. 09-5006 (D.N.J.)*

Dear Alan and Brian:

As you are aware, we represent the plaintiff in the matter referenced above. We have reviewed the Tender Offer documents filed with the Securities and Exchange Commission by Kraft, as well as the responses to those documents by Cadbury. We are concerned that the Recommendation Statement on Schedule 14d-9 (the "14d-9") that Cadbury has disseminated to its shareholders in response to Kraft's Tender Offer, as currently constituted, fails to provide Cadbury shareholders with all the material information necessary to determine whether to tender their shares to Kraft.

Specifically, the 14d-9 fails to disclose, among other things, Cadbury's projections out to 2013 even though it does disclose certain assumptions underlying the projections, demonstrating that those projections exist. We note that the failure to disclose the actual projections deprives Cadbury shareholders of the information necessary to assess the likelihood that Cadbury will meet cash flow targets, especially given the wide bands around revenue growth, trading margin, operating cash conversion, ROIC improvement and dividend growth set forth in the 14d-9. Additionally, failure to disclose the projections prevents shareholders from assessing the extent to which the Value in Action plan has already been incorporated into the operating plan and thus already factored into Cadbury's share price, and also whether Cadbury intends to meet cash flow targets through cost savings or price increases in light of the recent rise in cocoa prices.

In addition to Cadbury's financial projections, which are critical for shareholders to understand Cadbury's intrinsic value, the 14d-9 also fails to disclose: (i) the analyses conducted by Cadbury or its advisors with respect to synergies in a potential merger with Kraft, although Kraft has projected $625 million in annual cost synergies; (ii) whether Goldman Sachs or UBS



Alan S. Goudiss
Brian G. Burke
December 29, 2009
Page 2

have had a "recent advisory relationship" with Kraft; (iii) the amount of advisory fees that are being paid to Goldman Sachs and/or UBS, and the portion of those fees which equate to "success fee" payable if Kraft's Tender Offer is rejected by Cadbury shareholders; and (iv) the discussions Cadbury and/or its Board of Directors have had with other potential acquirers of Cadbury, including Hershey, Ferrero and Nestle, even though the publicly available information makes clear that those communications in fact exist.

We request that defendants disclose the material information, in a form acceptable to plaintiff, no less than 10 days before the pending closing of Kraft's Tender Offer, so that Cadbury's shareholders will be in a position to determine whether to tender their shares to Kraft. We request that defendants refrain from making any further statements to shareholders in connection with Kraft's Tender Offer until this material information is disclosed.

Moreover, we request that defendants produce, within three days, the categories of documents set forth below to facilitate plaintiff's continuing investigation of defendants' conduct in connection with Kraft's Tender Offer. We note that, when we agreed to extend defendants' date to respond to plaintiff's complaint, we expressly reserved the right to seek document discovery on an expedited basis (and the intervention of the Court) if necessary to ensure that the rights of Cadbury's shareholders are adequately protected before Kraft's Tender Offer closes.

1.    Cadbury Board meeting minutes with attachments and materials reviewed at the meetings, insofar as the materials relate to the Tender Offer, employment agreements, stockholder agreements, voting agreements, stock options, strategic alternatives or the potential acquisition of or business combination with Kraft, Nestle, Ferrero, Hershey or any other possible acquirer of Cadbury;

2.    All materials given to or received from the Company's financial advisors, Goldman Sachs International, Morgan Stanley & Co., and UBS Limited, relating to the Tender Offer or the potential acquisition of or business combination with Kraft, Nestle, Ferrero, Hershey or any other possible acquirer of Cadbury, including, but not limited to projections of the Company's future financial performance and valuation of the Company's assets;

3.    All materials given to or received from the Panel on Takeovers and Mergers relating to the Tender Offer or the potential acquisition of or business combination with Kraft, Nestle, Ferrero, Hershey or any other possible acquirer of Cadbury;

4.    Computer printouts summarizing to date the Cadbury executives' and directors' option holdings, options exercised, options vested and unvested, option grant dates, option vesting schedules, and option prices;



Alan S. Goudiss
Brian G. Burke
December 29, 2009
Page 3

5.      Monthly and quarterly executive and/or director packages or any other document containing Cadbury's historical and projected operations and financial performance, and valuation of the Company's assets;

6.      All communications between defendants, Goldman Sachs International, Morgan Stanley & Co., and UBS Limited, Kraft, Nestle, Ferrero, Hershey and/or any other entity expressing interest in acquiring Cadbury, and all communications to or from defendants concerning any potential acquisition of or business combination with Cadbury, or any other entity, any voting agreements, and/or any employment agreements; and

7.      All communications between defendants and the Panel on Takeovers and Mergers relating to the Tender Offer or the potential acquisition of or business combination with Kraft, Nestle, Ferrero, Hershey or any other possible acquirer of Cadbury.

To expedite this matter, we are willing to enter in to a confidentiality order in the form and substance of that set forth in Appendix S to the Local Civil Rules of the United States District Court of the District of New Jersey.

Please let us know no later than close of business on Thursday, December 31, 2009 whether you intend to comply with the requests set forth above. Please be advised that we will seek the intervention of the Court as necessary to ensure that the interests of shareholders are adequately protected in connection with this matter.

Sincerely,

MARK SOLOMON

MS:mmh
cc:    Peter S. Pearlman
       David Wissbroecker

**EXHIBIT 3**

# SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK, NY | 10022-6069

WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

agoudiss@shearman.com                                                December 31, 2009
212-848-4906

VIA E-MAIL

Mark Solomon
Coughlin Stoia Geller Rudman & Robins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Re: *Steward International Enhanced Index Fund v. Carr, et al.*, No. 09-5006 (D.N.J.)

Dear Mark:

We write in response to your letter of December 29, 2009 requesting that defendants make
certain disclosures and produce various documents in connection with Kraft Foods, Inc.'s
takeover offer of Cadbury plc. For the reasons set forth in our December 28 letter to Judge
Cavanaugh, we believe that plaintiff's requests are unwarranted and premature at this stage in the
litigation. We also note that a number of the items requested in your letter are strictly regulated
under the U.K. takeover code, and we expressly reserve all rights and defenses with respect
thereto.

