**Q₁**

## SECTION Q. DEALINGS BY CONNECTED EXEMPT PRINCIPAL TRADERS

### RULE 38

### 38.1 PROHIBITED DEALINGS

**An exempt principal trader connected with an offeror or the offeree company must not carry out any dealings with the purpose of assisting the offeror or the offeree company, as the case may be.**

*NOTE ON RULE 38.1*

*Suspension of exempt status*

*Any dealings by an exempt principal trader connected with an offeror or the offeree company with the purpose of assisting an offeror or the offeree company, as the case may be, will constitute a serious breach of the Code. Accordingly, if the Panel determines that a principal trader has carried out such dealings, it will be prepared to rule that the principal trader should cease to enjoy exempt status for such period of time as the Panel may consider appropriate in the circumstances.*

### 38.2 DEALINGS BETWEEN OFFERORS AND CONNECTED EXEMPT PRINCIPAL TRADERS

**An offeror and any person acting in concert with it must not deal as principal with an exempt principal trader connected with the offeror in relevant securities of the offeree company during the offer period. It will generally be for the advisers to the offeror (including a corporate broker) to ensure compliance with this Rule rather than the principal trader. (See also Rule 4.2(b).)**

*NOTE ON RULE 38.2*

*Competition reference periods*

*During a competition reference period the restrictions in this Rule will also apply to an offeror subject to the reference and to any person acting in concert with it.*

### 38.3 ASSENTING SECURITIES AND DEALINGS IN ASSENTED SECURITIES

**An exempt principal trader connected with the offeror must not assent offeree company securities to the offer or purchase such securities in assented form until the offer is unconditional as to acceptances.**

*NOTES ON RULE 38.3*

*1. Withdrawal rights under Rule 13.5*

*If withdrawal rights are introduced under Rule 13.5, the acceptances in relation to any securities assented to the offer after it was unconditional as to*

30.3.09

**Q₂**

**RULE 38** *CONTINUED*

*NOTES ON RULE 38.3 continued*

*acceptances by an exempt principal trader connected with the offeror must be withdrawn and such securities may not be re-assented to the offer unless, following the period agreed by the Panel for withdrawal rights to run, the offer becomes or is declared unconditional as to acceptances.*

*2. Schemes of arrangement*

*See Section 12 of Appendix 7.*

## 38.4 VOTING

**Securities owned by an exempt principal trader connected with an offeror or the offeree company must not be voted in the context of an offer.**

*NOTE ON RULE 38.4*

*Schemes of arrangement*

*See Section 12 of Appendix 7.*

## 38.5 DISCLOSURE OF DEALINGS

**Dealings in relevant securities, during the offer period, by an exempt principal trader connected with an offeror or the offeree company should be aggregated and disclosed to a RIS and the Panel not later than 12 noon on the business day following the date of the transactions, stating the following details:—**

**(a) if the relevant trading desk has recognised intermediary status and is dealing in a client-serving capacity:**

    **(i)   total acquisitions and disposals; and**

    **(ii)  the highest and lowest prices paid and received; or**

**(b) if the relevant trading desk does not have recognised intermediary status, or if it does but is not dealing in a client-serving capacity, the details required under Note 5(a) on Rule 8 (see Note 4 on this Rule).**

**In each case, it should be stated whether the connection is with an offeror or the offeree company. In the case of dealings in options or derivatives, full details should be given so that the nature of the dealings can be fully understood (see Note 5 on Rule 8).**

**Q3**

**RULE 38** *CONTINUED*

*NOTES ON RULE 38.5*

*1.   Dealings and relevant securities*

*See the definitions of dealings and relevant securities in the Definitions Section.*

*2.   Method of disclosure*

*Dealings should be disclosed to a RIS by electronic delivery. A copy must be sent to the Panel in electronic form. A specimen disclosure form is available on the Panel's website (www.thetakeoverpanel.org.uk) or may be obtained from the Panel. Disclosures under this Rule should follow that format.*

*3.   Exception*

*Where it has been announced that an offer or possible offer is, or is likely to be, solely in cash, there is no requirement to disclose dealings in relevant securities of the offeror.*

*4.   Recognised intermediaries dealing in a proprietary capacity*

*Where an exempt principal trader with recognised intermediary status deals in relevant securities other than in a client-serving capacity (or re-books a position which was acquired in a client-serving capacity so as to hold it in a proprietary capacity), it should aggregate and disclose under Rule 38.5(b) the interests, short positions and rights to subscribe which it holds in a proprietary capacity with those of the group's exempt principal traders which do not have recognised intermediary status. However, in making such disclosures, it need not aggregate and disclose details of any interests, short positions and rights to subscribe which it holds in a client-serving capacity.*

*5.   Amendments*

*If details included in a dealing disclosure are incorrect, they should be corrected as soon as practicable in a subsequent disclosure. Such disclosure should state clearly that it corrects details disclosed previously, identify the disclosure or disclosures being corrected, and provide sufficient detail for the reader to understand the nature of the corrections. In the case of any doubt, the Panel should be consulted.*

**App 1.1**

## APPENDIX 1

### WHITEWASH GUIDANCE NOTE

(See Note 1 of Notes on Dispensations from Rule 9.)

## 1   INTRODUCTION

(a)  This note sets out the procedures to be followed if the Panel is to be asked to waive the obligation to make a general offer under Rule 9 which would otherwise arise where, as a result of the issue of new securities as consideration for an acquisition or a cash injection or in fulfilment of obligations under an agreement to underwrite the issue of new securities, a person or group of persons acting in concert acquires an interest, or interests, in shares to an extent which would normally give rise to an obligation to make a general offer.

(b)  Where the word "offeror" is used in a particular Rule, it should be taken in the context of a whitewash as a reference to the potential controllers. Similarly, the phrase "offeree company" should be taken as a reference to the company which is to issue the new securities and in which the actual or potential controlling position will arise.

(c)  Rules 19, 20 and 24.14, where relevant, apply equally to documents, announcements and information published in connection with a transaction which is the subject of the whitewash procedure.

## 2   SPECIFIC GRANT OF WAIVER REQUIRED

In each case, specific grant of a waiver from the Rule 9 obligation is required. Such grant will be subject to:—

(a)  there having been no disqualifying transactions (as set out in Section 3 below) by the person or group seeking the waiver in the previous 12 months;

(b)  prior consultation with the Panel by the parties concerned or their advisers;

(c)  approval in advance by the Panel of the circular setting out the details of the proposals;

(d)  approval of the proposals by an independent vote, on a poll, at a meeting of the holders of any relevant class of securities, whether or not any such meeting needs to be convened to approve the issue of the securities in question; and

(e)  disenfranchisement of the person or group seeking the waiver and of any other non-independent party at any such meeting.