As you are aware, Judge Cavanaugh has scheduled a conference for January 4, 2010, at which
we anticipate that this issue, among others, will be addressed in more detail.

Very truly yours,

Alan S. Goudiss

cc:    Peter S. Pearlman
       David Wissbroecker

ABU DHABI | BEIJING | BRUSSELS | DÜSSELDORF | FRANKFURT | HONG KONG | LONDON | MANNHEIM | MENLO PARK
MUNICH | NEW YORK | PARIS | ROME | SAN FRANCISCO | SÃO PAULO | SINGAPORE | TOKYO | TORONTO | WASHINGTON, DC

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORGANIZED IN THE UNITED STATES UNDER THE LAWS OF THE STATE OF DELAWARE, WHICH LAWS LIMIT THE PERSONAL LIABILITY OF PARTNERS.

NYDOCS04/516071.1

**EXHIBIT 4**

**COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP**
Peter S. Pearlman
Jeffrey W. Herrmann
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

**COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP**
Darren J. Robbins
Mark Solomon
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

**LITE DEPALMA GREENBERG
  & RIVAS, LLC**
Joseph J. DePalma
Bruce D. Greenberg
Katrina Carroll
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Lee D. Rudy
Michael Wagner
James H. Miller
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUSAN DOUGHERTY, on Behalf of Herself and All Others Similarly Situated, and Derivatively on Behalf of Nominal Defendant CADBURY PLC, | CIVIL ACTION NO. 09-6406 (DMC) |
| Plaintiff, | ████████ ORDER CONSOLIDATING RELATED ACTIONS AND APPOINTING CO-INTERIM CLASS COUNSEL AND CO-LEAD DERIVATIVE COUNSEL AND LIAISON COUNSEL |
| v. | |
| ROGER CARR, TODD STITZER, ANDREW BONFIELD, WOLFGANG BERNDT, GUY ELLIOT, LORD PATTEN, RAYMOND VIAULT, BARONESS HOGG, and COLIN DAY, | |
| Defendants, | |
| and | |
| CADBURY PLC, | |
| Nominal Defendant | |

| | | |
|---|---|---|
| STEWARD INTERNATIONAL ENHANCED INDEX FUND, Derivatively On Behalf of Cadbury PLC, | : : : | CIVIL ACTION |
| | : : | NO. 09-5006 (DMC) |
| Plaintiff, | : : | |
| vs. | : : | |
| ROGER CARR, TODD STITZER, ANDREW R.J. BONFIELD, WOLFGANG BERNDT, GUY ELLIOT, RAYMOND VIAULT, COLIN R. DAY, BARONESS SARAH ELIZABETH MARY HOGG and LORD CHRISTOPHER FRANCIS PATTEN, | : : : : : : : | |
| Defendants, | : : | |
| -and- | : : | |
| CADBURY PLC, An English Corporation, | : :: | |
| Nominal Defendant. | | |

Plaintiffs Susan Dougherty and Steward International Enhanced Index Fund (jointly, "Plaintiffs").  "Individual Defendants" Roger Carr, Todd Stitzer, Andrew R.J. Bonfield, Wolfgang Berndt, Guy Elliot, Raymond Viault, Colin R. Day, Barroness Sarah Elizabeth Mary Hogg, and Lord Christopher Francis Patten, and "Nominal Defendant" Cadbury PLC (together with the Individual Defendants, "Defendants"), through their undersigned counsel, hereby jointly move and agree as follows:

1.      The above-captioned shareholder class and derivative actions against certain officers and directors of Cadbury PLC ("Cadbury") involve the same subject matter, defendants, and common questions of law and fact.  Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, where actions such as these involve "a common question or law or fact," this Court may "consolidate the actions" and "issue any other orders to avoid unnecessary cost or delay."

2.      In an effort to assure consistent rulings and decisions and the avoidance of unnecessary duplication of effort, the undersigned counsel for Plaintiffs enter into this Joint Motion.  The counsel are: (a) Coughlin Stoia Geller Rudman & Robbins LLP, counsel for

2

plaintiff Steward International Enhanced Index Fund and Proposed Co-Interim Class Counsel

and Co-Lead Derivative Counsel, (b) Barroway Topaz Kessler Meltzer & Check, LLP,

counsel for plaintiff Susan Dougherty and Proposed Co-Interim Class Counsel and Co-Lead

Derivative Counsel, and (c) Cohn Lifland Pearlman Herrmann & Knopf LLP, counsel for

plaintiff Steward International Enhanced Index Fund and Proposed Liaison Counsel.

    3.    Plaintiffs agree that the following actions are related actions that in the interests of

justice and efficiency should be consolidated for all purposes, including pre-trial proceedings and

trial:

| Abbreviated Case Name | Case Number | Date Filed |
| --- | --- | --- |
| *Steward International Enhanced Index Fund v. Carr, et al.* | 09-5006 (DMC) | September 30, 2009 |
| *Dougherty v. Carr, et al.* | 09-6406 (DMC) | December 23, 2009 |

    4.    Plaintiffs agree that every pleading filed in these consolidated actions, or in any

separate action included herein, must bear the following caption:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| In re Cadbury PLC Shareholder Litigation | Case No. 09-5006 (DMC) |
| --- | --- |

    5.    When a pleading or other court paper filed in the Consolidated Action is

intended to apply to all actions therein, the words "ALL ACTIONS" shall appear

immediately after the words "THIS DOCUMENT RELATES TO:" in the caption set out

above.  When a pleading or other court paper is intended to be applicable only to one, or

some, but not all of such actions, the party filing the document shall indicate the action(s) to

which the document is intended to be applicable by last name of the named plaintiff(s) and

the docket number(s).