**App** 1.2

APPENDIX 1 *CONTINUED*

*NOTES ON SECTION 2*

*1.   Early consultation*

*Consultation with the Panel at an early stage is essential. Late consultation may well result in delays to planned timetables. Experience suggests that the documents published in connection with the whitewash procedure may have to pass through several proofs before they meet the Panel's requirements and no waiver of the Rule 9 obligation will be granted until such time as the documentation has been approved by the Panel.*

*2.   Other legal or regulatory requirements*

*It must be noted that clearance of the circular in accordance with any other legal or regulatory requirement (for example, under the UKLA Rules) does not constitute approval of the circular by the Panel.*

## 3   DISQUALIFYING TRANSACTIONS

Notwithstanding the fact that the issue of new securities is made conditional upon the prior approval of a majority of the shareholders independent of the transaction at a general meeting of the company:—

(a)  the Panel will not normally waive an obligation under Rule 9 if the person to whom the new securities are to be issued or any person acting in concert with him has acquired any interest in shares in the company in the 12 months prior to the publication of the circular relating to the proposals but subsequent to negotiations, discussions or the reaching of understandings or agreements with the directors of the company in relation to the proposed issue of new securities;

(b)  a waiver will be invalidated if any acquisitions of interests in shares are made in the period between the publication of the circular and the shareholders' meeting.

## 4   WHITEWASH CIRCULAR

The circular must contain the following information and statements and comply appropriately with the Rules of the Code as set out below:—

(a)  competent independent advice to the offeree company regarding the transaction, the controlling position which it will create and the effect which this will have on shareholders generally;

(b)  full details of the maximum potential controlling position:

(i) where this is dependent upon the outcome of underwriting arrangements, it should be assumed that the potential controllers will, in addition to any other entitlement, take up their full underwriting participation; and

**App** 1.3

APPENDIX 1 *CONTINUED*

(ii) where convertible securities, options or securities with subscription rights are to be issued, the potential controlling position must be indicated on the assumption that only the controllers will convert or exercise the subscription rights, and will do so in full and at the earliest opportunity (the date of which must also be given);

(c) where the maximum potential shareholding resulting from the proposed transaction will exceed 50% of the voting rights of the company, specific and prominent reference to this possibility and to the fact that, subject to Section 7 below, the potential controllers may acquire further interests in shares without incurring any further obligation under Rule 9 to make a general offer;

(d) in cases where the potential controlling position will be held by more than one person, the identity of the potential controllers and their individual potential interests in shares in addition to the information required under (i) below;

(e) a statement that the Panel has agreed, subject to shareholders' approval, to waive any obligations to make a general offer which might result from the transaction;

(f) Rule 19.2 (responsibility statements, etc.);

(g) Rule 21.2 (inducement fees);

(h) Rules 23, 24.1, 24.2 and 25.2 (information which must include full details of the assets, if any, being injected);

(i) Rules 24.3 and 25.3 (disclosure of interests and dealings). Dealings in respect of Rule 24.3 should be covered for the 12 months prior to the publication of the circular but dealings in respect of Rule 25.3 need not be disclosed as there is no offer period;

(j) Rules 24.5 and 24.8 (arrangements in connection with the proposal);

(k) Rule 25.4 (service contracts of directors and proposed directors);

(l) Rule 25.6 (material contracts, irrevocable commitments and letters of intent);

(m) Rule 26 (documents to be on display); and

(n) Rules 28 and 29 (profit forecasts and asset valuations relating to the offeree company or relating to assets being acquired by the offeree company).

**App 1.4**

## 5   UNDERWRITING AND PLACING

In cases involving the underwriting or placing of offeree company securities, the Panel must be given details of all the proposed underwriters or placees, including any relevant information to establish whether or not there is a group acting in concert, and the maximum percentage which they could come to hold as a result of implementation of the proposals.

## 6   ANNOUNCEMENTS FOLLOWING SHAREHOLDERS' APPROVAL

(a) Following the meeting at which the proposals are considered by shareholders, an announcement must be made by the offeree company giving the result of the meeting and the number and percentage of offeree company shares in which the potential controllers are, or are entitled to be, interested as a result. The announcement must be published in accordance with the requirements of Rule 2.9.

(b) Where the final controlling position is dependent on the results of underwriting, the offeree company must make an announcement following the issue of the new securities stating the number and percentage of shares in which the controllers are interested at that time.

(c) Where convertible securities, options or securities with subscription rights are to be issued:—

   (i)  the announcement of the potential controlling position must be made on the basis of the assumptions described in Section 4(b) above;

   (ii) following each issue of new securities a further announcement must be made confirming the number and percentage of shares in which the controllers are interested at that time; and

   (iii) the information in (i) and (ii) should be included in the company's annual report and accounts until all the securities in respect of which the waiver has been granted have been issued or it is confirmed that no such issue will be made.

*NOTE ON SECTION 6*

*Copies of announcements*

*Copies of announcements made under this Section should be sent to the Panel.*

**APPENDIX 1** *CONTINUED*

## 7   SUBSEQUENT ACQUISITIONS BY POTENTIAL CONTROLLERS

Immediately following approval of the proposals at the shareholders' meeting, the potential controllers will be free to acquire further interests in shares of the offeree company, subject to the provisions of Rules 5 and 9.

Where shareholders approve the issue of convertible securities, or the issue of warrants or the grant of options to subscribe for new shares where no immediate voting rights are obtained, the Panel will view the approval as sanctioning maximum conversion or subscription at the earliest possible moment without the necessity for the making of an offer under Rule 9. However, if the potential controllers propose to acquire further interests in voting shares following the relevant meeting, the Panel should be consulted to establish the number of shares to which the waiver will be deemed to apply.

(See also Note 4 on Rule 9.1 and Rule 37.1.)

**App 2.1**

## APPENDIX 2

### FORMULA OFFERS GUIDANCE NOTE

### 1   INTRODUCTION

When offers are made for the share capital of investment trusts, it is common for the consideration to be calculated by reference to a formula related to the net assets of the offeree company. If offers are made on this basis, there are certain special requirements which must be followed.

### 2   SPECIFICATION OF THE FORMULA

Since it is common for the result of the formula to differ from net asset value as generally understood, the term "net asset value" should not be used in connection with the consideration to be paid to shareholders. The expression "formula asset value" should be used instead. Where the consideration is expressed by reference to formula asset value, the means by which this figure will be arrived at must be clearly set out in both the offer announcement and the offer document. It will usually be convenient to express this formula algebraically, identifying the significant constituent elements, in a separate appendix.