6. Plaintiff Susan Dougherty's Amended Verified Shareholder Class Action and Derivative Complaint ("Complaint") shall be the operative complaint in the Consolidated Action. ~~Upon receipt of the appropriate notice and request from Plaintiffs' Liaison Counsel, Defendants' counsel agrees to waive service on behalf of all Defendants in accord with Fed. R. Civ. P. 4(d).~~

7. The parties agree that Plaintiff's Co-Interim Class Counsel and Co-Lead Derivative Counsel shall be Coughlin Stoia Geller Rudman & Robbins LLP and Barroway Topaz Kessler Meltzer & Check, LLP.

8. Co-Interim Class Counsel and Co-Lead Derivative Counsel shall have the authority to speak for plaintiffs in matters regarding pretrial and trial procedure and in settlement negotiations, and shall make all work assignments in such a manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.

9. Co-Interim Class Counsel and Co-Lead Derivative Counsel shall be responsible for coordination of all activities and appearances on behalf of plaintiffs. No motion, request for discovery, or other pretrial proceeding shall be initiated or filed by plaintiffs except through Co-Interim Class Counsel and Co-Lead Derivative Counsel.

10. Defendants' counsel may rely upon all agreements made with Co-Interim Class Counsel and Co-Lead Derivative Counsel, or other duly authorized representatives of plaintiffs. Such agreements shall be binding on plaintiffs.

11. The parties agree that Liaison Counsel for Plaintiffs shall be Cohn Lifland Pearlman Herrmann & Knopf LLP.

12. Liaison Counsel shall be available and responsible for communications to and from this Court. Liaison Counsel shall also be responsible for the creation and maintenance of a master service list of all parties and their respective counsel.

13.   Plaintiffs agree that this Order shall apply to each shareholder class or derivative action, arising out of the same or substantially the same transactions or events as these cases, which is subsequently filed in, assigned, remanded, removed, or transferred to this Court.

IT IS SO STIPULATED, this 5th day of January, 2010 by:

**LITE DEPALMA GREENBERG & RIVAS, LLC**

Joseph J. DePalma
Bruce D. Greenberg
Katrina Carroll
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Tel: (973) 623-3000

Counsel for Plaintiff Susan Dougherty

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF, LLP**

_s/ Peter S. Pearlman_
Peter S. Pearlman
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Tel: (201) 845-9600

Counsel for Plaintiff Steward International Enhanced Index Fund and Proposed Liaison Counsel

**LOWENSTEIN SANDLER PC**
Douglas Eakeley
65 Livingston Avenue
Roseland, New Jersey 07068
Tele: (973) 597-2348
Fax: (973) 597-2349

Douglas Eakeley

Counsel for Defendants

**SO ORDERED.**

Dated: _____, 2010

THE HONORABLE DENNIS M. CAVANAUGH
UNITED STATES DISTRICT JUDGE

5

**EXHIBIT 5**

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3

4     SUSAN DOUGHERTY, On Behalf of      :    Civil No.
      Herself and All Others Similarly        09-6406-DMC
5     Situated, and Derivatively on     :
      Behalf of Nominal Defendant            TRANSCRIPT OF
6     CADBURY PLC,                       :     PROCEEDINGS

7                    Plaintiff,          :

8                    v.                  :

9     ROGER CARR, TODD STITZER,          :
      ANDREW BONFIELD, WOLFGANG BERNDT,
10    GUY ELLIOT, LORD PATTEN,           :
      RAYMOND VIAULT, BARONESS HOGG,
11    and COLIN DAY,                     :

12                   Defendants,         :

13    and                               :

14    CADBURY PLC,                       :

15                   Nominal Defendant :
      -----------------------------------x

16
                                    Newark, New Jersey
17                                  January 5, 2010

18    BEFORE:

19         THE HON. DENNIS M. CAVANAUGH, U.S.D.J.

20                              Reported by
                                CHARLES P. McGUIRE, C.S.R.
21                              Official Court Reporter

22         Pursuant to Section 753, Title 28, United States
           Code, the following transcript is certified to be
23         an accurate record as taken stenographically in
           the above entitled proceedings.

24

25                              s/CHARLES P. McGUIRE, C.S.R.


                   CHARLES P. McGUIRE, C.S.R.

1    APPEARANCES:

2

         LITE DePALMA GREENBERG & RIVAS, LLC
3        Two Gateway Center, 12th floor
         Newark, New Jersey 07102
4        BY: JOSEPH J. DePALMA, ESQ.
         And
5        COHN LIFLAND PEARLMAN HERMANN & KNOPF LLP
         Park 80 Plaza West-One
6        Saddle Brook, New Jersey 07663
         BY: JEFFREY W. HERMANN, ESQ.
7        And
         BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
8        280 King of Prussia Road
         Radnor, Pennsylvania 19087
9        BY: LEE D. RUDY, ESQ., and
             JAMES H. MILLER, ESQ.
10       And
         COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
11       655 West Broadway, Suite 1900
         San Diego, CA 92101
12       BY: MARK SOLOMON, ESQ.
         Attorneys for Plaintiffs
13
         LOWENSTEIN SANDLER PC
14       65 Livingston Avenue
         Roseland, New Jersey 07068
15       BY: DOUGLAS S. EAKELEY, ESQ., and
             JASON E. HALPER, ESQ.
16       And
         SHEARMAN & STERLING LLP
17       599 Lexington Avenue
         New York, New York 10022-6069
18       BY: ALAN S. GOUDISS, ESQ., and
             BRIAN G. BURKE, ESQ.
19       Attorneys for Defendants

20

21

22

23

24

25


                    CHARLES P. McGUIRE, C.S.R.

1          THE COURT CLERK:  All rise.

2          THE COURT:  Be seated.

3          Good morning.

4          This is Dougherty v. Carr, Civil Number 09-6406.

5          Counsel, can we get your appearances?

6          MR. DePALMA:  Good morning, Your Honor, and happy

7    new year.