The Panel does not consider it appropriate to insist on a standard method of calculating net asset values in formula offers. There is, however, a danger of confusion being caused when assessing the advantages or disadvantages of an offer by reference to net asset values which are calculated by each side on a different basis. Principals and their advisers should, therefore, ensure that wherever reference is to be made to net asset value as an argument for or against an offer, the utmost clarity is used to make plain the basis of calculation. This applies to paid advertisements in the press as well as to documents and announcements published in connection with an offer.

### 3   DATE ON WHICH THE FORMULA CRYSTALLIZES

In all circumstances, the consideration payable under the formula should be determined as at the day the offer becomes or is declared unconditional as to acceptances or, in the case of a scheme of arrangement, as at a date which is a fixed number of days prior to the court sanction hearing (in either case, the "FAV calculation date").

*NOTE ON SECTION 3*

*Schemes of arrangement*

*In the case of a scheme, the FAV calculation date should normally be set for a date no earlier than seven days prior to the date of the court sanction hearing (as defined in Appendix 7). The Panel should be consulted if this is impracticable.*

30.3.09

**App** 2.2

APPENDIX 2 *CONTINUED*

### 4   ESTIMATE OF THE FORMULA OFFER VALUE

The offer announcement must include an estimate of the value of the offer, in pence per share, on the day of the announcement and the offer document must include a similar estimate on the latest practicable date prior to publication.

### 5   MAXIMUM AND MINIMUM PRICES

An offeror may include in a formula offer a term that if the formula offer produces a price higher than a specified price (the "maximum price") only that price will be paid and/or a term that if it produces a price lower than a specified price (the "minimum price") then that price will be paid.

### 6   RULE 6

Since in a formula offer the current value of the offer is only determinable by reference to the value, at any relevant time, of the assets to which the formula is related, an offeror can only be confident that acquisitions of interests in shares during an offer are in conformity with Rule 6 if it is able to calculate the price which would have been payable on the basis of the formula at the time of the acquisitions. Where such calculation is possible and the price paid exceeds the formula price so calculated, it follows that the acquisitions will have been made on the basis of an improved formula and the offeror will, therefore, be required to increase the offer by making the improved formula generally available.

Calculation of the formula price at the time of an acquisition will only be possible if there is co-operation from the board of the offeree company. It is not acceptable for the procedure set out in the previous paragraph to be applied on the basis of estimated net asset values, eg those contained in brokers' circulars. Where there is no co-operation from the board of the offeree company, therefore, the offeror will not be able to use this procedure and any acquisitions which fall to be taken into account for the purposes of Rule 6 will create an obligation to pay at least the same price to all accepting shareholders. Where there are alternative offers, however, the offeror may choose which of the alternatives should be subject to the minimum price.

### 7   RULES 9 AND 11

Rules 9 and 11 apply equally to formula offers; thus, if appropriate, the cash offer must contain a term guaranteeing a minimum price under the offer at the highest cash price paid in respect of the acquisitions of interests in shares to which the Rules apply.

30.3.09

**App** 2.3

## 8   "FLOOR AND CEILING" CONDITIONS

There is no objection to the incorporation of conditions in a formula offer which provide for the offer to lapse in the event that the formula asset value (calculated on the FAV calculation date) falls outside specified limits or if movements in certain securities markets' indices exceed specified limits.

## 9   OFFEREE BOARD OBLIGATIONS

There is no obligation on the board of the offeree company to provide information relating to the calculation of the formula price until a successful offeror has taken control. Nevertheless, where an offer has a "floor and ceiling" condition related to the formula asset value, the board of the offeree company must announce, within 7 days after the FAV calculation date, whether the formula calculated on the FAV calculation date fell within the specified limits.

Once an offer is wholly unconditional, it is expected that both sides will co-operate in calculating the formula price payable to accepting shareholders. Where agreement is not forthcoming, however, the offeror will not be permitted to determine unilaterally the price payable. Where such circumstances could arise, the offer should provide for an interim payment to be made to accepting shareholders of not less than 85% of the offeror's best estimate of the formula price payable. When the offeror is able to calculate correctly the price payable, the difference should be paid to accepting shareholders as soon as possible; any excess paid to shareholders as a result of an over-estimate of the formula asset value will not be recoverable.

30.3.09

**App 3.1**

## APPENDIX 3

## DIRECTORS' RESPONSIBILITIES AND CONFLICTS OF INTEREST GUIDANCE NOTE

## 1   DIRECTORS' RESPONSIBILITIES

While a board of directors may delegate the day-to-day conduct of an offer to individual directors or a committee of directors, the board as a whole must ensure that proper arrangements are in place to enable it to monitor that conduct in order that each director may fulfil his responsibilities under the Code. These arrangements should ensure that:-

(a)  the board is provided promptly with copies of all documents and announcements published by or on behalf of their company which bear on the offer; the board receives promptly details of all dealings in relevant securities made by their company or its associates and details of any agreements, understandings, guarantees, expenditure (including fees) or other obligations entered into or incurred by or on behalf of their company in the context of the offer which do not relate to routine administrative matters;

(b)  those directors with day-to-day responsibility for the offer are in a position to justify to the board all their actions and proposed courses of action; and

(c)  the opinions of advisers are available to the board where appropriate.

The above procedures should be followed, and board meetings held, as and when necessary throughout the offer in order to ensure that all directors are kept up-to-date with events and with actions taken.

Any director who has a question concerning the propriety of any action as far as the Code is concerned should ensure that the Panel is consulted.

The Panel expects directors to co-operate with it in connection with its enquiries; this will include the provision, promptly on request, of copies of minutes of board meetings and other information in their possession, or in the possession of an offeror or the offeree company as appropriate, which may be relevant to the enquiry.

**App** 3.2

## 2   FINANCIAL ADVISERS AND CONFLICTS OF INTEREST

Instances where conflicts of interest may arise include those resulting from the possession of material confidential information or where the adviser is part of a multi-service financial organisation, as exemplified below.

### (a)   Material confidential information

A financial adviser may have the opportunity to act for an offeror or the offeree company in circumstances where the adviser is in possession of material confidential information relating to the other party, for example, because it was a previous client or because of involvement in an earlier transaction. In certain circumstances, this may necessitate the financial adviser declining to act, for example, because the information is such that a conflict of interest is likely to arise. Such a conflict may be incapable of resolution simply by isolating information within the relevant organisation or by assigning different personnel to the transaction; however, when a financial adviser has been actively advising a company which becomes an offeree company, it may be acceptable for it to continue to act.

### (b)   Segregation of businesses

It is incumbent upon multi-service financial organisations to familiarise themselves with the implications under the Code of conducting other businesses in addition to, for example, corporate finance or stockbroking. If one part of such an organisation is involved in an offer, for example, in giving advice to an offeror or the offeree company, a number of Rules of the Code may be relevant to other parts of that organisation, whose actions may have serious consequences under the Code. Compliance departments of such organisations have an important role in this respect and are encouraged to liaise with the Panel in cases of doubt.