8          Joseph DePalma of Lite DePalma Greenberg & Rivas

9    for the Dougherty Plaintiff.

10         With me today from the Barroway Topaz firm in

11   Pennsylvania are Lee Rudy and Jamie Miller.

12         MR. MILLER:  Good morning, Your Honor.

13         THE COURT:  Good morning.

14         MR. DePALMA:  And, Your Honor, there is a pending

15   pro hac application.

16         THE COURT:  If it has not already been signed, I

17   saw it; I think it came in over Judge Falk's signature.  But

18   I'll allow counsel.

19         MR. DePALMA:  Thank you, Your Honor.

20         MR. HERMANN:  Good morning, Your Honor, and happy

21   new year.

22         Jeffrey W. Hermann from Cohn Lifland Pearlman

23   Hermann & Knopf for Plaintifs, and with me is Mark Solomon

24   of Coughlin Stoia.  And there has also been a pro hac order

25   submitted.  I don't know if it's been signed yet.

1          THE COURT:  No objection; right?

2          MR. EAKELEY:  No objection, Your Honor.

3          MR. HERMANN:  I would ask the Court to welcome

4    Mr. Solomon to counsel table.

5          THE COURT:  All right.  No problem.

6          MR. EAKELEY:  Good morning, Your Honor.

7          Douglas Eakeley and Jason Halper from Lowenstein

8    Sandler.  With us are co-counsel Alan Goudiss and Brian

9    Burke from Shearman & Sterling.  Again, we've moved their

10   admissions pro hac, but they're pending.

11         THE COURT:  Is Shearman & Sterling a law firm?

12   What is that?

13       (Laughter)

14         MR. EAKELEY:  Small boutique.

15       (Laughter)

16         THE COURT:  No problem, gentlemen.

17         MR. GOUDISS:  Thank you, Your Honor.

18         MR. BURKE:  Thank you.

19         THE COURT:  All right.  Well, we received this --

20   I apologize -- this was on for yesterday.  My wife and I

21   have been having a tough cold season and I wasn't feeling

22   very well yesterday.  And I appreciate that.  Hopefully, we

23   caught all of you before you started your travels.  I know

24   that my clerk made calls.  So I apologize for any problem

25   that I created for you.

1        We've reviewed this matter.  Quite frankly, I had

2    my doubts as to whether or not it was even necessary to have

3    oral argument, but I decided to do so.  But I've got to tell

4    you, Plaintiffs have to go a long way to convince me that I

5    have to sign an order in this case.

6        I'll hear you.

7        MR. RUDY:  Good morning, Your Honor.

8        THE COURT:  I know you don't like to start off

9    that way, but, counsel, my view is, why fool around with

10   this?  Let's get to the point and figure out what we're

11   going to do.

12       MR. RUDY:  Well Your Honor, actually, I appreciate

13   your candor.  It will save us some talking, some wasted

14   talking.

15       THE COURT:  I'm sure your talking is never wasted,

16   counsel.

17     (Laughter)

18       MR. RUDY:  You're the first person to say that to

19   me.

20     (Laughter)

21       MR. RUDY:  Your Honor, it's Lee Rudy from Barroway

22   Topaz.  Good morning.

23       I guess I just wanted to sort of explain

24   procedurally where there's two sets of Plaintiffs' counsel

25   at the table.

                        CHARLES P. McGUIRE, C.S.R.

1          There was a contested motion filed just before the

2     new year relating to consolidation and lead-counsel issues

3     which have been resolved over the last couple of days.

4          THE COURT:  Good.

5          MR. RUDY:  And we have a proposed order that I

6     could hand up to the Court for your review or we could

7     submit it electronically, but it is agreed to by Defendants

8     as well.

9          THE COURT:  I'll take it.

10         (Documents were handed up to the Court.)

11         MR. RUDY:  In substance, there's an agreement that

12    the two cases will be consolidated, that there will be

13    co-lead counsel and liaison counsel appointed, and that the

14    Plaintiffs will proceed together, rowing in the same

15    direction.

16         THE COURT:  So all counsel have been agreed upon.

17         MR. RUDY:  That's correct.

18         THE COURT:  Okay.  I thought you mentioned liaison

19    counsel had to be appointed, but I assume --

20         MR. RUDY:  No, no, we've agreed -- Lite DePalma's

21    office has graciously agreed to serve as counsel in the

22    case, and Mr. Hermann will be liaison counsel at his firm.

23         THE COURT:  Okay.

24         2010.  Mr. Eakeley, it was just 1964, wasn't it?

25         MR. EAKELEY:  It was, Your Honor.

CHARLES P. McGUIRE, C.S.R.

1          (Laughter)

2                  MR. EAKELEY:  Fond memories.

3                  THE COURT:  Okay.  I signed the order.

4                  MR. RUDY:  Thank you, Your Honor.

5                  So with that order, the Plaintiffs are able to

6      sort of proceed in a coordinated fashion.

7                  And I think that I can certainly speak for both

8      Plaintiffs when I say that we disagree, politely, of course,

9      with Your Honor's assessment that injunctive relief should

10     not be issued at this point.  I'm going to allow my

11     colleague to elaborate further, but I think suffice it to

12     say that Plaintiffs believe it is imperative at this time

13     that we begin to receive limited discovery that should not

14     conflict with the process that is under way in

15     Great Britain, should not prove too onerous for Defendants,

16     and should allow Plaintiffs to prosecute our claims, which

17     we think are colorable and have merit.

18                 Additional correspondence with the Court was filed

19     today, and I think with the Court's permission I'll turn it

20     over to my colleagues, who can address the additional

21     submissions today.

22                 THE COURT:  I will allow that.

23                 Let me just place something else on the record.  I

24     probably should have done this before.