The concepts of "exempt fund managers" and "exempt principal traders" in the Code are in recognition of the fact that fund management and principal trading may be conducted on a day-to-day basis quite separately within the same organisation; but it is necessary for such organisations to satisfy the Panel that this is the case. It is essential, therefore, that such organisations arrange their affairs to ensure not only total segregation of those operations but also that those operations are conducted without regard for the interests of other parts of the same organisation or of their clients. The Code contains a number of Rules which are designed to ensure that the principles on which these concepts are based are upheld.

**APPENDIX 4**

**RECEIVING AGENTS' CODE OF PRACTICE**

*NB 1 This Appendix should be read in conjunction with Rules 9.3 and 10 and, in particular, Notes 4 — 8 on Rule 10.*

*NB 2 If an offer relates to securities some or all of which are held in uncertificated form in CREST and in respect of which CREST maintains the register, references in this Appendix to the register shall be deemed to be references to:*

*(a)  the register of securities held in certificated form (if any); and*

*(b)  the record of securities held in uncertificated form maintained by the offeree company's registrar.*

## 1   INTRODUCTION

This Code of Practice has been drawn up by the Panel in consultation with the Confederation of British Industry, the British Bankers' Association and the Registrars Group of the Institute of Chartered Secretaries and Administrators. It is reproduced with the agreement and support of these bodies. In relation to the additions and amendments necessitated by the introduction of CREST, the Panel also consulted CRESTCo Limited.

It is essential when determining the result of an offer under the Code that appropriate measures are adopted such that all parties to the offer may be confident that the result of the offer is arrived at by an objective procedure which, as far as possible, eliminates areas of doubt. This Code of Practice is designed to ensure that those acceptances and purchases which may be counted towards fulfilling the acceptance condition and thus included in the certificate are properly identified to enable the receiving agent to provide the certificate required by Note 7 on Rule 10. Receiving agents are also required to establish appropriate procedures such that acceptances and purchases can be checked against each other and between different categories so that no shareholding will be counted twice.

The principles and procedures outlined in this Code of Practice are, except with the prior consent of the Panel, to be followed in all cases. It must be understood that the Panel expects co-operation between the offeree company's registrar and the offeror's receiving agent to ensure that the procedures can be undertaken in a timely manner. Co-operation is interpreted to include the provision of data in a form convenient for the receiving agent. For example, if the receiving agent so requests, following the announcement of an offer, the registrar should, if practicable, provide the register in electronic form. Whenever

**App** 4.2

APPENDIX 4 *CONTINUED*

possible, if requested to do so, the registrar should provide, in similar form, details of changes to the register rather than a complete new register.

Receiving agents will have direct access to the Panel should they believe that there is insufficient co-operation or that they are being given instructions contrary to this Code of Practice.

## 2   QUALIFICATIONS FOR ACTING AS A RECEIVING AGENT

A receiving agent to an offer must either:—

(a) be a member of the Registrars' and Receiving Bankers' Committee of the British Bankers' Association; or

(b) be a member of the Registrars Group of the Institute of Chartered Secretaries and Administrators and:

    (i) (1) be responsible for the share register of a listed public company, other than itself, with not less than 20,000 shareholders; or

    (2) be responsible for the share registers of not less than 25 public companies which are admitted to the Official List or to trading on AIM; and

    (ii) (1) have performed the duties of a receiving agent on more than 25 occasions; or

    (2) have been directly involved with keeping share registers of public companies for more than 10 years; or

(c) be an organisation which has satisfied the Panel that it has the experience and resources necessary to act as receiving agent in connection with the relevant offer.

## 3   THE PROVISION OF THE OFFEREE COMPANY'S REGISTER

(a) When a firm intention to make an offer is announced, the offeree company should instruct its registrar to respond within two business days to a request from the offeror for the provision of the register which should be updated to reflect the position as at the close of business on the date of the request. The registrar should provide details of both participant and account IDs for holdings in CREST.

(b) The offeree company's registrar should also be instructed to keep the register as up-to-date as the register maintenance system will allow. CREST imposes certain obligations on registrars in this respect but for

**App** 4.3

APPENDIX 4 *CONTINUED*

certificated holdings outside CREST the registrar should ensure that maintenance is such that it can comply with (c) below. The updating procedures should include, in addition to the registration of transfers, the registration of all changes affecting the register (eg grants of representation, marriage certificates, changes of address etc). The receiving agent should also be informed on a daily basis by the offeree company's registrar of any adjustment to holdings in CREST not advised by the CREST operator through register update requests ("RURs").

(c) From the date following the day on which a firm intention to make an offer is announced, the CREST operator will, after the appropriate request, make available to the offeror's receiving agent copies of all RURs generated in relation to the offeree company.

As far as certificated holdings are concerned, the registrar must provide updates, on a daily basis, to the register within two business days after notification of the transfer and, in addition, copies of all documents, including CREST stock deposits, which would lead to a change in the last copy register provided to the offeror must be provided as rapidly. On the final register day* any such information received by the offeree company's registrar but not yet provided to the offeror's receiving agent must be made available for collection by the offeror's receiving agent, at the latest, by noon on the day preceding the final closing date† of the offer.

From the final register day* until the time that the offer becomes or is declared unconditional as to acceptances or lapses, the offeree company's registrar should continue to update the register on a daily basis so that all transfers and other documents which have been received by the offeree company's registrar by 1.00 pm on the final closing date† of the offer are processed by 5.00 pm that day at the latest. In addition, copies of these documents should be sent immediately to the offeror's receiving agent insofar as not previously notified.

(d) Arrangements should be made to ensure that the offeror's receiving agent has access to the offeree company's registrar at all times, which includes weekends and Bank Holidays, during the period between the final register day* and the time the offer becomes or is declared unconditional as to acceptances or lapses, in order that any queries arising from acceptances and purchases can be investigated and accurate decisions taken.

*† See definitions at end of Appendix

**App 4.4**

APPENDIX 4 *CONTINUED*

### 4   THE PROVISION OF ADDRESSES, ELECTRONIC ADDRESSES, ELECTIONS AND OTHER DETAILS

(a)  When a firm intention to make an offer is announced, the offeree company should respond, or instruct its registrar to respond, within two business days to a request from the offeror for details in respect of:

(i)  electronic addresses provided to the offeree company by shareholders in the offeree company for the receipt of documents, announcements and other information in electronic form;

(ii)  addresses, electronic addresses and other information provided to the offeree company by, or on behalf of, persons with information rights for the receipt of documents, announcements and other information in hard copy form or electronic form;

(iii) addresses, electronic addresses and other information provided to the offeree company by any other persons entitled to receive copies of documents, announcements or information for the receipt of such communications in hard copy form or electronic form (including a copy of any register(s) of persons entitled to receive documents under Rule 15); and

(iv) elections made in accordance with applicable legal or regulatory provisions by, or on behalf of, shareholders in the offeree company, persons with information rights or any other relevant persons to receive communications from the offeree company in hard copy form,

provided, in each case, that the relevant address, electronic address, election or other information has been provided to the offeree company for the receipt of information generally and not only for certain specific types of information.