25                 I'm working under the assumption everyone here, of

1    course, knows all about this matter, but just so the record

2    is clear, this matter comes before this Court upon

3    application for temporary restraints filed by Plaintiff

4    Susan Dougherty.  Plaintiff requests that the Court issue

5    injunctive relief to prevent a tender offer for stock of

6    Cadbury PLC from expiring on January 5th, 2010, today.

7    Plaintiff is a shareholder of Cadbury PLC and brings this

8    action individually and on behalf of all holders of Cadbury

9    stock against Cadbury's corporate directors, that's Roger

10   Carr, Todd Stitzer, Andrew Bonfield, Wolfgang Berndt,

11   Guy Elliot, Lord Patten, Raymond Viault, Baroness Hogg,

12   and Colin Day, the Board or the Defendants, as well as

13   against Nominal Defendant Cadbury PLC.  Plaintiff asserts

14   that Defendants breached their fiduciary duties to the

15   shareholders by failing to engage in good-faith negotiations

16   with a potential acquirer, Kraft Foods.  Plaintiff argues

17   that Defendants breached their duties of loyalty, due care,

18   good faith and fair dealing by, one, refusing to negotiate

19   with Kraft after being presented with a proposed tender

20   offer, and, two, publishing an inadequate stockholders

21   circular in response to Kraft's offer.

22          First, Plaintiff asserts that the board improperly

23   rejected the lucrative tender offer, and, second, that the

24   Defendants' proxy response to Kraft's offer was incomplete

25   and misleading.  Plaintiff contends that the transaction

1    should be enjoined until Defendants engage Kraft in

2    good-faith negotiations to maximize share value and correct

3    mistakes and/or inadequacies in the proxy circulated to the

4    shareholders.  The Plaintiff also seeks expedited discovery

5    prior to a full injunction determination from the Court.

6            Now I'll hear you.

7            MR. RUDY:  Your Honor, I can summarize what you

8    read in maybe shorter form by saying that the Plaintiffs are

9    here relating to disclosures that have been made.  The

10    timing has changed since even the filing of those papers.

11    This is a fairly fluid situation, as I'm sure you

12    understand.

13            THE COURT:  I read something in the paper today

14    about it.

15            MR. RUDY:  Exactly.  And now we're functioning

16    under slightly different timing.  Today was the deadline.

17    The deadline is now February 2nd.

18            THE COURT:  Oh, good.

19            MR. RUDY:  So what that does for us is, it allows

20    us to -- Plaintiffs' counsel is also --

21            THE COURT:  It allows us to not be so emergent.

22            MR. RUDY:  Right.  Well, Plaintiffs' counsel is

23    sometimes accused of being Chicken Little, and I think it

24    allows me to say the sky is not exactly falling, but the sky

25    is cracking.

1          So what we're standing before Your Honor today

2      asking for is that discovery be ordered and that Plaintiffs

3      be allowed to take limited discovery in advance of that.

4          THE COURT:  Let me ask you, what kind of discovery

5      are we talking about here?

6          You know, the secondary argument is that basically

7      we're dealing with a bunch of people that don't live here.

8          MR. RUDY:  Well, I think I will with the Court's

9      permission turn to my colleague, who has a British accent,

10     so maybe he can help us with that.

11         (Laughter)

12         MR. SOLOMON:  Thank you, Your Honor.

13         I will turn it over to Mr. Hermann in a minute,

14     who has some additional information for the Court, I know

15     some submissions he wants to talk about.

16         The information that we're seeking is information

17     that is blatantly omitted from the literature that Cadbury's

18     has disseminated.  They have tried to encourage their

19     shareholders not to tender their shares based on a number of

20     supposed factors, including their projections for future

21     performance.  In the literature, they talk about what is a

22     projection and what isn't in a fairly self-serving way, and

23     in the literature, they talk about 2009 projections and then

24     talk about targets out to 2013.

25         It's clear that there are projections that

                    CHARLES P. McGUIRE, C.S.R.

1   underlie the targets and the more limited projections up

2   until 2009 that they could share.  It's clear that there is

3   virtually no information for the shareholders on what it is

4   that takes us from 2009 through to 2013 with an improved

5   performance and presumably an increased stock price that

6   recognizes that performance that suggests that this offer of

7   a 30-percent-plus premium on what the stock was trading for

8   in August should be denied or should be turned down.

9   There's no information for the shareholders other than

10  pretty much the ipse dixit of Defendants who said from the

11  get-go, No way nohow, we know what we're doing, we've done a

12  good job so far, we're going to do a good job in the future,

13  trust us.

14          Well, certainly our Plaintiffs aren't in a

15  position to feel comfortable simply trusting an abrupt and

16  extremely aggressive refusal --

17          THE COURT:  The value that the stock presently has

18  that could be had by your Plaintiffs by selling the stock;

19  is that more or less than the tender offer?

20          MR. SOLOMON:  At the moment, the stock is trading

21  ahead of the tender offer price.

22          THE COURT:  That's pretty significant, isn't it?

23          MR. SOLOMON:  That's significant in that obviously

24  there's a belief that something's going to happen, that

25  either Kraft will raise its bid significantly or the bidding

CHARLES P. McGUIRE, C.S.R.

1    war will --

2              THE COURT:  Isn't that also pretty significant as

3    a matter of damage?

4              MR. SOLOMON:  Well, that depends.  I mean, there's

5    an issue as to -- and we don't know what arbitrage is

6    involved, we don't know how many shares have been tendered,

7    we don't know how many shares have been sold in the market

8    precisely, but we do believe that most --

9              THE COURT:  Well, isn't that kind of speculative?

10             MR. SOLOMON:  It is speculative, and I'm not

11   denying that, Your Honor.  But it's a fact that most

12   institutions -- most institutions and most individual

13   shareholders have held onto their stock, watching the story

14   develop.

15             THE COURT:  What is it exactly that you want, when

16   do you want it, and who do you want it to go to?