(b)  The information provided to an offeror in compliance with (a) above should be updated to reflect the position as at the close of business on the day of the request. The offeree company shall ensure, or shall instruct its registrar to ensure, that the information described in (a) above is kept as up-to-date as the relevant maintenance system will allow and updates shall be provided to the offeror, or its receiving agent, in respect of any changes in that information at the same time as updates to the company's register are provided under Section 3 above to the offeror's receiving agent.

30.3.09

**App** 4.5

**APPENDIX 4** *CONTINUED*

(c) When the information referred to in (a) above is provided to an offeror by the offeree company or its registrar, the use of that information by the offeror for purposes that are not related to the offer may be subject to legal restrictions, including in relation to the protection of data.

## 5   COUNTING OF ACCEPTANCES

The offeror's receiving agent must ensure that all acceptances counted as valid meet the requirements set out in Note 4 on Rule 10 and, if appropriate, Note 6 on Rule 10.

## 6   COUNTING OF PURCHASES

The offeror's receiving agent must ensure that all purchases counted as valid meet the requirements (subject to Note 8 on Rule 10) set out in Note 5 on Rule 10 and, if appropriate, Note 6 on Rule 10.

## 7   OFFERS BECOMING OR BEING DECLARED UNCONDITIONAL AS TO ACCEPTANCES BEFORE THE FINAL CLOSING DATE†

Prior to an offer becoming or being declared unconditional as to acceptances before the final closing date†, the offeror's receiving agent must ensure that the requirements of Note 6 on Rule 10 have been satisfied.

## 8   DISCLAIMERS IN RECEIVING AGENTS' CERTIFICATES

Certificates issued by the offeror's receiving agent should be unqualified, save for a disclaimer (if necessary) as to limitations on the responsibility of the receiving agent for the errors of third parties which are not evident from the documents available to the receiving agent. A disclaimer in the following form would normally be acceptable; any variation should be specifically agreed by the Panel in advance:-

"In issuing this certificate we have, where necessary, relied on the following matters:

    (i) certifications of acceptance forms by the offeree company's registrar;

    (ii) certifications by the offeree company's registrar that a transfer of shares has been executed by or on behalf of the registered holder in favour of the offeror company or its nominees;

*† See definitions at end of Appendix*

30.3.09

# App 4.6

**APPENDIX 4 *CONTINUED***

(iii) confirmation from the offeror of the validity of shares recorded as registered holdings and purchases in the context of Note 8 on Rule 10.

As the offeror company's receiving agent, we have examined with due care and attention the information provided to us, and, as appropriate, made due and careful enquiry of relevant persons, in order that we may issue this certificate and have no reason to believe that the information contained in it cannot be relied upon but, subject thereto, we accept no responsibility or liability whatsoever in respect of any error of the offeree company's registrar or the offeror company's buying broker for the matters set out above to the extent that we have relied upon them in issuing this certificate."

*DEFINITIONS*

*\*final register day — the day two days prior to the final closing date† of an offer.*

*†final closing date — the 60th day or other date beyond which the offeror has stated that its offer will not be extended.*

**App** 5.1

**APPENDIX 5**

**TENDER OFFERS**

## 1   PANEL'S CONSENT REQUIRED

The Panel's consent is required for any tender offer. The Panel's consent will normally be granted where:

(a)  the tender offer could not result in the offeror and persons acting in concert with it being interested in shares carrying 30% or more of the voting rights of the company on the closing date of the tender; or

(b)  the tender offer is by a person holding shares carrying more than 50% of the voting rights of a company, is for less than all the shares carrying voting rights held by the minority and the Panel believes the circumstances justify the use of a tender offer.

Where a tender offer to which this Appendix applies is made on the Stock Exchange or on PLUS, this Appendix takes precedence over any requirements of the Stock Exchange and PLUS for the conduct of tender offers. However, the resulting transactions will be subject to the relevant trade and transaction reporting rules and requests for delivery and settlement.

This Appendix does not apply where a tender offer is made solely for the purpose of a company buying in its own shares.

*NOTES ON SECTION 1*

*1.   Calculation of percentage of shares in which a person is interested*

*The percentage of shares in which a person is interested should be calculated by reference to the issued share capital at the time of the announcement of the tender offer after taking into account the latest published information; if, however, it is known at the time of the announcement that by the closing date of the tender offer the issued share capital will have changed, this must also be taken into account.*

*2.   Tender offers in competition with other types of offer under the Code*

*Where a tender offer is proposed for shares in a company subject to another type of offer under the Code, the following matters will have to be considered:*

*(a)  extension of the offer period in respect of the other offer;*

*(b)  sending the tender advertisement to all shareholders and persons with information rights; and*

*(c)  disclosure of dealings by the offeror making the tender offer and any associates in the manner set out in Rule 8.*

30.3.09

# App 5.2

APPENDIX 5 *CONTINUED*

## 2   PROCEDURE AND CLEARANCE

(a)  A person publishing a tender offer for the shares of a company which are admitted to listing on the Official List or to trading on AIM or on PLUS must do so by paid advertisement in two national newspapers and must notify the company concerned of the information specified in Section 3 at least 7 days before the day on which the tender offer closes. The offeror may also send copies of the advertisement to shareholders of the company and persons with information rights, subject to compliance with the FSMA.

(b)  In all other cases, the tender offer must be made by sending a circular to shareholders and persons with information rights (containing the same information as for a tender offer advertisement as specified in Section 3) and must be open for acceptance for at least 21 days. A copy of the circular must be provided to the company concerned not later than the date on which it is published.

(c)  Subject to (d) below, the offeror must treat all shareholders on equal terms.

(d)  A tender offer must be for cash only but may be at a fixed price or a maximum price; top-up arrangements are not permitted.

(i)   Fixed price: if the tenders exceed the number of shares sought, they will be scaled down pro rata.

(ii)  Maximum price: if the tender offer is over-subscribed, the striking price will be the lowest price at which the number of shares sought is met and all who tender at or below the striking price will receive that price. If necessary, tenders made at the striking price will be scaled down pro rata or balloted.

If the tender offer is under-subscribed, all who tender will receive the maximum or fixed price, except where fewer shares are tendered than the percentage below which the tender is void.

(e)  The text of the advertisement or circular must be cleared by the Panel.