17             MR. SOLOMON:  Okay.  I would like, Your Honor,

18   discovery of the documents that underlie the projections and

19   the targets in the 14d-9 submission.  I would like documents

20   and materials that give us a clue as to what Cadbury's

21   position is on the synergies that Kraft say will be

22   delivered.  They're silent on that; the shareholders haven't

23   really been informed of anything material.  We would like

24   some indication, and we'd like to know, since they have

25   suggested that they prefer other bidders to Kraft out of one

1    side of their mouth, and on the other side of their mouth,

2    they say, but it's all about the money, we'd like to know

3    what's going on with the other bidders.

4           Now, obviously a lot of this is commercially

5    sensitive, and obviously there will be a confidentiality

6    order entered that we've already suggested to adopt the

7    local rule in that regard.

8           So there are two things that we're looking for.

9    We're looking for the production of documents well ahead of

10   February the 2nd so that we can analyze them and come back

11   to the Court with the results of our analysis.  That

12   analysis we believe will result in a request that the Court

13   order the Defendants to disclose certain information ahead

14   of the expiration and tender offer so that our clients and

15   the class that they purport to represent are able to make a

16   truly informed decision.  At the moment, there's a lot of

17   emotion, there's a lot of national pride involved in what's

18   going on, there's a lot of entrenchment, we think, although

19   it's true they can't entrench themselves in ways that they

20   potentially could entrench themselves --

21          THE COURT:  There's not a similar case going on

22   like this in England, is there?

23          MR. SOLOMON:  There is not.  There probably

24   couldn't be.

25          THE COURT:  Why is that?

14

1          MR. SOLOMON:  That's one of the problems:  How do

2     you get relief in the U.K.  And the answer is with very

3     great difficulty.  The takeover panel itself is judge, jury,

4     executioner.  The takeover panel itself has said that it's

5     not looking to change the way it's ever conducted itself.

6     It's slightly informal, it's slightly mysterious, and it

7     certainly isn't a court of law, and it certainly isn't a

8     body that is looking into the fairness of the transaction in

9     any way, the benefits of one transaction or another in any

10    way, and I don't believe it's looking into the integrity of

11    what is being submitted.  And to the extent that Kraft is

12    pressing the takeover panel for more disclosures, it would

13    appear that those efforts have been unsuccessful because

14    we've seen none of the disclosures yet that we think would

15    be important, for two reasons:  One, we believe the

16    disclosures will allow the shareholders to make a fair

17    appraisal of just what their stock is worth and therefore to

18    allow them to make the decision due a week, by February 2nd,

19    to tender shares or not.

20         THE COURT:  So far, all I've heard you ask for is

21    documentation.  You're not seeking any depositions or

22    testimony from anyone?

23         MR. SOLOMON:  Well, we probably would, Your Honor,

24    but I would like the documents first, to be perfectly frank.

25         THE COURT:  Let me hear from the Defendants.

CHARLES P. McGUIRE, C.S.R.

1          Who am I going to hear from?

2          MR. EAKELEY:  Mr. Goudiss will speak for us, Your

3    Honor.

4          MR. GOUDISS:  If I may.

5          May it please the Court.

6          Alan Goudiss and Brian Burke from Shearman &

7    Sterling.

8          Judge, sometimes, you can judge a book by its

9    cover.  This is a quintessentially U.K. offer.  It's

10   controlled by a code and takeover practice in the U.K. and

11   overseen by a statutory body that is neither mysterious,

12   insensitive, or out of touch with the realities of the

13   market.  The takeover panel here strictly regulates the

14   offer at issue.  It provides for all the disclosures that

15   are required.  It hears complaints from shareholders,

16   bidders, or anybody else.

17          THE COURT:  Are you saying I have no authority, I

18   have no jurisdiction?

19          MR. GOUDISS:  Your Honor, with all respect, I

20   believe that you should defer to the takeover panel in these

21   circumstances.

22          THE COURT:  Except I haven't received, other than

23   your indication that there is a forum non conveniens issue,

24   I haven't received any motion or anything formal to that

25   effect.

1            MR. GOUDISS:  Well, Your Honor --

2            THE COURT:  Certainly I could -- that might have a

3    -- I'm not ruling one way or the other, but it certainly has

4    caught our attention that there seems to be a viable motion

5    there.

6            MR. GOUDISS:  Your Honor, if I could, by way of

7    background, the Stewart action was commenced back in

8    September.  That was the first action relating to this in

9    the U.S. courts.  A month or so ago, we learned about the

10    Dougherty action in State Court and removed it.  At that

11    time, Your Honor, up to that point, nothing had happened in

12    either case.  There was no call for disclosure, there was no

13    call for discovery, there was nothing.  The Plaintiffs were

14    sitting and watching, because in the U.K., their clients,

15    the stockholders, get to decide.  My client can't do

16    anything to impede their choice.

17            At that point, Your Honor, we wrote you a letter

18    and requested a conference specifically to effect

19    consolidation so that we could make the motion on

20    forum non conveniens and on substance grounds so as to

21    dispose of the case.  We were very pleased that Plaintiffs

22    have now worked out their differences and have now agreed to

23    a consolidation.  That puts the case in exactly the posture

24    we believe it ought to be, one in which we have an operative

25    complaint, Plaintiffs speaking with one voice, and an

1    opportunity at this stage to move to dismiss the complaint

2    and to defer, as you should, to the U.K. authorities, who

3    have primarily regulatory authority here.

4         THE COURT:  When can you do that by?

5         It's 11:30.

6         MR. GOUDISS:  Monday?

7         Pardon me?

8         THE COURT:  It's 11:30.

9    (Laughter)

10        MR. GOUDISS:  Monday, a week from yesterday?  I

11   can move more quickly than that if you would like, Your

12   Honor.

13        THE COURT:  Well, we don't want to be too

14   draconian here.

15        I think, quite frankly, that I'm not quite sure I

16   understand the thing about the letter and the like, but I

17   think, quite frankly, especially with this relief we now

18   have of today not being the day, but February 2nd, I think

19   it would be to everybody's benefit for us to have the

20   opportunity to see that application.  If you're correct, we

21   shouldn't have to get involved in all of this.  If you're

22   wrong, then they're in a much different position and I'll be

23   in a much different position to make whatever rulings.  But

24   I think in the first instance, you're correct, and I think

25   that should be what I should be dealing with now.