(f)  In every case the UKLA, the Stock Exchange or PLUS, as appropriate, and the Panel must be sent a copy of the final text of the advertisements or circulars in hard copy form and electronic form at the same time as they are sent to the newspapers or are published.

**App** 5.3

APPENDIX 5 *CONTINUED*

## 3   DETAILS OF TENDER OFFER ADVERTISEMENTS

(a)   The advertisement of a tender offer or circular (as the case may be), which must constitute a firm offer, must include the particulars set out below:—

(i)     the name of the offeror;

(ii)    the name of the broker or other agent acting for the offeror;

(iii)   the name of the company whose shares are sought;

(iv)   the maximum number of shares or proportion of voting capital offered for;

(v)    a statement that, if tenders totalling less than 1% of the voting rights of the company are received, the tender offer will be void. Alternatively, the offeror may indicate a higher percentage below which the tender offer will be void but any figure higher than 5% is not permitted unless approved by the Panel in advance of the announcement of the tender offer;

(vi)   a statement that, subject to (v), a shareholder's tender will be irrevocable;

(vii)  the fixed or maximum price offered;

(viii) the number and percentage of shares in which the offeror and persons acting in concert with it are interested, specifying the nature of the interests concerned (see Note 5(a) on Rule 8);

(ix)   the closing day and time for the tender; and

(x)    the arrangements for delivery and settlement (on a basis approved in advance by the Panel).

(b)  A tender offer may not be subject to any condition other than (a)(v) above.

(c)  If the offeror wishes to make a statement about its future intentions, it must be contained in the advertisement of the tender offer or circular, as the case may be, and should be explicit and unambiguous. The Panel should be consulted in advance with regard to any such statement.

(d)  If the offeror wishes, a statement may be made comparing the value of the tender offer with the market value of the shares being offered for.

30.3.09

**App** 5.4

**APPENDIX 5** *CONTINUED*

**(e) The advertisement or circular must be restricted to the items above together with any information required under the FSMA, secondary legislation made under that Act or any rule made by the FSA.**

*NOTES ON SECTION 3*

*1.   Future offers*

*If the offeror or a person acting in concert with it makes a statement which implies that the offeror does not intend to make an offer for the company, Rule 2.8 will apply.*

*2.   Limit on contents of tender advertisements and circulars*

*The limit on the amount of information permissible in tender advertisements and circulars is strictly enforced; no form of argument or persuasion is allowed. Consequently the offeror (or any person acting in concert with it) may not make any statement or otherwise publish any information in connection with the tender offer which is not already contained in the tender offer advertisement or circular itself.*

## 4   CIRCULARS FROM THE BOARD OF THE OFFEREE COMPANY

**A copy of any document published by the board of the offeree company in connection with the tender offer must be sent to the Panel in hard copy form and electronic form at the same time as it is published.**

## 5   ANNOUNCEMENT OF THE RESULT OF A TENDER OFFER

**The result of a tender offer must be announced by 8.00 am on the business day following the close of the tender. The announcement must be published in accordance with the requirements of Rule 2.9.**

## 6   PROHIBITION OF FURTHER TRANSACTIONS DURING A TENDER OFFER

**The offeror and any person acting in concert with it may not otherwise acquire or dispose of any interest in shares carrying voting rights in the company between the time of the publication of the tender offer and the time when the result of the tender offer is announced.**

**App 6.1**

## APPENDIX 6

### BID DOCUMENTATION RULES FOR THE PURPOSES OF SECTION 953 OF THE COMPANIES ACT 2006

For the purposes of Section 953 of the Companies Act 2006, "offer document rules" and "response document rules" are those giving effect, respectively, to Article 6(3) and the first sentence of Article 9(5) of the Directive (see section 10(e) of the Introduction). The relevant parts of Rules 24 and 25 are set out below. Rule 27 is also relevant to the extent set out in section 10(e) of the Introduction.

**"Offer document rules"**

| Article | Those parts of the Rule set out below which give effect to the Article |
|---------|-----------------------------------------------------------------------|
| *Article 6(3)(a)* | **Rule 24.2(d)(v)** |
| *Article 6(3)(b)* | **Rule 24.2(d)(ii)** |
| *Article 6(3)(c)* | **Rule 24.2(d)(iv)** |
| *Article 6(3)(d)* | **Rule 24.2(d)(v) and Note 5 on Rule 24.2** |
| *Article 6(3)(e)* | **Rule 24.2(d)(xv)** |
| *Article 6(3)(f)* | **Rule 24.2(d)(iv)** |
| *Article 6(3)(g)* | **Rule 24.3(a)(i), (ii)** |
| *Article 6(3)(h)* | **Rule 24.2(d)(vi)** |
| *Article 6(3)(i)* | **Rule 24.1** |
| *Article 6(3)(j)* | **Rule 24.6 (first phrase)** |
| *Article 6(3)(k)* | **Rule 24.2(d)(xi)** |
| *Article 6(3)(l)* | **Rule 24.2(f)** |
| *Article 6(3)(m)* | **Rule 24.2(d)(iii) and Note 4 on Rule 24.2** |
| *Article 6(3)(n)* | **Rule 24.2(d)(xiv)** |

**"Response document rules"**

| *Article 9(5), first sentence* | **Rule 25.1(a) and (b)** |
|-------------------------------|--------------------------|

**App** 7.1

## APPENDIX 7

## SCHEMES OF ARRANGEMENT

**DEFINITIONS AND INTERPRETATION**

**Court sanction hearing**

The hearing of the court to sanction a scheme of arrangement.

**Effective date**

Effective date means:

(a) the date on which the order of the court sanctioning the scheme is delivered to the registrar of companies for registration; or

(b) if later, the date on which the order of the court confirming any associated reduction of capital and statement of capital are delivered to the registrar of companies for registration or, if the court so orders, the date on which they are registered.

**Offer documents and offeree board circulars**

In the case of a scheme of arrangement, references in the Code to an offer document or to the offeree board circular (and related expressions) shall be construed as references to the scheme circular and references to a revised offer document or to a subsequent offeree board circular (and related expressions) shall be construed as references to any supplementary scheme circular.

**Shareholder meetings**

The meeting of shareholders in the offeree company (or meetings of relevant classes of shareholders) convened by the court to consider a resolution to approve a scheme of arrangement and any general meeting of the offeree company (and related class meetings) convened to consider any resolution to approve or give effect to a scheme.

## 1   APPLICATION OF THE CODE TO SCHEMES OF ARRANGEMENT

The provisions of the Code apply to an offer effected by means of a scheme of arrangement in the same way as they apply to an offer effected by means of a contractual offer, except as set out in this Appendix 7.

## 2   MANDATORY OFFERS

An obligation to make a mandatory offer under Rule 9 may not be satisfied by way of a scheme of arrangement except with the prior consent of the Panel.