CHARLES P. McGUIRE, C.S.R.

1            I'll say it again that I do have some trouble with

2      this whole idea.  I'm not as familiar as perhaps I should be

3      with this council that you're talking about, but I'm sure

4      you're going to familiarize me with it.  And I'd like to see

5      that, and I'd like that done on short notice, with enough

6      time -- I realize I have some high-powered firms going for

7      us here, so I'm sure we can get things done on a fast track,

8      but I want to be fair to make sure everybody has their

9      opportunity.

10            When can you get your motion in to me, within

11      reason?

12            MR. GOUDISS:  Again, I propose Monday, but if you

13      prefer it this week, we'll do it at the Court's convenience.

14            THE COURT:  Well, Monday would be --

15            What's Monday's date, Scott?

16            MR. GOUDISS:  The 11th.

17            THE COURT:  The 11th.

18            And I assume you would want the same amount of

19      time to respond.

20            MR. HERMANN:  A week.  A week.

21            THE COURT:  So now we're at the 17th -- 18th.

22            Normally there would be a short reply.

23            MR. GOUDISS:  We could reply within a day.

24            THE COURT:  Okay.  18th.  19th.

25        (Off the record discussion)

1          THE COURT:  All right.  Gentlemen, does anybody

2     object to that schedule?

3          MR. SOLOMON:  I'm sorry, Your Honor, and I don't

4     want to be objectionable, but the problem with that is, I'm

5     just not so sure in the event that you're persuaded by us as

6     opposed to Mr. Goudiss, I'm not so sure that that allows the

7     process then to develop so that --

8          THE COURT:  Well, I'm going to go a step further.

9     I'm going to direct counsel for Defendants to at least

10    marshal the documentation as sought in a place that could be

11    easily ascertainable.  I'm not telling you to turn it over

12    to anyone, but I don't want to hear then in the event your

13    motion is denied and Plaintiffs' ultimate request for

14    expedited discovery is granted that we can't get it done in

15    time.  That would kind of just negate everything we're

16    trying to do.

17         MR. GOUDISS:  I understand.  May I make this

18    suggestion, Your Honor?

19         THE COURT:  Sure.  Sure.

20         MR. GOUDISS:  In addition to moving to dismiss on

21    forum non conveniens and other grounds, may I suggest that

22    in our submission we also address the categories of

23    documents that Mr. Solomon has suggested?

24         THE COURT:  Yes.  No problem.

25         MR. GOUDISS:  And the reason for that is that a

CHARLES P. McGUIRE, C.S.R.

1    number of the categories he's already identified are just

2    strictly prohibited under U.K. law.

3            THE COURT:  Okay.  I have no problem with that.

4    And if you're correct -- and I'm not even suggesting that

5    you will eventually have to turn them over.

6            MR. GOUDISS:  Okay.

7            THE COURT:  But I think since we're in effect

8    putting a two-and-a-half-week stay on the application that

9    we should at least not be able to then come back and say,

10   gee, we don't have time now to do it.

11           MR. GOUDISS:  I understand that completely.

12           THE COURT:  So, counsel, I'm going to -- again, I

13   have counsel some of whom I've known for a long time here.

14   I have every reason to believe that you will do the

15   appropriate thing.  Again, I'm asking you to marshal it

16   together, at least in whatever form -- I have no idea of the

17   types of documentation, it sounds like it could be some

18   sophisticated and perhaps voluminous things, but at least

19   have it in a place that it can be accessed quickly - I mean

20   two days or a day or two.

21           MR. GOUDISS:  Okay.

22           THE COURT:  Again, I'm not making any ruling as to

23   where I'm going on that; I want to see further.  But I think

24   that's a fair way to look at it because of this date,

25   assuming the February 2 date stands.  I don't know; these

CHARLES P. McGUIRE, C.S.R.

1   things have a way of moving.  All right?

2             MR. GOUDISS:  We understand your instruction.

3             THE COURT:  All right.  Does anybody else have

4   anything else they wish to say?

5             MR. SOLOMON:  I guess the additional point would

6   be, Your Honor, if we could have a hearing date as close as

7   possible to the last submission.

8             THE COURT:  All right.  We just said the 17th,

9   18th.  The 19th would be reply?

10            MR. GOUDISS:  Correct.

11            THE COURT:  That's what; a Wednesday?

12            THE COURT CLERK:  The 19th is Tuesday.  The 20th

13  is Wednesday.

14            THE COURT:  Okay.  Then something's messed up

15  because the reply dates -- the 17th is a Monday?

16            MR. GOUDISS:  Eighteenth.

17            THE COURT CLERK:  The 18th is a Monday.

18            THE COURT:  Okay.  The 18th is their response.

19            MR. GOUDISS:  The 19th, I reply.

20            THE COURT:  The 19th by the end of the day is the

21  reply, so now Wednesday's the 20th.  I guess the following

22  Monday.

23            I think I'm starting a trial -- what date is that

24  following Monday?

25            THE COURT CLERK:  The 25th.

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

1          THE COURT:  Are we starting a trial, not next

2   week, the week after, Scott?

3          THE COURT CLERK:  No.

4      (Off the record discussion)

5          THE COURT:  All right.  I guess tentatively the

6   25th.  I say "tentatively" --

7          You know what?  I'd prefer to do it the 26th.

8          MR. GOUDISS:  As you wish, Your Honor.

9          THE COURT:  Because, with the weekend there, I

10  might need that day Monday.  So the 26th.

11         THE COURT CLERK:  Ten o'clock.

12         THE COURT:  At 10 o'clock.  Is that okay for

13  everyone?

14         MR. GOUDISS:  That is, Your Honor.

15         MR. SOLOMON:  One moment, Your Honor?  I want to

16  confer with my colleague.