1.10.09

**App** 7.2

**APPENDIX 7** *CONTINUED*

*NOTES ON SECTION 2*

*1.   When the Panel's consent may be granted*

*Factors which the Panel will take into account when considering an application to satisfy a mandatory offer obligation by way of a scheme include the views of the offeree board and its independent adviser and the likely timetable of the scheme.*

*If the Panel permits the mandatory offer obligation to be so satisfied and the scheme lapses for a reason which would not have caused a contractual offer to lapse, the Panel will require the offeror to make a new contractual offer immediately in compliance with Rule 9. The scheme circular must include a statement by the offeror that, if the scheme lapses for such a reason, the offeror will make a new contractual offer as required by the Panel. In such circumstances Rule 9.7 will apply.*

*2.   Triggering Rule 9 during a scheme*

*Where an offeror is implementing its offer by way of a scheme of arrangement, the offeror and persons acting in concert with it may acquire an interest in shares which causes the offeror to have to extend a mandatory offer under Rule 9 only if the offeror has obtained the Panel's prior consent either to satisfy its mandatory offer obligation by way of a scheme or to switch to a contractual offer (see Section 8 of this Appendix 7).*

## 3   DATE OF SHAREHOLDER MEETINGS

The shareholder meetings must normally be convened for a date which is at least 21 days after the date of the scheme circular.

## 4   HOLDING STATEMENTS

(a) If a statement of the kind described in Note 1 on Rule 19.3 is made during an offer period involving a scheme of arrangement, the Panel will normally require the statement to be clarified by a date, to be specified by the Panel, in advance of the date of the shareholder meetings.

(b) Where appropriate, however, taking into account all relevant circumstances, including:

(i) the interests of offeree shareholders and the desirability of clarification prior to the shareholder meetings; and

(ii) the time which the offeror or potential offeror has had to consider its position,

APPENDIX 7 *CONTINUED*

the Panel may permit clarification after the date of the shareholder meetings but before the date of the court sanction hearing.

## 5   ANNOUNCEMENTS FOLLOWING KEY EVENTS IN A SCHEME

(a)  As soon as practicable after the votes on the relevant resolutions at the shareholder meetings and, in any event, by no later than 8.00 am on the business day following the shareholder meetings, the offeree company must make an announcement stating whether or not the resolutions were passed by the requisite majorities (and, if not, whether or not the scheme has lapsed) and giving details of the voting results in relation to the meetings, including:

(i)  in the case of any general meeting of the offeree company convened to consider any resolution to approve or give effect to the scheme, if a poll was taken, the number of shares of each class which were voted for and against the resolutions and the percentage of the shares voted which those numbers represent; and

(ii)  in the case of each court-convened meeting:

*(a)*  the number of shareholders of the class who voted for and against the resolution to approve the scheme and the percentage of those voting shareholders which those numbers represent;

*(b)*  the number of shares of the class which were voted for and against the resolution to approve the scheme and the percentage of the total shares voted which those numbers represent; and

*(c)*  the percentage of the issued shares of the class which the shares voted for and against the resolutions represent.

(b)  As soon as practicable following the court sanction hearing, the offeree company must make an announcement stating the decision of the court and including details of whether the scheme will proceed or has lapsed.

(c)  As soon as practicable on the effective date, the offeree company or the offeror must make an announcement stating that the scheme has become effective.

**App** 7.4

## 6   CHANGES TO THE EXPECTED SCHEME TIMETABLE

(a) Any adjournment of a shareholder meeting or court sanction hearing, or a decision by the offeree board to propose such an adjournment, must be announced promptly by the offeree company in accordance with the requirements of Rule 2.9. If the meeting or hearing is adjourned to a specified date, the announcement should set out the relevant details. If the meeting or hearing is adjourned without at the same time specifying a date for the adjourned meeting, a further announcement should be made in accordance with the requirements of Rule 2.9 once the new date has been set.

(b) Similarly, except with the consent of the Panel, any other change to the expected timetable of events set out in the scheme circular must be announced promptly by the offeror or offeree company (as appropriate) in accordance with the requirements of Rule 2.9.

(c) In all cases, the Panel should be consulted as to whether notice of an adjournment of any meeting or hearing or any other delay in, or change to, the expected timetable should, in addition, be sent to offeree company shareholders and persons with information rights.

## 7   REVISION

Any revision to a scheme of arrangement should normally be made by no later than the date which is 14 days prior to the date of the shareholder meetings (or any later date to which such meetings are adjourned). The consent of the Panel must be obtained if it is proposed to make any revision to a scheme either:

(a) less than 14 days prior to the date of the shareholder meetings (or any later date to which such meetings are adjourned); or

(b) following the shareholder meetings.

## 8   SWITCHING

(a) With the consent of the Panel, the offeror may switch from a scheme of arrangement to a contractual offer or from a contractual offer to a scheme of arrangement, whether or not the offeror has reserved the right to change the structure of the offer.

(b) The Panel will determine the offer timetable that will apply following any switch to which it consents.

(c) The offeror must announce a switch in accordance with the requirements of Rule 2.9. The announcement must include:

**App** 7.5

APPENDIX 7 *CONTINUED*

(i)   details of all changes to the terms and conditions of the offer as a result of the switch;

(ii)  details of any material changes to the other details originally announced pursuant to Rule 2.5(b);

(iii) an explanation of the offer timetable applicable following the switch (as determined by the Panel); and

(iv)  an explanation of whether or not any irrevocable commitments or letters of intent procured by the offeror or its associates will remain valid following the switch.

*NOTE ON SECTION 8*

*Determination of the offer timetable following a switch*

*Factors which the Panel may take into account when determining the offer timetable that will apply following a switch include:-*

*(a)  the time required to enable shareholders in the offeree company to reach a properly informed decision;*

*(b)  the time which has elapsed since the switching offeror's original announcement under Rule 2.5 and the extent to which it is reasonable for the offeree board to be hindered in the conduct of its affairs;*

*(c)  the views of the offeree board and the switching offeror; and*

*(d)  the likely effect of the new offer timetable on any competing offeror.*

## 9   ALTERNATIVE CONSIDERATION

(a) If a scheme of arrangement permits shareholders to elect to receive any alternative form of consideration, or to elect, subject to the election of others, to vary the proportions in which they receive different forms of consideration, the ability of shareholders to make such elections must not be closed off or withdrawn before the shareholder meetings.

(b) A shareholder who has elected to receive a particular form of consideration in respect of any of his shares must be entitled to withdraw his election. However, this right may be shut off not earlier than one week prior to the date on which the court sanction hearing is originally proposed to be held or, if for any reason the court sanction hearing is rearranged for a later date, not earlier than one week prior to that later date.