17      (Off the record discussion among counsel)

18         MR. SOLOMON:  The concern I'm hearing is really a

19  practical concern, and that is, we do appreciate the

20  schedule that we're trying to put in place, but with the

21  February 2nd date, we're so close then to the February 2nd

22  date that we really don't have --

23         THE COURT:  What do you want me to do?  Do you

24  want to have less time to do briefs?  I mean, I've got to

25  have time to look at these.  My clerks have to look at this.

CHARLES P. McGUIRE, C.S.R.

1          MR. SOLOMON:  Sure.  I understand that, Your

2     Honor.

3          THE COURT:  Can counsel get this in by Friday, and

4     then if you can get it in by the following Wednesday --

5          MR. SOLOMON:  Yes, we can.

6          THE COURT:  -- and then have the reply so we can

7     move a little bit faster.  But this is some sophisticated

8     stuff here.  I don't want to make it impossible for you to

9     do your job.

10          MR. SOLOMON:  No, I understand, Your Honor.

11          MR. RUDY:  Your Honor, if I may, perhaps it makes

12     sense for you to tell us when a hearing date would be.

13          THE COURT:  I just did.

14          MR. RUDY:  No, an earlier hearing date, and then

15     we can --

16          THE COURT:  What do you mean, an earlier hearing

17     date?

18          MR. RUDY:  Earlier than the 26th.  And if you're

19     saying -- and we can set a briefing schedule that gives

20     Your Honor enough time to read.  If you tell us how many

21     days you would like before the hearing to have full

22     submissions, we can potentially work out the briefing dates

23     amongst ourselves.

24          (Off the record discussion between the Court and the

25     court clerk)

                    CHARLES P. McGUIRE, C.S.R.

1          THE COURT:  I guess we could do it the morning of

2     the 21st.

3          MR. SOLOMON:  I think from our perspective we'd be

4     agreeable to that, Your Honor.  I don't want you to read

5     anything into my nonappearance on that date, but I do have

6     to take depositions in Paris on that date.

7          THE COURT:  You have a choice of being in Newark

8     or Paris, and you're going to Paris?

9          (Laughter)

10         MR. SOLOMON:  Thank you, Your Honor.

11         MR. RUDY:  He should expect to be here, Your

12    Honor.

13         (Laughter)

14         THE COURT:  I will not take any offense.

15         MR. SOLOMON:  Thank you, Your Honor.

16         THE COURT:  All right.  I'm just looking:  The

17    18th is a holiday; it's Martin Luther King Day.  That's

18    Monday.  The 19th is the inauguration, which I might be at

19    for at least the morning.  The 20th, I'll need, and I have a

20    doctor's appointment on the afternoon of the 21st.  So that

21    would leave us the morning of the 21st, I think, as the

22    earliest that we could get through this.

23         Now, that means you'd have to have everything in

24    to us by Friday, the following week, so we have a chance to

25    look and pay attention.  Can we get that done?

1          MR. GOUDISS:  I --

2          THE COURT:  You know, a reply is not necessary

3     under all the circumstances, since we're going to have oral

4     argument.  Many times I don't have oral argument; then the

5     reply becomes more important.  But if I'm going to have oral

6     argument, you would have your opportunity to reply.

7          MR. GOUDISS:  Your Honor, I'm loath to do it.

8     I'll waive the reply.  May I suggest our brief due a week

9     from yesterday, Monday, their brief submitted by Friday, the

10    end of that week?

11         THE COURT:  I think that's fair.  I think that's

12    fair, since --

13         MR. GOUDISS:  And I'll save my reply arguments for

14    the argument.

15         THE COURT:  What we're doing here is trying to

16    accommodate the Plaintiff.  So I think that's a fair

17    request.

18         MR. SOLOMON:  We don't have a problem with that,

19    Your Honor.

20         MR. GOUDISS:  I hate to be accused of accomodating

21    the Plaintiffs, but, understood.

22         (Laughter)

23         THE COURT:  Okay.  Then that's it, gentlemen.

24    That's the date.

25              And just so we're clear, counsel, you went over

CHARLES P. McGUIRE, C.S.R.

1    the information that you sought.  Was that all the

2    information?  Because counsel wants to be in a position to

3    respond.

4              MR. SOLOMON:  There is some more, Your Honor.

5              THE COURT:  You know what to do?  My suggestion --

6    you don't have to take up our time now -- is just let

7    counsel know so he knows what's he's responding to.

8              Do you have something there?

9              MR. HERMANN:  Yes, Your Honor.  If I may

10   approach.  This morning, we sent electronically, but if I

11   can approach --

12             THE COURT:  Sending it electronically over there

13   doesn't necessarily mean that I got it this morning.

14             MR. HERMANN:  That's why I brought it with me,

15   Your Honor.

16             THE COURT:  All right.  Does counsel have copies?

17             MR. HERMANN:  Yes.  And in that letter lists

18   exactly what we're seeking.

19             THE COURT:  Good.  We'll take it.

20             MR. HERMANN:  If I may approach.

21             THE COURT:  Just give it to my clerk.  Give it to

22   Rob.

23             MR. HERMANN:  Good.  Thank you.

24             THE COURT:  All right.  Gentlemen, is there

25   anything else --

CHARLES P. McGUIRE, C.S.R.

1          MR. GOUDISS:  No, Your Honor.

2          THE COURT:  -- that we need to do?  Okay.

3          MR. SOLOMON:  Thank you very much, Your Honor.

4          THE COURT:  Thank you, gentlemen.

5          MR. HERMANN:  10 a.m. on the 21st?

6          THE COURT:  10 a.m.?  Is that good for everybody?

7          MR. HERMANN:  Is that good?  Yes.

8          THE COURT:  Okay.

9          You know, maybe somebody should also submit an

10  order to the effect that this was adjourned and stating what

11  we're doing.  Do that in the form of an order just so we

12  have a record.

13          MR. GOUDISS:  We'll do that, Your Honor.

14          THE COURT:  All right.  Thank you.

15      (Matter concluded)

16

17

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.S.R.