30.3.09

**App** 7.6

**APPENDIX 7** *CONTINUED*

*NOTE ON SECTION 9*

*Rule 11.1*

*The obligation to make cash available under Rule 11.1 will be considered to have been met if, at the time the acquisition was made, shareholders were able to elect for cash consideration at a price per share not less than that required by Rule 11.1, even if such an election subsequently ceases to be available.*

## 10 SETTLEMENT OF CONSIDERATION

Except with the consent of the Panel, the consideration must be sent to offeree company shareholders within 14 days of the effective date. The terms of the scheme must reflect this requirement.

## 11 RETURN OF DOCUMENTS OF TITLE

If an offer being implemented by way of a scheme lapses or is withdrawn, or if a shareholder withdraws his election for a particular form of consideration, all documents of title and other documents lodged with any form of election must be returned as soon as practicable (and in any event within 14 days of such lapsing or withdrawal) and the receiving agent should immediately give instructions for the release of securities held in escrow.

## 12 VOTING BY CONNECTED EXEMPT PRINCIPAL TRADERS

Except with the consent of the Panel, securities owned by an exempt principal trader connected with an offeror or the offeree company must not be voted on a resolution put to shareholders in the offeree company to approve or to give effect to a scheme of arrangement. The Panel will normally grant its consent in the following circumstances:

(a)  an exempt principal trader connected with an offeror whose offer is being implemented by way of a scheme will normally be permitted to vote against the scheme but will not normally be permitted to vote in favour of it;

(b)  an exempt principal trader connected with a competing offeror (or potential offeror) will normally be permitted to vote in favour of such a scheme but will not normally be permitted to vote against it; and

(c)  an exempt principal trader connected with the offeree company will normally be permitted to vote in favour of or against the scheme.

**App 7.7**

## 13 SCHEMES WHICH DO NOT HAVE THE SUPPORT OF THE OFFEREE BOARD

The Panel should be consulted if an offeror is considering announcing an offer or possible offer which it is proposed will be implemented by means of a scheme of arrangement without, prior to such announcement, obtaining the support of the offeree board.

## 14 PROVISIONS DISAPPLIED IN A SCHEME

The following provisions of the Code do not apply to a scheme of arrangement:

(a) Rule 4.5 (restriction on the offeree company accepting an offer in respect of treasury shares);

(b) Rule 10 (the acceptance condition);

(c) Note 3 on Rule 11.1 (when the obligation to offer cash is satisfied);

(d) the Note on Rule 12.1 (the effect of lapsing);

(e) Note 2 on Rule 13.5 (availability of withdrawal rights);

(f) Rules 17.1 and 17.2 (announcement of acceptance levels);

(g) Rule 18 (the use of proxies and other authorities in relation to acceptances);

(h) Rule 24.6 (incorporation of obligations and rights) and Rule 24.13 (cash underwritten alternatives which may be shut off);

(i) Rules 31.1 to 31.10 (timing of the offer);

(j) Rule 32.1(b), Notes 3 (first sentence) and 4 on Rule 32.1, paragraph (b) of Note 3 on Rule 32.2 and Note 5 on Rule 32.2 (revision);

(k) Rules 33.1 to 33.3 (alternative offers);

(l) Rule 34 (right of withdrawal); and

(m) Rules 36.4, 36.5 and 36.7 (partial offers).

**Doc** 1

## DOCUMENT CHARGES

Charges are payable on offer documents as set out in this Section.

The document charges are subject to periodic review; until further notice they are payable on all offers valued at £1 million or more. The amount of the charge will depend upon the value of the offer according to the scale set out below.

## 1   SCALE OF DOCUMENT CHARGES

| Value of the offer £ million | | | Charge £ | Charge as a maximum % of the value of the offer % |
|---|---|---|---|---|
| | 1 to | 5 | 2,000 | 0.20 |
| Over | 5 to | 10 | 8,500 | 0.17 |
| Over | 10 to | 25 | 14,000 | 0.14 |
| Over | 25 to | 50 | 27,500 | 0.11 |
| Over | 50 to | 100 | 50,000 | 0.10 |
| Over | 100 to | 250 | 75,000 | 0.08 |
| Over | 250 to | 500 | 100,000 | 0.04 |
| Over | 500 to | 1,000 | 125,000 | 0.03 |
| Over | 1,000 | | 175,000 | 0.02 |

## 2   VALUATION OF OFFER FOR DOCUMENT CHARGES

When the charge falls to be calculated on the basis of the value of securities to be issued as consideration, it should be computed by reference to the middle market quotation of the relevant securities at the last practicable date before the publication of the offer document as stated in that document and/or, as the case may be, by reference to the estimate of the value of any unlisted securities consideration given in the document in accordance with Rule 24.10.

When there are alternative offers, the alternative with the highest value will be used to calculate the value of the offer. Offers for all classes of equity share capital and other transferable securities carrying voting rights will be included in the calculation of the value of the offer, but offers for non-voting, non-equity share capital, convertibles, options etc will not.

## 3   "WHITEWASH" DOCUMENTS

A document charge is payable on all whitewash documents when, if a mandatory offer would be necessary but for the whitewash, its value would be £1 million or more. The Panel should be consulted in cases of whitewashes involving underwriting commitments or the issue of convertible securities.

30.3.09

# Doc 2

**DOCUMENT CHARGES** *CONTINUED*

The scale of charges is set out below:

| Value of the offer £ million | | Charge £ |
|---|---|---|
| | 1 to 5 | 2,500 |
| Over | 5 to 10 | 5,000 |
| Over | 10 | 10,000 |

## 4 MERGERS

When a merger is effected by offers for both companies by a new company created to make the offers, the document charge will be determined by the value of the lower of the two offers.

## 5 TENDER OFFERS

The document charge does not apply to tender offers under Appendix 5.

## 6 PAYMENT OF DOCUMENT CHARGES

The financial adviser to the offeror (or, if there is no financial adviser, the offeror) is responsible for the payment of the document charge to the Panel except in the case of a whitewash document when the financial adviser to the offeree company is responsible. Payments should be sent to the Panel when documents are published.

In all cases, a note setting out the calculation of whether a document charge is payable or not and, if payable, showing the calculations relating to each form of the offer should accompany the offer document (and payment where applicable) sent to the Panel. If the offer is revised, a similar note should be sent to the Panel with the revised offer document and any necessary further payment.

## 7 VAT AND OTHER TAX

The Customs and Excise authorities have confirmed that, under the arrangements which currently apply, the activities of the Panel are outside the scope of Value Added Tax. Document charges are therefore not liable to VAT and these payments will be treated as disbursements for VAT purposes.

The Panel is advised that the tax treatment of the document charge should follow that of the costs of the offer.

30.3.09