EXHIBIT 5

Westlaw.

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

**CR. v Panel on Takeovers and Mergers Ex p.
Datafin Plc**

[1987] 2 W.L.R. 699
Court of Appeal

Sir John Donaldson, Lloyd, and Nicholls M.R.

1986 Nov. 25, 26, 27; Dec. 1; 5

Judicial Review—Panel on Take—overs and Merg-
ers—Complaint—Panel dismissing complaint of al-
leged breach of panel's code on take—overs and
mergers—Whether decision subject to judicial re-
viewCompany—Take—overs and merg-
ers—Reference to City Panel on Take—overs and
Mergers—Take—over bid—Alleged breach of panel's
code on take—overs and mergers—Panel dismissing
complaint—Whether decision of panel errone-
ous—Whether panel's decision subject to judicial
review

The applicants, who were bidding in competition with
N. Plc. to take over another company, complained to
the Panel of Take-overs and Mergers that N. Plc. had
acted in concert with other parties in breach of the City
Code on Take-overs and Mergers. The panel dis-
missed the complaint and the applicants applied to the
High Court for leave to apply for judicial review by
way, inter alia, of certiorari to quash the panel's deci-
sion and of mandamus to compel the panel to recon-
sider the complaint. The judge refused leave on the
ground that the panel's decision was not susceptible to
judicial review.

On the renewed application before the Court of Ap-
peal, the court granting leave in order itself to consider
both the substantive application and the question of
jurisdiction: -

that the supervisory jurisdiction of the High Court was
adaptable and could be extended to any body which
performed or operated as an integral part of a system
which performed public law duties, which was sup-
ported by public law sanctions and which was under
an obligation to act judicially, but whose source of
power was not simply the consent of those over whom

it exercised that power; that although the panel pur-
ported to be part of a system of self-regulation and to
derive its power solely from the consent of those
whom its decisions affected, it was in fact operating as
an integral part of a governmental framework for the
regulation of financial activity in the City of London,
was supported by a periphery of statutory powers and
penalties, and was under a duty in exercising what
amounted to public powers to act judicially; that,
therefore, the court had jurisdiction to review the
panel's decision to dismiss the applicants' complaint;
but that since, on the facts, there were no grounds for
interfering with the panel's decision, the court would
decline to intervene (post, pp. 835E - 836A, 838B -
839A, 844E-H, 846C-D, 848H - 849D, H, 852A-D).

Reg. v. Criminal Injuries Compensation Board, Ex
parte Lain[1967] 2 Q.B. 864          , D.C., applied.

*Per*        Sir John Donaldson M.R. In the light of the
special nature of the panel, its functions, the market in
which it is operating, the time scales which are in-
herent in that market and the need to safeguard the
position of third parties, who may be numbered in
thousands, all of whom are entitled to continue
to    ***816***    trade upon an assumption of the
validity of the panel's rules and decisions, unless and
until they are quashed by the court, the relationship
between the panel and the court should be historic
rather than contemporaneous. The court should allow
contemporary decisions to take their course, consid-
ering the complaint and intervening, if at all, later and
in retrospect by declaratory orders (post, p. 842B-E).

The following cases are referred to in the judgments:

Council of Civil Service Unions v. Minister
for the Civil Service[1985] A.C. 374; [1984] 3 W.L.R.
1174; [1985] I.C.R. 14; [1984] 3 All E.R. 935,
H.L.(E.)
Czarnikow v. Roth, Schmidt & Co.[1922] 2 K.B. 478,
C.A.          .
Gillick v. West Norfolk and Wisbech Area Health
Authority[1986] A.C. 112          ;          [1985] 2
W.L.R. 413; [1985] 1 All E.R. 533          ,
C.A.;          [1986] A.C. 112; [1985] 3 W.L.R. 830;
[1985] 3 All E.R. 402, H.L.(E.)          .
O'Reilly    v.    Mackman[1983]    2    A.C.

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                              Page 2
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

237 ; [1982] 3 W.L.R. 604; [1982] 3 All E.R. 680 , C.A.; [1983] 2 A.C. 237; [1982] 3 W.L.R. 1096; [1982] 3 All E.R. 1124, H.L.(E.)

Reg. v. British Broadcasting Corporation, Ex parte Lavelle[1983] 1 W.L.R. 23; [1983] I.C.R. 99; [1983] 1 All E.R. 241

Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864; [1967] 3 W.L.R. 348; [1967] 2 All E.R. 770, D.C. .

Reg. v. Industrial Court, Ex parte A.S.S.E.T.[1965] 1 Q.B. 377; [1964] 3 W.L.R. 680; [1964] 3 All E.R. 130, D.C. .

Reg. v. Inland Revenue Commissioners, Ex parte National Federation of Self-Employed and Small Businesses Ltd.[1982] A.C. 617; [1981] 2 W.L.R. 722; [1981] 2 All E.R. 93, H.L.(E.)

Reg. v. Monopolies and Mergers Commission, Ex parte Argyll Group Plc.[1986] 1 W.L.R. 763; [1986] 2 All E.R. 257, C.A. .

Reg. v. National Joint Council for the Craft of Dental Technicians (Disputes Committee) Ex parte Neate[1953] 1 Q.B. 704; [1953] 2 W.L.R. 342; [1953] 1 All E.R. 327, D.C. .

The following additional cases were cited in argument:

Clifford and O'Sullivan, In Re[1921] 2 A.C. 570 , H.L.(I.)

Eastham v. Newcastle United Football Club Ltd.[1964] Ch. 413; [1963] 3 W.L.R. 574; [1963] 3 All E.R. 139

Law v. National Greyhound Racing Club Ltd.[1983] 1 W.L.R. 1302; [1983] 3 All E.R. 300, C.A.

Nagle v. Feilden[1966] 2 Q.B. 633; [1966] 2 W.L.R. 1027; [1966] 1 All E.R. 689, C.A.

Reg. v. Aston University Senate, Ex parte Roffey[1969] 2 Q.B. 538; [1969] 2 W.L.R. 1418; [1969] 2 All E.R. 964, D.C. .

Reg. v. Barnsley Metropolitan Borough Council, Ex parte Hook[1976] 1 W.L.R. 1052; [1976] 3 All E.R. 452, C.A. .

Reg. v. East Berkshire Health Authority, Ex parte Walsh[1985] Q.B. 152; [1984] 3 W.L.R. 818; [1984] I.C.R. 743; [1984] 3 All E.R. 425, C.A. .

Reg. v. Post Office, Ex parte Byrne[1975] I.C.R. 221, D.C. .

Rex v. Boycott, Ex parte Keasley[1939] 2 K.B. 651; [1939] 2 All E.R. 626, D.C. .

Rex v. Electricity Commissioners, Ex parte London Electricity Joint Committee Co. (1920)

Ltd. [1924] 1 K.B. 171, C.A. .

Rex v. Roupell(1776) 2 Cowp. 458

*817 Ridge v. Baldwin[1964] A.C. 40; [1963] 2 W.L.R. 935; [1963] 2 All E.R. 66, H.L.(E.) .

Sirros v. Moore[1975] Q.B. 118; [1974] 3 W.L.R. 459; [1974] 3 All E.R. 776, C.A. .

APPLICATION for judicial review.

The applicants, Datafin Plc. and Prudential Bache Securities Inc., applied for leave to apply for judicial review of a decision of the Panel on Take-overs and Mergers on 24 November 1986, under the City Code on Take-overs and Mergers, with the effect that an offer by the first interveners, Norton Opax Plc., for the issued ordinary share capital of McCorquodale Plc. became unconditional. The second interveners were Samuel Montagu & Co. Ltd., merchant bankers and financial advisers to Norton Opax. The relief sought included (1) an order of certiorari to quash the panel's decision and/or a declaration that that decision was wrong in law; (2) an order of mandamus requiring the panel to reconsider and take a proper decision in accordance with the City code; (3) an injunction to restrain Norton Opax, whether by itself, its officers, employees, agents or otherwise from (a) acquiring shares in McCorquodale pursuant to Norton Opax's offer dated 7 November 1986, or (b) registering any further shares in McCorquodale in the name of Norton Opax or any nominee of Norton Opax, pending the final determination of these proceedings; (4) costs and further or other relief. The grounds on which relief was sought were, inter alia, that rule 6.2 of the City Code on Take-overs and Mergers had been infringed in the course of Norton Opax's take-over bid and the panel's decision to the contrary was erroneous; that decisions of the panel were susceptible to judicial review; and that the applicants, as competing bidders for McCorquodale, had a sufficient interest to make the application.

On 25 November 1986, Hodgson J. refused the applicants leave to make that application and on the same day the applicants renewed the application before the Court of Appeal. The court granted leave in order to hear the substantive application itself and to consider more fully the question of jurisdiction. At the conclusion of the hearing, the court dismissed the substantive application but reserved both its reasons and its decision on the question of jurisdiction.

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

The facts are stated in the judgment of Sir John Donaldson M.R.

*Jeremy Lever Q.C.* and *Derrick Turriff* for the applicants. Introduction: there are three possible situations in which a person affected by a decision may wish to challenge it: (a) a public duty is owed by the decision-maker, which the person affected may invoke and obtain judicial review under R.S.C., Ord. 53 ; (b) a private duty is owed by the decision-maker, which the person affected can invoke to obtain the normal remedies of private law, including a declaratory judgment; (c) no duty is owed by the decision-maker which the person affected can invoke. A paradigm, but not the only case of public duty, is where the power to take the decision was derived from public law, e.g. a statute, statutory instrument, prerogative or some other aspect of the common law. A paradigm case of private duty is where the decision-maker and *818 the person affected are in contractual relations with each other and the decision arose exclusively out of, or related exclusively to, the contractual relationship. Similarly, perhaps, if the decision affects the person's [private] right to earn a living, then the decision-maker's duty might be a private one. An example of no duty would be a decision by the committee of the Garrick Club not to admit a person seeking election. (If the decision affected an existing member, he would have contractual rights under (b) above.)

The circumstances in which a public duty exists are not confined to situations where the source of the power lies in public law (the situation considered by Lord Diplock in Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374 , 409B). There are three ways of testing the existence of a public law duty: (i) the aforementioned "source" test; (ii) the "consequences" test: where the decision is made under a system which has a public law character by reason of the fact that it has consequences in the field of public law including, for example, the fact that measures to secure compliance with the rules of the system include measures taken in the exercise of public law powers; (iii) the "function" test: where the system under which the decision is made performs the functions of a public law system.

In refusing leave to apply for judicial review in the present case, Hodgson J. had in mind

both Reg. v. East Berkshire Health Authority, Ex parte Walsh[1985] Q.B. 152 and Law v. National Greyhound Racing Club Ltd.[1983] 1 W.L.R. 1302 ; yet the circumstances of both cases are different from those of the present case because of the contractual relationships involved, making them essentially private duty cases.

The factual and legal background to the Code on Takeovers and Mergers: the Bank of England was an important progenitor if not the onlie begetter. The Bank of England is a statutory body with wide powers: see Bank of England Act 1946, section 4 . The Bank clearly performs its relevant functions in part in collaboration with the Department of Trade and Industry. Between them they gave birth to the Joint Review Body, which is engaged in general supervision of the securities market. For the origins of the Code on Take-overs and Mergers, see *Halsbury's Laws of England,* 4th ed. (1974), vol. 7, para. 791. The code is a code of ethics, not a code of law. Until recently, the Council of the Securities Industry had been involved in its enforcement, but in 1985 the Panel on Take-overs and Mergers assumed sole responsibility. (The Securities and Investments Board is not yet in full operation.) The code is statutorily recognised: see, for example, paragraph 10 of the Schedule to the Restrictive Trade Practices (Services) Order 1976 (S.I. 1976 No. 98) (made under the Fair Trading Act 1973 but now operating under the Restrictive Trade Practices Act 1976 ). Sanctions for breach of the code are set out in the introduction to the code and include expulsion from the securities markets and reference to the Department of Trade and Industry, the Stock Exchange or other appropriate body, which would use statutory or contractual powers to penalise any transgressor. A breach of the code is ipso facto an act of misconduct by a member of the Stock Exchange, for which he may be expelled. Furthermore, the admission of shares to the Official List may *819 be withheld in the event of such a breach. The listing of securities is a statutory function performed by the Stock Exchange under the Stock Exchange (Listing) Regulations 1984 (S.I. 1984 No. 716) , made, pursuant to section 2(2) of, and paragraph 2(2) of the Schedule to, the European Communities Act 1972 , in implementation of E.E.C. directives. Thus a sanction for breach of the code - delisting - involves the exercise of a statutory power. Therefore the code has many of the characteristics of law, but

[1987] Q.B. 815                                                                 Page 4
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

lacks the redeeming features of a legal system.

The historical development of the courts' supervisory jurisdiction by way of judicial review may be outlined as follows. (1)   Rex v. Electricity Commissioners, Ex parte London Electricity Joint Committee Co.    (1920) Ltd. [1924] 1 K.B. 171    , 205,    per    Lord Atkins. (2)    Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967]    2    Q.B.    864    , 882, 884A-885B,    per    Lord Parker C.J. and Diplock L.J. (3)    O'Reilly v. Mackman[1983] 2 A.C. 237    , 279B-G,    per    Lord Diplock. (4)    Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374    , 407H, where Lord Diplock castigates the treatment of previous judicial dicta, which were never intended to be exhaustive, as if they were statutes. See also    per    Lord Roskill at p. 414E-F, emphasising the evolutionary nature of the law on judicial review.

Does the Panel on Take-overs and Mergers owe a public duty? One answers this by reference to the three tests of the existence of a public law duty outlined above. (1) Applying the source test: there was an implied devolution by the government to the panel of a power to regulate transactions covered by the code. That power came through the Bank of England and, in the Joint Review Body, through the Department of Trade and Industry. The Bank of England appoints the chairman and deputy chairman of the panel. All this has been done for the better governance of the realm; and in all the circumstances it is impossible to say that the system established by the code operated by the panel has nothing to do with the government. The role of the government in this area is emphasised by a recommendation of the E.E.C. Commission in 1977 to the effect that governments should set up regulatory systems such as that provided by the Code. (2) Applying the consequences test: where a decision taken under the system which has a public law character because it has consequences in a public law field, measures taken include public law measures. Note references to consequences in    Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864    , 884, and in    O'Reilly v. Mackman[1983] 2 A.C. 237    . See also    Rex v. Boycott, Ex parte Keasley[1939]    2    K.B. 171    and    Nagle v. Feilden[1966] 2 Q.B. 633    , 651,    per    Salmon L.J. (3) Ap-

plying the function test: despite the fact that the code claims not to contain legal rules, it does have legal consequences and the power to make decisions comes from the code and the rules. The function performed by the panel is a public law function: it is regulatory in a public rather than a private sense, as can be seen from the way it operates and the consequences of breach. Furthermore, any attempt to oust the jurisdiction of the courts by proclaiming the non-legal nature of the code must be against public policy.   *820

*Robert    Alexander    Q.C.,    Timothy    Lloyd Q.C.*    and    *Keith Rowley*    for the panel.
The question of the courts' jurisdiction over the panel is important for all self-regulating bodies. The City is traditionally self-regulating and remains substantially so, subject to the    Financial Services Act 1986    . That Act does not expressly deal with the Panel on Take-overs and Mergers. In many cases of self-regulation, there may be a right to a remedy in private law, usually arising out of a contractual relationship. The absence of a public law jurisdiction does not necessarily deprive persons affected of a remedy. For example, where someone alleges that the rules of a body as to its membership are in restraint of trade, it is open to him to bring an action notwithstanding that he is not a member of that body:    Eastham v. Newcastle United Football Club Ltd.[1964] Ch. 413    . But in such a case there would be no jurisdiction in public law over that body.

Self-regulation stems from a realization by a group that the regulation of their activities is desirable in the common interest. That group accepts that rules for the performance of functions and duties should be established and enforced. The success of self-regulation depends on (i) rules being drawn up by responsible and acceptable responsible bodies; (ii) the observance of those rules; (iii) respect for the decisions of those bodies by those affected; (iv) those who operate in the market accepting that the rules and their obedience to them are essential as an aspect of entering the market at all. In assessing whether the rules provide sufficient protection, it is right to remember that no one can survive in the market without the confidence of others, and that such rules ultimately serve the public interest.

The Panel on Take-overs and Mergers, in denying the jurisdiction of the court, is not claiming a licence to take wrong decisions. The panel may be required to take decisions swiftly and finally. When a

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

ruling is asked for in the course of a bid, it may affect the outcome of the bid before or after it has succeeded. If the latter, then the shares will already be traded under the new name. In the former case, if a dissatisfied party rushes to court, it will have the effect of dislocating the market during a takeover situation, however fast the court is able to act. If the panel is called to resolve a conflict between parties and their financial advisers, there is an overwhelming need for speedy finality. An application to the court may be made as a defensive measure during a bid, to create uncertainty even after the outcome of the bid is known. It could be used as a ploy. The importance of finality was stressed by Sir John Donaldson M.R. in         Reg. v. Monopolies and Mergers Commission, Ex parte Argyll Croup Plc[1986] 1 W.L.R. 763        , 774H. This is a valid policy consideration when considering whether to extend jurisdiction.

The Code on Take-overs and Mergers already contains certain safeguards for those affected by its decisions, including a right of appeal. Where a party is affected by virtue of their membership of the Stock Exchange, they can rely on the contractual relationship already existing to provide a private law remedy.

The panel is only susceptible to judicial review if it satisfies the traditional criteria for determining whether it is fulfilling a public duty. This depends on power; more particularly, the source of that power. To    **\*821**    suggest, as do the applicants, that a body whose power does not derive from a public source can still be subject to public law if it performs a public law function with public law consequences, is to deny a fundamental aspect of public law. Moreover, the fact that either the    Restrictive Trade Practices Act 1976    or the    Restrictive Trade Practice (Services) Order 1976    refer to an agreement or recommendation or activity of another body does not render the functions of that body public law functions. The exempted agreements listed in    Schedule 3    to the Act are clearly not within the ambit of public law. So far as the    Stock Exchange (Listing) Regulations 1984    are concerned, the fact that a party (the Stock Exchange) governed by public law implements (directly or indirectly) a decision by a third party (the panel) not within the public law domain does not bring that third party into the public law forum. In any case the Stock Exchange is only subject to public law by virtue of those regulations.

The source of its power remains of critical importance to any determination as to whether a body is subject to judicial review. That source might lie in primary or secondary legislation. Moreover, it is clear from    Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374    that if the Crown exercises its prerogative through a statutory instrument, then the source is such as to render it liable to judicial review. Review might also lie if the Crown exercised its prerogative without a Statutory Instrument. The applicants' second (consequences) and third (function) tests represent an extension of the law because they enable review to take place without looking at the critical element, namely the source of the power to take the decision under review. The seriousness of the consequences, or of the public interest involved, is not the correct test. Public law operates against those bodies which could be the subject of prerogative writs. The    Order 53    procedure has not expanded the scope of operation of public law in the sense of having extended the category of bodies which could be subject to prerogative orders. In    O'Reilly v. Mackman[1983] 2 A.C. 237    , Lord Diplock observed that Order 53 did not create new remedies but was essentially procedural. In    Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374    , 408-409, Lord Diplock, setting out the types of action which were reviewable, emphasised throughout the importance of the source of public law powers. See also    Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864    and    Reg. v. Post Office, Ex parte Byrne[1975] I.C.R. 743    . All these cases show that it is the source of power that determines whether judicial review should lie.

The panel is performing a duty which it is in the public interest should be performed, but it is not a public duty. It is a private duty, because Parliament in its wisdom has decided to leave this area subject to self-regulation. [Reference was made to    Law v. National Greyhound Racing Club Ltd.[1983] 1 W.L.R. 1302    ;    Reg. v. East Berkshire Health Authority,    Ex    parte    Walsh[1985]    Q.B. 152    ;    O'Reilly v. Mackman[1983] 2 A.C. 237    and    Nagle v. Feilden[1966] 2 Q.B. 633    .] A body is only subject to judicial review where its decisions affect persons qua subjects of the realm. Such a body must be established by a governmental    **\*822**    power: see, generally,    Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864    ;    Rex

[1987] Q.B. 815                                                                                                                    Page 6
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

v. Electricity Commissioners, Ex parte London Electricity Joint Committee Co. (1920) Ltd. [1924] 1 K.B. 171; In Re Clifford and O'Sullivan[1921] 2 A.C. 570 ; O'Reilly v. Mackman[1983] 2 A.C. 237 ; Reg. v. Barnsley Metropolitan Borough Council, Ex parte Hook[1976] 1 W.L.R. 1052 ; Reg. v. Aston University Senate, Ex parte Roffey[1969] 2 Q.B. 538 ; Sirros v. Moore[1975] Q.B. 118 and Reg. v. Post Office, Ex parte Byrne[1975] I.C.R. 221 .

On the facts of this case, the panel does not derive its power from a public source. The applicants rely on a devolution of power through the Bank of England and the Department of Trade and Industry but the only statutory powers the Bank of England has are the power to give directions to other banks (under the Bank of England Act 1946 ) and the power to grant banking licences. Otherwise, it has no power over other institutions. The Joint Review Body is a wholly informal body which does not exercise powers. It is and has been the policy of governments to leave such institutions to self-regulation. The applicants cannot rely on the fact that other bodies, such as the Stock Exchange, have powers, such as the power to list or de-list stocks, which apply the standards of the panel as making the panel subject to judicial review. Finally, the applicants' reliance on the function test runs counter to the decision of the House of Lords in In Re Clifford and O'Sullivan[1921] 2 A.C. 570 . [Counsel also referred to a skeleton argument which is substantially quoted in the judgment of Sir John Donaldson M.R., post, p. 839D-H.]

*Jonathan Sumption Q.C.* and *Stephen Richards* for the interveners. It is against the public interest for decisions of the Panel on Take-overs and Mergers to be subject to judicial review. As an essential component in a system of self-regulation, it is imperative that the panel should be able to make decisions with absolute finality, in view of the damage otherwise done to the smooth operation of the market. If a party which is unsuccessful before the panel is able to apply for judicial review, it will soon become a device to which anyone wanting to frustrate a bid will be able to resort.

Even if the panel is subject to judicial review, the chances of the court's discretion being exercised in favour of an applicant are slim indeed. An application for judicial review is not an appeal. It is for the panel

to hear and evaluate the evidence and to find the relevant facts. The court can only interfere if there has been illegality (the panel has misdirected itself in law), irrationality (no reasonable panel could have reached such a decision) or procedural impropriety (failure by the panel to conform to the rules governing its own conduct or to basic rules of natural justice).

On the chronology to the take-over bid, once a bid goes unconditional as to acceptances (i.e. acceptances exceed 50 per cent) it is undesirable that there be any substantial lapse of time before the bid goes unconditional in all respects. Otherwise those who have already accepted the bid cannot trade their stock. A contract is formed between the offeror and each accepting shareholder from which neither can resile. It is common ground that in this case, the Norton Opax bid had gone **\*823** unconditional as to acceptances. Once that happens, none of these contracts is conditional on the approval of the panel.

The applicants make three basic complaints. First, they allege that in breach of the Code on Take-overs and Mergers, Norton Opax failed to increase its offer to McCorquodale shareholders, other than core sub-underwriters, to reflect the increased consideration paid to core sub-underwriters and the parent company of the principal core sub-underwriter for the McCorquodale shares acquired by it from them. But Norton Opax did not pay any increased consideration for McCorquodale shares either to the core sub-underwriters or indeed to anyone else. Under the terms of the underwriting agreements, the success of the bid gave the core sub-underwriters the entitlement to an increased underwriting fee, but that was no part of the consideration for the McCorquodale shares. The sub-underwriters would have received it even if the same shares had been assented to Norton Opax by someone other than a core sub-underwriter. But in any case, since this point was not put to the panel, it cannot be argued here.

Secondly, the applicants allege that in breach of the code, the Kuwait Investment Office ("K.I.O.") acted in concert with Norton Opax in that, for whatever reasons, they had an agreement with Samuel Montagu & Co. Ltd., Norton Opax's merchant banker, which gave them an incentive to see that Norton Opax's offer became unconditional and they did so by purchasing shares at a price 12.2p in excess of the cash price offered by Norton Opax and by assenting those shares

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                 Page 7
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (**Cite as: [1987] Q.B. 815**)

to Norton Opax. Essentially, this amounts to an allegation that an agreement which gives underwriters an interest in the success of the bid makes the underwriter a concert party if he purchases shares in the target company. But that does not come within the definition of "concert party" in the code, and it is not for the court to make it do so now.

Thirdly, the applicants allege that in view of the timing of and the price paid by K.I.O. in their purchase of McCorquodale shares, the fact that they were purchased through one of the brokers to Norton Opax and the assenting of those shares to that offer, the panel could not properly fail to conclude that K.I.O. and Norton Opax were acting in concert, unless it misdirected itself in law by erroneously assuming that in order to support such a finding it would have to have found that there had been communication between Norton Opax and K.I.O. in connection with those share purchases. This complaint is no doubt partly based on a sentence in the report to the panel's executive: "Certain of [the core underwriters] met the management for the standard presentation during the offer in the normal way but in fact K.I.O. never met the management at all." The applicants assume from this first that the executive regarded that as conclusive of the absence of a concert party situation and secondly that the panel did likewise. But it is clear from the affidavit evidence of Sir Jasper Hollom, chairman of the panel, that the panel made no such error. The panel approached the matter on the assumption that for a "concert party" to exist there had to be an agreement or understanding between the parties, and in the absence of contact at the presentation meeting, evidence had to be found elsewhere to support such a finding. Such evidence, sufficient to satisfy the panel, was not **\*824** adduced, who therefore concluded that K.I.O.'s decision to purchase the shares was made for genuine investment reasons, all of which explained both the purchase and its timing.

In any event, these were all matters of fact for the panel to consider so that even if the court had jurisdiction to intervene, it should not exercise its discretion in favour of doing so. But for the reasons given both on behalf of the interveners and previously on behalf of the panel itself, the court has no jurisdiction to intervene and the application should be refused.

*Lever*          in reply, referred to          Reg. v. Inland Revenue Commissioners, Ex parte National Federa-

tion of Self-Employed and Small Businesses Ltd.[1982]          A.C.          617          , 642-643,          *per*          Lord Diplock;          O'Reilly v. Mackman[1983]          2          A.C.          237          , 257-258,          *per*          Lord Denning M.R.;          In Re          Clifford          and          O'Sullivan[1921]          2          A.C. 570          ;          Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967]          2          Q.B. 864          ;          Ridge          v.          Baldwin[1964]          A.C. 40          ;          Rex          v.          Rorpell(1776)          2          Cowp. 458          ;          Reg. v. Barnsley Metropolitan Borough Council, Ex parte Hook[1976]          1          W.L.R. 1052          and          Reg. v. Post Office, Ex parte Byrne[1975]          I.C.R. 221          .

The reality of the situation is that the self-regulation urged by the respondents does not exist. The right of a man to offer to buy another's property is restricted by statutes such as the          Fraud (Investment) Act 1958          . He has to go through an authorised person or obtain the permission of the Department of Trade and Industry. Datafin cannot make an offer except subject to the restrictions imposed. This strongly supports the concept of implied devolution and the role of the function test which the applicants urge upon the court. It is hollow to speak of self-regulation here: what we are discussing is clearly a public law system. The function being performed is one of public law. It must be a matter of deep concern to the courts if such a system can operate out-with the law.

Even if a private remedy is available, that is not fatal to a claim for judicial review. Only if the decision concerned is taken specifically by reference to a private law situation will it be excluded from the public law jurisdiction. Even if there is a private law relationship in the present case, this decision was not taken in that context, so it is no bar to the availability of the Order 53 jurisdiction.

*Cur. adv. vult.*

5 December. The following judgments were handed downSIR JOHN DONALDSON M.R.

The Panel on Take-overs and Mergers is a truly remarkable body. Perched on the 20th floor of the Stock Exchange building in the City of London, both literally and metaphorically it oversees and regulates a very important part of the United Kingdom financial

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                                          Page 8
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

market. Yet it performs this function without visible means of legal support.

The panel is an unincorporated association without legal personality and, so far as can be seen, has only about twelve members. But those members are appointed by and represent the Accepting Houses **\*825** Committee, the Association of Investment Trust Companies, the Association of British Insurers, the Committee of London and Scottish Bankers, the Confederation of British Industry, the Council of the Stock Exchange, the Institute of Chartered Accountants in England and Wales, the Issuing Houses Association, the National Association of Pension Funds, the Financial Intermediaries Managers and Brokers Regulatory Association, and the Unit Trust Association; the chairman and deputy chairman being appointed by the Bank of England. Furthermore, the panel is supported by the Foreign Bankers in London, the Foreign Brokers in London and the Consultative Committee of Accountancy Bodies.

It has no statutory, prerogative or common law powers and it is not in contractual relationship with the financial market or with those who deal in that market. According to the introduction to the City Code on Take-overs and Mergers, which it promulgates:

"The code has not, and does not seek to have, the force of law, but those who wish to take advantage of the facilities of the securities markets in the United Kingdom should conduct themselves in matters relating to take-overs according to the code. Those who do not so conduct themselves cannot expect to enjoy those facilities and may find that they are withheld. The responsibilities described herein apply most directly to those who are actively engaged in all aspects of the securities markets, but they are also regarded by the panel as applying to directors of companies subject to the code, to persons or groups of persons who seek to gain control (as defined) of such companies, and to all professional advisers (insofar as they advise on the transactions in question), even where they are not directly affiliated to the bodies named in section (1)(a). Equally, where persons other than those referred to above issue circulars to shareholders in connection with take-overs the panel expects the highest standards of care to be observed. The provisions of the code fall into two categories. On the one hand, the code enunciates general principles of conduct to be observed in take-over transactions: these general principles are a codification of good standards of commercial behaviour and should have an obvious and universal application. On the other hand, the code lays down a series of rules, some of which are no more than examples of the application of the general principles whilst others are rules of procedure designed to govern specific forms of take-over. Some of the general principles, based as they are upon a concept of equity between one shareholder and another, while readily understandable in the City and by those concerned with the securities markets generally, would not easily lend themselves to legislation. The code is therefore framed in non-technical language and is, primarily as a measure of self-discipline, administered and enforced by the panel, a body representative of those using the securities markets and concerned with the observance of good business standards, rather than the enforcement of the law. As indicated above, the panel executive is always available to be consulted and where there is doubt this should be done in advance of any action. Taking legal or other **\*826** professional advice on matters of interpretation under the code is not an appropriate alternative to obtaining a view or a ruling from the executive."

"Self-regulation" is an emotive term. It is also ambiguous. An individual who voluntarily regulates his life in accordance with stated principles, because he believes that this is morally right and also, perhaps, in his own long term interests, or a group of individuals who do so, are practising self-regulation. But it can mean something quite different. It can connote a system whereby a group of people, acting in concert, use their collective power to force themselves and others to comply with a code of conduct of their own devising. This is not necessarily morally wrong or contrary to the public interest, unlawful or even undesirable. But it is very different.

The panel is a self-regulating body in the latter sense. Lacking any authority de jure, it exercises immense power de facto by devising, promulgating, amending and interpreting the City Code on Take-overs and Mergers, by waiving or modifying the application of the code in particular circumstances, by investigating and reporting upon alleged breaches of the code and by the application or threat of sanctions. These sanctions are no less effective because they are applied indirectly and lack a legally enforceable base.

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

Thus, to quote again from the introduction to the code:

"If there appears to have been a material breach of the code, the executive invites the person concerned to appear before the panel for a hearing. He is informed by letter of the nature of the alleged breach and of the matters which the director general will present. If any other matters are raised he is allowed to ask for an adjournment. If the panel finds that there has been a breach, it may have recourse to private reprimand or public censure or, in a more flagrant case, to further action designed to deprive the offender temporarily or permanently of his ability to enjoy the facilities of the securities markets. The panel may refer certain aspects of a case to the Department of Trade and Industry, the Stock Exchange or other appropriate body. No reprimand, censure or further action will take place without the person concerned having the opportunity to appeal to the appeal committee of the panel." The unspoken assumption, which I do not doubt is a reality, is that the Department of Trade and Industry or, as the case may be, the Stock Exchange or other appropriate body would in fact exercise statutory or contractual powers to penalise the transgressors. Thus, for example, rules 22 to 24 of the Rules of the Stock Exchange (1984) provide for the severest penalties, up to and including expulsion, for acts of misconduct and by rule 23.1 :

"Acts of misconduct may consist of any of the following... (g) Any action which has been found by the Panel on Take-overs and Mergers (including where reference has been made to it, the appeal committee of the panel) to have been in breach of the City Code on Take-overs and Mergers. The findings of the panel, subject ***827** to any modification by the appeal committee of the panel, shall not be re-opened in proceedings taken under rules 22 to 24."

The principal issue in this appeal, and only issue which may matter in the longer term, is whether this remarkable body is above the law. Its respectability is beyond question. So is its bona fides. I do not doubt for one moment that it is intended to, and does, operate in the public interest and that the enormously wide discretion which it arrogates to itself is necessary if it is to function efficiently and effectively. Whilst not wishing to become involved in the political contro-

versy on the relative merits of self-regulation and governmental or statutory regulation, I am content to assume for the purposes of this appeal that self-regulation is preferable in the public interest. But that said, what is to happen if the panel goes off the rails? Suppose, perish the thought, that it were to use its powers in a way which was manifestly unfair. What then? Mr. Alexander submits that the panel would lose the support of public opinion in the financial markets and would be unable to continue to operate. Further or alternatively, Parliament could and would intervene. Maybe, but how long would that take and who in the meantime could or would come to the assistance of those who were being oppressed by such conduct?

A somewhat similar problem confronted the courts in 1922 when the Council of the Refined Sugar Association, a self-regulatory body for the sugar trade and no less respectable than the panel, made a rule which purported to preclude any trader from asking a trade arbitrator to state a case for the opinion of the court or from applying to the court for an order that such a case be stated. The matter came before a Court of Appeal consisting of Bankes, Atkin and Scrutton L.JJ.: see *Czarnikow v. Roth, Schmidt & Co.*[1922] 2 K.B. 478 . The decision has no direct application to the present situation, because the court was concerned with the law of contract, but its approach was traditional, significant and, in the case of Scrutton L.J., colourful. This approach can be illustrated by brief quotations from the judgments. Bankes L.J. said, at p. 484:

"To release real and effective control over commercial arbitration is to allow the arbitrator, or the arbitration tribunal, to be a law unto himself, or themselves, to give him or them a free hand to decide according to law or not according to law as he or they think fit, in other words to be outside the law. At present no individual or association is, so far as I am aware, outside the law except a trade union. To put such associations as the Refined Sugar Association in a similar position would in my opinion be against public policy. Unlimited power does not conduce to reasonableness of view or conduct." Scrutton L.J. said, at p. 488:

"In my view to allow English citizens to agree to exclude this safeguard for the administration of the law is contrary to public policy. There must be

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

no Alsatia in England where the King's writ does not run. " Atkin L.J. said, at p. 491:

"I think that it is still a principle of English law that an agreement to oust the jurisdiction of the courts is invalid... In the case of powerful associations such as the present, able to impose their own arbitration clauses upon their members, and, by their uniform contract, conditions upon all non-members contracting with members, the result might be that in time codes of law would come to be administered in various trades differing substantially from the English mercantile law. The policy of the law has given to the High Court large powers over inferior courts for the very purpose of maintaining a uniform standard of justice and one uniform system of law... If an agreement to oust the common law jurisdiction of the court is invalid every reason appears to me to exist for holding that an agreement to oust the court of this statutory jurisdiction is invalid."

Thus far I have made no mention of the facts underlying this application or of the parties, other than the panel. This is not accidental, but reflects the fact that the major issue of whether the courts of this country have any jurisdiction to control the activities of a body which de facto exercises what can only be characterised as powers in the nature of public law powers does not depend upon those particular facts. Nor has the issue of jurisdiction vel non any connection with the quite distinct issue of how, in principle, the court should exercise any jurisdiction which it may have. The facts are only relevant to whether this is an appropriate case in which, in accordance with such general principles, to exercise any such jurisdiction. However, I should now remedy the deficiency.

The applicants for relief by way of judicial review are Datafin Plc., an English company, and Prudential-Bache Securities Inc. of New York. In addition there appear, as interveners, Norton Opax Plc. and Samuel Montagu & Co. Ltd., their merchant bankers and financial advisers, both being English companies. Other members of the cast, albeit not parties to the proceedings, are Greenwell Montagu & Co. Ltd., the stockbroking arm of Samuel Montagu; Laurence Prust, another stockbroker; the Kuwait Investment Office ("K.I.O.") a major investor in the United Kingdom financial market; and McCorquodale Plc., an English printing company, which was the

target for the take-over bids which precipitated the present proceedings. I can take the background facts from the paper prepared by the executive of the panel:

"2.1 In March 1986 Norton Opax made its original offer for McCorquodale, but the offer lapsed in April on reference to the *829 Monopolies · and Mergers Commission. On 24 September it was announced that the M.M.C. had concluded that the acquisition would not operate against the public interest. Norton Opax was then free to proceed with its offer. 2.2 On 25 September 1986 Norton Opax announced its final offer for McCorquodale. The offer was two new Norton Opax ordinary shares for each McCorquodale ordinary share and, at that time, valued each McCorquodale ordinary share at 290p. In addition there was an underwritten cash alternative of 260p per McCorquodale share provided by Samuel Montagu. The board of McCorquodale, advised by Kleinwort Benson, recommended shareholders to reject the offer. 2.3 On 1 November 1986 a competing offer was announced. The offeror was Datafin, a new company formed by certain executive directors and members of the management of McCorquodale and backed by a number of financial institutions, led by Prudential-Bache. The offer was 300p cash per McCorquodale share. Subsequently on 6 November 1986, Norton Opax announced an increased final offer of seven new Norton Opax ordinary shares for every three McCorquodale shares, valuing each McCorquodale share (on the basis of Norton Opax's share price at the time) at 340.7p, with an underwritten cash alternative of 303.3p per share. Datafin then increased its offer first to 310p and subsequently to 315p cash per share. 2.4 During the course of the offers Mr. Robert Maxwell acquired a substantial shareholding in McCorquodale and by the time of the announcement of Datafin's final offer held some 22 per cent. At that stage he undertook to commit his entire shareholding to Norton Opax's offer on the basis that if it failed both his shareholding and Norton Opax's would be assented to Datafin's offer. 2.5 On 20 November 1986, Norton Opax declared its offer unconditional as to acceptances, having received acceptances representing 50.2 per cent. of the share capital of McCorquodale. At the request of the executive, Norton Opax has agreed not to declare its offer fully unconditional pending the result of this hearing."

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                                                      Page 11
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

Both the alternative cash offers by Norton Opax were underwritten in a novel, but not unprecedented, form, involving core underwriters and core sub-underwriters as contrasted with traditional market underwriters. The executive reported:

"Under these arrangements in outline, a number of potential sub-underwriters are identified who are prepared to accept a lower commission if the offer fails, on the basis of a higher one if it is successful. This practice has recently developed and its rationale is apparent in the case of companies bidding for others larger than themselves where there is a particular need to save costs if the bid is unsuccessful. It was first used in the Argyll/Distillers offer and was also seen as relevant for Norton Opax's bid for McCorquodale. Both core underwriters and market underwriters receive a greater commission if the bid is successful, but the difference is more marked in the case of the core underwriters. Full details of the    **\*830**    commission arrangements are set out in Samuel Montagu's submission, but they can be summarised as follows. (1) Market underwriters receive a commitment commission of ½ per cent. together with a further           per cent. for each period of 7 days (or part) in excess of 30 days. (2) Core underwriters receive a commitment commission of ¼ per cent. increased to 1½ per cent. if the bid is successful. (3) Both market and core underwriters receive a further ¾ per cent. based upon the value of Norton Opax shares allotted pursuant to the offer in respect of acceptances received up to the time the cash alternative closes.

"Approximately 100 million Norton Opax shares were involved in the initial underwriting on 25 September; of these K.I.O. sub-underwrote some 11 million as core underwriter and 8 million as market underwriter. For the increased final offer announced on 6 November some 89 million Norton Opax shares were underwritten, K.I.O. taking approximately 11 million as core underwriter. In each case the proportion of shares underwritten by K.I.O. was greater than that of other sub-underwriters although it is noteworthy that one other core sub-underwriter took 10 million shares in the second underwriting. Moreover Greenwell Montagu have said that K.I.O.'s share was not disproportionately large, given that K.I.O. are generally the greater participant in their underwriting list, owing to their substantial size."

Consistently with the panel's declared intention of doing equity between one shareholder and another, the code contains rules which prevent an offeror from buying shares at prices higher than that contained in his offer without revising that offer upwards to match those prices and which also prevent him increasing any offer which has been made on the expressed basis that it would not thereafter be increased. These rules would be ineffective if, while the offeror was subject to restrictions upon his conduct, his servants, agents or those acting in collaboration with him remained wholly free to take whatever action they thought fit. Accordingly the rules contain restrictions upon the freedom of action of persons acting in concert with the offeror, quaintly referred to as "concert parties." They are "defined" in the rules as follows, although it should be noted that whilst part of the definition could be properly so described, the remainder involves a rebuttable presumption that certain parties fall within the definition:

"Acting in concert

*"This definition has particular relevance to mandatory offers and further guidance with regard to behaviour which constitutes acting in concert is given in the notes on rule 9.1*

"Persons acting in concert comprise persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition by any of them of shares in a company, to obtain or consolidate control (as defined below) of that company. Without prejudice to the general application of this definition the following persons will be presumed to be persons acting in concert with other persons in the same category unless the    **\*831**    contrary is established: - (1) a company, its parent, subsidiaries and fellow subsidiaries, and their associated companies, and companies of which such companies are associated companies, all with each other (for this purpose ownership or control of 20 per cent. or more of the equity share capital of a company is regarded as the test of associated company status); (2) a company with any of its directors (together with their close relatives and related trusts); (3) a company with any of its pension funds; (4) a person with any investment company, unit trust or other person whose investments such person manages on a discretionary basis; (5) a financial ad-

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                                                   Page 12

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (**Cite as: [1987] Q.B. 815**)

viser with its client in respect of the shareholdings of:
(a) the financial adviser; and (b) all the investment
accounts which the financial adviser manages on a
discretionary basis, where the percentage of the cli-
ent's equity share capital held by the financial adviser
and those investment accounts totals 10 per cent. or
more; and (6) directors of a company which is subject
to an offer or where the directors have reason to be-
lieve a bona fide offer for their company may be im-
minent.

*"Note: where the panel has ruled that a group of
persons is acting in concert, it will be necessary for
clear evidence to be presented to the panel before it
can·be accepted that the position no longer obtains."*

It is common ground that Datafin and Pruden-
tial-Bache, as the leading financial backer of Datafin's
bid, are concert parties. Accordingly neither could
seek to obtain further shares in McCorquodale at a
price in excess of 315p cash per share, the figure put
forward in Datafin's final offer. It is also common
ground that Norton Opax and Laurence
Prust/Greenwell Montagu, the two brokers to the offer
whilst acting as such were concert parties, as were
Norton Opax and Samuel Montagu, their merchant
bankers. So too were K.I.O. and Greenwell Montagu,
when acting on their behalf, but K.I.O. was subject to
no relevant restrictions under the rules, provided that it
was not acting in concert with one or other of the rival
bidders.

However, Datafin and Prudential-Bache maintained
that K.I.O. and Norton Opax were concert parties and
that K.I.O. had acted in breach of the code in author-
ising Greenwell Montagu to buy some 2.4 million
McCorquodale shares on its behalf from Sun Life
Assurance Society Plc. ("Sun Life") at a price of
315.5p on 17 November 1986 immediately after
Datafin had made a final offer of 315p and in assent-
ing those shares to Norton Opax's offer.

The basic facts upon which this charge was
founded were as follows. (a) K.I.O. had a significant
interest in the Norton Opax bid being successful, since,
in that event under the core underwriting arrangement,
it would be paid about £350,000 in underwriting fees,
whereas it would only receive £35,000 if the bid failed.
(b) The £350,000 would be paid by Norton Opax
through the principal underwriter, K.I.O. being
sub-underwriters. (c) The purchase of the Sun Life

shares was suggested to K.I.O. by Greenwell Montagu,
one of the joint brokers to the Norton Opax bid. (d)
K.I.O. assented the shares to the Norton Opax bid. (e)
K.I.O. could have bought McCorquodale shares on the
market at a        *832          price below 315.5p per
share before the final Datafin offer was made at 315p
per share and at a time when Datafin might thereby
have been induced to raise its earlier bid, but failed to
do so.

On these facts Datafin and Prudential-Bache con-
cluded that there must have been some agreement or
understanding (formal or informal) between Norton
Opax and K.I.O. actively to co-operate through the
acquisition of shares in McCorquodale in order to
obtain control of that company. They further con-
tended that K.I.O. as a concert party with Norton Opax,
had offered Sun Life more than 303.3p per share, the
Norton Opax cash alternative and that, reading the
underwriting agreement and the offer together, Norton
Opax had agreed to acquire the ex-Sun Life
McCorquodale shares from K.I.O. at a price in excess
of that on offer to other shareholders in McCorquodale,
since the assent of these shares tipped the balance in
favour of the success of the bid and entitled K.I.O. to a
bonus of the additional underwriting fee.

This complaint against Norton Opax and K.I.O.
was put to the panel and considered by the executive,
which heard evidence and concluded:

"          *6 The views of the execu-
tive*      6.1 In order that Norton Opax and
K.I.O. can be regarded as acting in concert, it must be
established that there is an agreement or understand-
ing, which provides for active co-operation between
them; that such co-operation includes the purchasing
of McCorquodale shares by one of them; and that any
such purchasing is for the purpose of obtaining and
consolidating code control of McCorquodale. 6.2 To
reach a conclusion of acting in concert, the executive
considers there should be evidence that leads to that
conclusion or circumstances must be such that it
should on balance be inferred that the relevant parties
were acting in concert. In this case, the executive has
no reason to doubt the facts, and statements of inten-
tions, as recounted by representatives of Norton Opax,
Greenwell Montagu, Laurence Prust and K.I.O. The
fact that people may act with similar intentions or that
someone may purchase further shares with a view to
becoming a substantial shareholder in the offeror will

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                                                    Page 13
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

not of themselves amount to evidence of a concert party. 6.3 K.I.O. is one of the most substantial investment institutions, in this country. For this reason it is generally offered a large share in underwritings by brokers, and deals with Greenwell Montagu on this basis. The particular type of underwriting arrangement entered into in connection with the Norton Opax offer, involving K.I.O.'s role as a 'core' underwriter, although not the norm, is by no means extraordinary. The core underwriters were not approached before the day the offers were announced, did not know each other's identity and received no special presentations. Certain of them met the management for the standard presentation during the offer in the normal way but in fact K.I.O. never met the management at all. The executive is therefore of the view that the underwriting arrangements do not provide evidence of any agreement or understanding providing for active co-operation between K.I.O. and Norton Opax for the purpose of obtaining control of McCorquodale. The executive has discussed the subsequent purchases of McCorquodale shares with K.I.O. As stated above, K.I.O. have                **\*833**                 said that the purchase of McCorquodale shares was seen simply as an opportunity for acquiring a significant interest in the combined Norton Opax/McCorquodale group and was motivated solely by investment criteria. The executive see no reason to doubt K.I.O.'s motives in this respect. The fact that K.I.O. sought to become a substantial shareholder in the combined group cannot of itself give rise to a presumption of concertedness. The purchase price of the McCorquodale shares is also worthy of note. At 315                      it was only                            in excess of Datafin's offer. The exposure to K.I.O. in the event that the Norton Opax offer lapsed was therefore minimal, since it would be able to realise 315p in accepting the Datafin offer. The executive has also discussed the purchases with the other investment institutions involved; again in each case the executive has been assured that the purchases were made solely with a view to investing in the combined group. 6.4 In conclusion, the executive is of the view that at no stage during the course of the offer has there been any agreement or understanding between K.I.O. and Norton Opax which leads to their being held to be acting in concert.

      "7          *Consequences of the panel's ruling*          7.1 If the panel agrees with the executive's ruling the executive recommends that Norton Opax should be released from its undertaking not to declare the offer wholly unconditional. 7.2 If the panel

were to take the contrary view to the executive it would be necessary to address the question of how to deal with the consequences in the context of a final offer. On the one hand, to order an increased offer under either rule 6 or rule 11 would be problematic; as has been stated above, since the offer was expressed to be final, it could be argued that a concert party should not enable the offeror to increase his offer when he would otherwise be precluded from doing so. On the other hand, to require the bid to lapse might be equally inappropriate."

      The complaint was futher considered by the panel itself, which also heard evidence. It dismissed the complaint, the chairman saying:

      "The panel have carefully considered the evidence laid before them in this case and I have to tell you that they are not convinced that a concert party did exist in code terms in this instance; and they, therefore, uphold the ruling of the executive on that point. The panel did go on to consider more generally the position of - the relationship of - core underwriting arrangements in circumstances such as these and they would wish to add a rider to the effect that the gearing effects core underwriting arrangements have could in their view, in particular circumstances, in particular cases, be such as to contribute appreciably towards the creation of a presumption of concerted action; and that, therefore, in cases where core underwriting arrangements are involved those concerned should have particular regard to the possibility of their being held, in the light of all the circumstances in a particular case, to be in concert. and they would further add that in such circumstances where there is core underwriting involved, one of the circumstances which would further intensify the degree of investigation which would be implied,            **\*834**             would be the fact of purchases above the bid price. It is not of course to be seen as exclusively a feature that would necessarily be brought into examination; but the existence of purchases above the bid price is naturally one which would intensify the degree of examination which would be appropriate in such cases. It will clearly, I think, be apt for the panel to issue a statement as soon as we can do so giving the announcement that a hearing on this subject has been held, that a concert party has not been found to exist and carrying also the rider points that I have mentioned."

On the morning of 25 November 1986 Datafin and

Prudential-Bache sought leave from Hodgson J. to apply for judicial review of the panel's decision and for consequential relief. The judge refused the application without giving reasons, whilst indicating that in his view the court had no jurisdiction. The application was renewed to this court that afternoon and we began the hearing at once. In the course of the argument we decided to give leave and further determined to hear the substantive application ourselves. We gave leave because the issue as to jurisdiction seemed to us to be arguable and of some public importance and we retained seisin of the matter with a view to saving time in a situation of considerable urgency.

It will be seen that there are three principal issues, viz.: (a) Are the decisions of the panel susceptible to judicial review? This is the "jurisdictional" issue. (b) If so, how in principle is that jurisdiction to be exercised given the nature of the panel's activities and the fact that it is an essential part of the machinery of a market in which time is money in a very real sense? This might be described as the "practical" issue. (c) If the jurisdictional issue is answered favourably to the applicants, is this a case in which relief should be granted and, if so, in what form?

As the new Norton Opax ordinary shares have been admitted to the Official Stock Exchange List and so can be traded, subject to allotment, any doubt as to the outcome of the present proceedings could affect the price at which these shares are or could be traded and thus the rights of those entitled to trade in them. Accordingly we thought it right to announce at the end of the argument that the application for judicial review would be refused. However, I propose to explain my reasons for reaching this conclusion by considering the three issues in the order in which I have set them out.The jurisdictional issue

As I have said, the panel is a truly remarkable body, performing its function without visible means of legal support. But the operative word is "visible," although perhaps I should have used the word "direct." Invisible or indirect support there is in abundance. Not only is a breach of the code, so found by the panel, ipso facto an act of misconduct by a member of the Stock Exchange, and the same may be true of other bodies represented on the panel, but the admission of shares to the Official List may be withheld in the event of such a breach. This is interesting and significant for listing of securities is a statutory function performed

by the Stock Exchange in pursuance of the Stock Exchange (Listing) Regulations 1984 (S.I. 1984 No. 716) , enacted in implementation *835 of E.E.C. directives. and the matter does not stop there, because in December 1983 the Department of Trade and Industry made a statement explaining why the Licensed Dealers (Conduct of Business) Rules 1983 (S.I. 1983 No. 585) contained no detailed provisions about take-overs. It said:

"There are now no detailed provisions in these statutory rules about take-overs and the following paragraphs set out the provisions as regards public companies and private companies respectively. 2. As regards public companies (as well as private companies which have had some kind of public involvement in the ten years before the bid) the department considers it better to rely on the effectiveness and flexibility of the City Code on Take-overs and Mergers, which covers bids made for public companies and certain private companies which have had some past public involvement. The City code has the support of, and can be enforced against, professional security dealers and accordingly the department expects, as a matter of course, that those making bids for public companies (and private companies covered by the code) to use the services of a dealer in securities authorised under the Prevention of Fraud (Investments) Act 1958 (such as a stock-broker, exempt dealer, licensed dealer, or a member of a recognised association), in which case the Secretary of State's permission for the distribution of take-over documents is not required. This is seen as an important safeguard for the shareholders of the public company (of which there may be several hundreds or thousands) and as a means of ensuring that such take-overs are conducted properly and fully in accordance with the provisions of the City code. It would only be in exceptional cases that the Secretary of State would consider removing this safeguard by granting permission under section 14(2) of the Act for the distribution of take-over documents in these circumstances."

The picture which emerges is clear. As an act of government it was decided that, in relation to take-overs, there should be a central self-regulatory body which would be supported and sustained by a periphery of statutory powers and penalties wherever non-statutory powers and penalties were insufficient or non-existent

[1987] Q.B. 815                                                                          Page 15
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

or where E.E.C. requirements called for statutory provisions.

No one could have been in the least surprised if the panel had been instituted and operated under the direct authority of statute law, since it operates wholly in the public domain. Its jurisdiction extends throughout the United Kingdom. Its code and rulings apply equally to all who wish to make take-over bids or promote mergers, whether or not they are members of bodies represented on the panel. Its lack of a direct statutory base is a complete anomaly, judged by the experience of other comparable markets world wide. The explanation is that it is an historical "happenstance," to borrow a happy term from across the Atlantic. Prior to the years leading up to the "Big Bang," the City of London prided itself upon being a village community, albeit of an unique kind, which could regulate itself by pressure of professional opinion. As government increasingly accepted the necessity for intervention to prevent fraud, it *836 built on City institutions and mores, supplementing and reinforcing them as appeared necessary. It is a process which is likely to continue, but the position has already been reached in which central government has incorporated the panel into its own regulatory network built up under the Prevention of Fraud (Investments) Act 1958 and allied statutes, such as the Banking Act 1979 .

The issue is thus whether the historic supervisory jurisdiction of the Queen's courts extends to such a body discharging such functions, including some which are quasi-judicial in their nature, as part of such a system. Mr. Alexander, for the panel, submits that it does not. He says that this jurisdiction only extends to bodies whose power is derived from legislation or the exercise of the prerogative. Mr. Lever for the applicants, submits that this is too narrow a view and that regard has to be had not only to the source of the body's power, but also to whether it operates as an integral part of a system which has a public law character, is supported by public law in that public law sanctions are applied if its edicts are ignored and performs what might be described as public law functions.

In Reg. v. Criminal Injuries Compensation Board, Ex parte Lain [1967] 2 Q.B. 864 , 882, Lord Parker C.J., who had unrivalled experience of the prerogative remedies both on the Bench and at the Bar, said that the exact limits of the ancient remedy of certiorari had never been and ought not to be specifically defined. I respectfully agree and will not attempt such an exercise. He continued, at p. 882:

"They have varied from time to time being extended to meet changing conditions. At one time the writ only went to an inferior court. Later its ambit was extended to statutory tribunals determining a lis inter partes. Later again it extended to cases where there was no lis in the strict sense of the word but where immediate or subsequent rights of a citizen were affected. The only constant limits throughout were that it was performing a public duty. Private or domestic tribunals have always been outside the scope of certiorari since their authority is derived solely from contract, that is, from the agreement of the parties concerned.... We have as it seems to me reached the position when the ambit of certiorari can be said to cover every case in which a body of persons of a public as opposed to a purely private or domestic character has to determine matters affecting subjects provided always that it has a duty to act judicially. Looked at in this way the board in my judgment comes fairly and squarely within the jurisdiction of this court. It is, as Mr. Bridge said, 'a servant of the Crown charged by the Crown, by executive instruction, with the duty of distributing the bounty of the Crown.' It is clearly, therefore, performing public duties." Diplock L.J., who later was to make administrative law almost his own, said, at pp. 884-885:

"The jurisdiction of the High Court as successor of the Court of Queen's Bench to supervise the exercise of their jurisdiction by inferior tribunals has not in the past been dependent upon the *837 source of the tribunal's authority to decide issues submitted to its determination, except where such authority is derived solely from agreement of parties to the determination. The latter case falls within the field of private contract and thus within the ordinary civil jurisdiction of the High Court supplemented where appropriate by its statutory jurisdiction under the Arbitration Acts. The earlier history of the writ of certiorari shows that it was issued to courts whose authority was derived from the prerogative, from Royal Charter, from franchise or custom as well as from Act of Parliament. Its recent history shows that as new kinds of tribunals have been

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

created, orders of certiorari have been extended to them too and to all persons who under authority of the Government have exercised quasi-judicial functions. True, since the victory of Parliament in the constitutional struggles of the 17th century, authority has been, generally if not invariably, conferred upon new kinds of tribunals by or under Act of Parliament and there has been no recent occasion for the High Court to exercise supervisory jurisdiction over persons whose ultimate authority to decide matters is derived from any other source. But I see no reason for holding that the ancient jurisdiction of the Court of Queen's Bench has been narrowed merely because there has been no occasion to exercise it. If new tribunals are established by acts of government, the supervisory jurisdiction of the High Court extends to them if they possess the essential characteristics upon which the subjection of inferior tribunals to the supervisory control of the High Court is based. What are these characteristics? It is plain on the authorities that the tribunal need not be one whose determinations give rise directly to any legally enforceable right or liability. Its determination may be subject to certiorari notwithstanding that it is merely one step in a process which may have the result of altering the legal rights or liabilities of a person to whom it relates. It is not even essential that the determination must have that result, for there may be some subsequent condition to be satisfied before the determination can have any effect upon such legal rights or liabilities. That subsequent condition may be a later determination by another tribunal (see    Rex v. Postmaster-General, Ex parte Carmichael[1928]      1       K.B. 291          ;           Rex v. Boycott, Ex parte Keasley[1939] 2 K.B. 651             ). Is there any reason in principle why certiorari should not lie in respect of a determination, where the subsequent condition which must be satisfied before it can affect any legal rights or liabilities of a person to whom it relates is the exercise in favour of that person of an executive discretion, as distinct from a discretion which    is    required    to    be    exercised    judicially?"          Ashworth J., who like Lord Parker C.J. had served as junior counsel to the Treasury and as such had vast experience in this field, said, at pp. 891-892:

"It is a truism to say that the law has to adjust itself to meet changing circumstances and although a tribunal, constituted as the board, has not been the subject of consideration or decision by this         *838          court in relation to

an order of certiorari, I do not think that this court should shrink from entertaining this application merely because the board had no statutory origin. It cannot be suggested that the board had unlawfully usurped jurisdiction: it acts with lawful authority, albeit such authority is derived from the executive and not from an Act of Parliament. In the past this court has felt itself able to consider the conduct of a minister when he is acting judicially or quasi-judicially and while the present case may involve an extension of relief by way of certiorari I should not feel constrained to refuse such relief if the facts warranted it."

The Criminal Injuries Compensation Board, in the form which it then took, was an administrative novelty. Accordingly it would have been impossible to find a precedent for the exercise of the supervisory jurisdiction of the court which fitted the facts. Nevertheless the court not only asserted its jurisdiction, but further asserted that it was a jurisdiction which was adaptable thereafter. This process has since been taken further in      O'Reilly v. Mackman[1983] 2 A.C. 237        , 279 (       per        Lord Diplock) by deleting any requirement that the body should have a duty to act judicially; in       Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374        by extending it to a person exercising purely prerogative power; and in      Gillick v. West Norfolk and Wisbech Area Health Authority[1986] A.C. 112         , where Lord Fraser of Tullybelton, at p. 163F and Lord Scarman, at p. 178F-H expressed the view obiter that judicial review would extend to guidance circulars issued by a department of state without any specific authority. In all the reports it is possible to find enumerations of factors giving rise to the jurisdiction, but it is a fatal error to regard the presence of all those factors as essential or as being exclusive of other factors. Possibly the only essential elements are what can be described as a public element, which can take many different forms, and the exclusion from the jurisdiction of bodies whose sole source of power is a consensual submission to its jurisdiction.

In fact, given its novelty, the panel fits surprisingly well into the format which this court had in mind in the      Criminal Injuries Compensation Board Case.      It is without doubt performing a public duty and an important one. This is clear from the expressed willingness of the Secretary of State for

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (**Cite as: [1987] Q.B. 815**)

Trade and Industry to limit legislation in the field of take-overs and mergers and to use the panel as the centrepiece of his regulation of that market. The rights of citizens are indirectly affected by its decisions, some, but by no means all of whom, may in a technical sense be said to have assented to this situation, e.g. the members of the Stock Exchange. At least in its determination of whether there has been a breach of the code, it has a duty to act judicially and it asserts that its raisin d'etre is to do equity between one shareholder and another. Its source of power is only partly based upon moral persuasion and the assent of institutions and their members, the bottom line being the statutory powers exercised by the Department of Trade and Industry and the Bank of England. In this context I should be very disappointed if the courts could not recognise the realities of executive power and *839 allowed their vision to be clouded by the subtlety and sometimes complexity of the way in which it can be exerted.

Given that it is really unthinkable that, in the absence of legislation such as affects trade unions, the panel should go on its way cocooned from the attention of the courts in defence of the citizenry, we sought to investigate whether it could conveniently be controlled by established forms of private law, e.g. torts such as actionable combinations in restraint of trade, and, to this end, pressed Mr. Lever to draft a writ. Suffice it to say that the result was wholly unconvincing and, not surprisingly, Mr. Alexander did not admit that it would be in the least effective.

In reaching my conclusion that the court has jurisdiction to entertain applications for the judicial review of decisions of the panel, I have said nothing about the substantial arguments of Mr. Alexander based upon the practical problems which are involved. These, in my judgment, go not to the existence of the jurisdiction, but to how it should be exercised and to that I now turn. The practical issue

Mr. Alexander waxed eloquent upon the disastrous consequences of the court having and exercising jurisdiction to review the decisions of the panel and his submissions deserved, and have received, very serious consideration. In a skeleton argument, he put it this way:

"Even if, which is not accepted, there is an apparent anomaly for an inability to challenge a patently wrong decision which may have important consequences, countervailing disadvantages would arise if the decisions were open to review. Applications would often be made which were unmeritorious. The fact that the court could dismiss such applications does not prevent their having a substantial effect in dislocating the operation of the market during the pendency of proceedings, in creating uncertainty in areas where it is vital that there should be finality. That finality should more appropriately exist at the threshold stage, by denying the possibility of action, rather than at the subsequent stage when the court comes to exercise its discretion since by that time there will already have been a lack of finality for a period. The nature of the rulings of the take-over panel are particularly required to have speed and certainty: they may be given in the middle of a bid, and they clearly may affect the operation of the market, and even short-term dislocation could be very harmful. The present case illustrates the uncertainty within the market which can be created by the mere bringing of an application. The issue is important for self-regulation as a whole. It would create uncertainty if it were to be said that each self-regulating body were to be considered in the context of the entire factual background of its operation, and of the peculiar features of the take-over panel which made it susceptible to judicial review. It would obviously have wide ranging consequences if there were general statements that self-regulating bodies carrying out important functions were susceptible to judicial review."*840

I think that it is important that all who are concerned with take-over bids should have well in mind a very special feature of public law decisions, such as those of the panel, namely that however wrong they may be, however lacking in jurisdiction they may be, they subsist and remain fully effective unless and until they are set aside by a court of competent jurisdiction. Furthermore, the court has an ultimate discretion whether to set them aside and may refuse to do so in the public interest, notwithstanding that it holds and declares the decision to have been made ultra vires: see, for example,      Reg. v. Monopolies and Mergers Commission, Ex parte Argyll Group Plc.[1986] 1 W.L.R. 763       . That case also illustrates the awareness of the court of the special needs of the financial markets for speed on the part of decision-makers and for being able to rely upon those decisions as a sure basis for dealing in the market. It further illustrates an awareness that such decisions affect a very wide public which will not be parties to

[1987] Q.B. 815                                                                                      Page 18
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

the dispute and that their interests have to be taken into account as much as those of the immediate disputants.

In the context of judicial review, it must also be remembered that it is not even possible to apply for relief until leave has been obtained. The purpose of this provision was explained by Lord Diplock in Reg. v. Inland Revenue Commissioners, Ex parte National Federation of Self-Employed and Small Businesses Ltd.[1982] A.C. 617 , 642-643:

"The need for leave to start proceedings for remedies in public law is not new. It applied previously to applications for prerogative orders, though not to civil actions for injunctions or declarations. Its purpose is to prevent the time of the court being wasted by busybodies with misguided or trivial complaints of administrative error, and to remove the uncertainty in which public officers and authorities might be left as to whether they could safely proceed with administrative action while proceedings for judicial review of it were actually pending even though misconceived."

In many cases of judicial review where the time scale is far more extended than in the financial markets, the decision-maker who learns that someone is seeking leave to challenge his decision may well seek to preserve the status quo meanwhile and, in particular, may not seek to enforce his decision pending a consideration of the matter by the court. If leave is granted, the court has the necessary authority to make orders designed to achieve this result, but usually the decision-maker will give undertakings in lieu. All this is but good administrative practice. However, against the background of the time scales of the financial market, the courts would not expect the panel or those who should comply with its decisions to act similarly. In that context the panel and those affected should treat its decisions as valid and binding, unless and until they are set aside. Above all they should ignore any application for leave to apply of which they become aware, since to do otherwise would enable such applications to be used as a mere ploy in take-over battles which would be a serious abuse of the process of the court and could not be adequately penalised by awards of costs.*841

If this course is followed and the application for leave is refused, no harm will have been done. If the appli-

cation is granted, it will be for the court to decide whether to make any and, if so, what orders to preserve the status quo. In doing so it will have regard to the likely outcome of the proceedings which will depend partly upon the facts as they appear from the information at that time available to the court, but also in part upon the public administrative purpose which the panel is designed to serve. This is somewhat special.

Consistently with its character as the controlling body for the self-regulation of take-overs and mergers, the panel combines the functions of legislator, court interpreting the panel's legislation, consultant, and court investigating and imposing penalties in respect of alleged breaches of the code. As a legislator it sets out to lay down general principles, on the lines of E.E.C. legislation, rather than specific prohibitions which those who are concerned in take-over bids and mergers can study with a view to detecting and exploiting loopholes.

Against that background, there is little scope for complaint that the panel has promulgated rules which are ultra vires, provided only that they do not clearly violate the principle proclaimed by the panel of being based upon the concept of doing equity between one shareholder and another. This is a somewhat unlikely eventuality.

When it comes to interpreting its own rules, it must clearly be given considerable latitude both because, as legislator, it could properly alter them at any time and because of the form which the rules take, i.e. laying down principles to be applied in spirit as much as in letter in specific situations. Where there might be a legitimate cause for complaint and for the intervention of the court would be if the interpretation were so far removed from the natural and ordinary meaning of the words of the rules that an ordinary user of the market could reasonably be misled. Even then it by no means follows that the court would think it appropriate to quash an interpretative decision of the panel. It might well take the view that a more appropriate course would be to declare the true meaning of the rule, leaving it to the panel to promulgate a new rule accurately expressing its intentions.

Again the panel has powers to grant dispensation from the operation of the rules: see, for example, rule 9.1 of the code. This is a dis-

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (**Cite as: [1987] Q.B. 815**)

cretionary power only fettered by the overriding obligation to seek, if not necessarily to achieve, equity between one shareholder and another. Again I should be suprised if the exercise of this power could be attacked, save in wholly exceptional circumstances and, even then, the court might well take the view that the proper form of relief was declaratory rather than substantive.

This leaves only the panel's disciplinary function. If it finds a breach of the rules proved, there is an internal right of appeal which, in accordance with established principles, must be exercised before, in any ordinary circumstances, the court would consider intervening. In a case, such as the present, where the complaint is that the panel should have found a breach of the rules, but did not do so, I would expect the court to be even more reluctant to move in the absence of any credible allegation of lack of bona fides. It is not for a court exercising a judicial **\*842** review jurisdiction to substitute itself for the fact-finding tribunal and error of law in the form of finding of fact for which there was no evidence or in the form of a mis-construction of the panel's own rules would normally be a matter to be dealt with by a declaratory judgment. The only circumstances in which I would anticipate the use of the remedies of certiorari and mandamus would be in the event, which I hope is unthinkable, of the panel acting in breach of the rules of natural justice - in other words, unfairly.

Nothing that I have said can fetter or is intended to or should be construed as fettering the discretion of any court to which application is made for leave to apply for judicial review of a decision of the panel or which, leave having been granted, is charged with the duty of considering such an application. Nevertheless, I wish to make it clear beyond a peradventure that in the light of the special nature of the panel, its functions, the market in which it is operating, the time scales which are inherent in that market and the need to safeguard the position of third parties, who may be numbered in thousands, all of whom are entitled to continue to trade upon an assumption of the validity of the panel's rules and decisions, unless and until they are quashed by the court, I should expect the relationship between the panel and the court to be historic rather than contemporaneous. I should expect the court to allow contemporary decisions to take their course, considering the complaint and intervening, if at all, later and

in retrospect by declaratory orders which would enable the panel not to repeat any error and would relieve individuals of the disciplinary consequences of any erroneous finding of breach of the rules. This would provide a workable and valuable partnership between the courts and the panel in the public interest and would avoid all of the perils to which Mr. Alexander alluded.The reasons for rejecting this application

There was some failure on the part of the applicants to appreciate, or at least to act in recognition of the fact, that an application for judicial review is not an appeal. The panel and not the court is the body charged with the duty of evaluating the evidence and finding the facts. The role of the court is wholly different. It is, in an appropriate case, to review the decision of the panel and to consider whether there has been "illegality," i.e., whether the panel has misdirected itself in law; "irrationality," i.e., whether the panel's decision is so outrageous in its defiance of logic or of accepted moral standards that no sensible person who had applied his mind to the question to be decided could have arrived at it; or "procedural impropriety," i.e., a departure by the panel from any procedural rules governing its conduct or a failure to observe the basic rules of natural justice, which is probably better described as "fundamental unfairness," since justice in nature is conspicuous by its absence. If authority be required for propositions which are so well established, it is to be found in the speech of Lord Diplock in *Council of Civil Service Unions v. Minister for the Civil Service*[1985] A.C. 374 , 410-411.

In the course of the hearing before this court, the applicants sought and were given leave to amend their grounds of application. As so **\*843** amended, they made three complaints of breaches of the code and of the panel's failure so to find. (a) In breach of the code, Norton Opax failed to increase its offer to McCorquodale shareholders, other than core sub-underwriters, to reflect the increased consideration paid to core sub-underwriters and the parent company of the principal core sub-underwriter for the McCorquodale shares acquired by it from them. (b) In breach of the code, K.I.O. acted in concert with Norton Opax in that, irrespective of the reasons for their conduct, they had an agreement with Samuel Montagu & Co. Ltd., Norton Opax's merchant banker, which gave them an

[1987] Q.B. 815                                                                                                   Page 20
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

incentive to procure that Norton Opax's offer should become unconditional and they did so procure by purchasing shares at a price 12.2p in excess of the cash price offered by Norton Opax and by assenting those shares to Norton Opax. (c) Having regard to the timing and price paid by K.I.O. for the McCorquodale shares, the fact that they were purchased through one of the brokers to Norton Opax's offer and the assenting of those shares to that offer, the panel could not properly have failed to find that K.I.O. and Norton Opax were concert parties, unless it misdirected itself in law in the erroneous belief that a finding that there was communication between Norton Opax and K.I.O. with regard to those share purchases was necessary to support such a finding.

I can dispose of complaint (a) very quickly. Norton Opax never did pay an increased consideration for McCorquodale shares to core sub-underwriters or anyone else. The success of the bid brought with it an entitlement on the part of the core sub-underwriters to be paid an increased underwriting fee, but this was not part of the consideration for McCorquodale shares. It would have been payable to core sub-underwriters if the same shares had been assented to Norton Opax by someone other than a core sub-underwriter. Furthermore, this point is not open, since it was not argued before the panel.

Complaint (b) essentially amounts to an allegation that an agreement which gives underwriters an interest in the success of a bid makes the underwriter a concert party if he purchases shares in the target company. The short answer to this is that "concert party" could be so defined, but it is not and whether any alteration should be made is a matter for the panel and not for the court.

Complaint (c) is no doubt based upon the sentence in paragraph 6.3. of the report of the panel's executive, which I have already quoted, reading: "Certain of [the core underwriters] met the management for the standard presentation during the offer in the normal way but in fact K.I.O. never met the management at all." Two assumptions are then made, namely that the executive regarded this as conclusive of the absence of a concert party situation and that the panel did likewise. We have in the event had the advantage of affidavit evidence from the chairman which makes it clear that the panel made no such error. He has deposed that the panel approached the matter

on the basis of the definition of "concert party" which requires a finding of an agreement or understanding. It did not regard the fact that there was no contact between K.I.O. and Norton Opax as an absolute bar to a finding of concerted action but rightly appreciated that, in the absence of such      *844      contact, sufficient evidence to support an agreement or understanding had to be found elsewhere if such a finding were to be made. There was no such evidence or none sufficient to satisfy the panel and the evidence as a whole satisfied it that K.I.O.'s decision to purchase the shares was made for genuine investment reasons which explained both the purchase and when it was made.

Whilst this is more than sufficient to dispose of complaint (c), the chairman's long, detailed and helpful affidavit well illustrates the need for the court to avoid underestimating the extent to which expert knowledge can negative inferences which might otherwise be drawn from a partial knowledge of the facts and the extent to which a greater knowledge of the facts can make a decision which at first might seem faintly surprising, not only explicable, but plainly right. Thus the panel from its expertise knew that no significance should be attached to the bare fact that K.I.O. used Greenwell Montagu as their brokers since

"it is common for an investor who wishes to buy shares for which an offer is current to use one of the brokers to the offer, because that broker's knowledge of the market during such period is likely to be particularly good. Brokers to an offer are regarded as free to continue their general broking business with other parties throughout the offer, though they must be careful about disclosure of information." Again, the panel heard evidence from other institutional purchasers of McCorquodale shares who bought at the same time and at substantially the same price as K.I.O., one of whom was not a core sub-underwriter and could therefore only have been influenced by investment considerations. They were also able to investigate in depth what were the investment justifications of the purchases by both that institution and K.I.O.

In conclusion, I should like to make it clear that, but for the issue as to jurisdiction, this is not a case in which leave to apply should ever have been given. All that could be said at that stage was that there was a

[1987] Q.B. 815                                                                                                    Page 21
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

case for considering whether the advent of core underwriting might not call for some reconsideration of the definition of "concert party," perhaps putting core underwriters in the category of persons in respect of whom there was a rebuttable presumption of concerted action. That was plainly a matter for the panel which was minded to add a rider to its decision pointing to the fact that core underwriting arrangement might be subjected to close scrutiny, particularly where they were associated with market purchases above the level of cash offers. The fact that the panel's conclusion might at first have appeared surprising to someone who was not in day to day contact with the financial markets and who had heard none of the evidence would not have begun to justify the grant of leave to apply. LLOYD L.J.

I agree that this appeal should be dismissed for the reasons given by Sir John Donaldson M.R. I add only a few words on the important question whether the Panel on Take-overs and Mergers is a body which is subject to judicial review. In my judgment it is.*845

There have been a number of cases since the decision of the House of Lords in O'Reilly v. Mackman [1983] 2 A.C. 237 in which it has been necessary for the courts to consider the new-found distinction between public and private law. In most of them, objection has been taken by the defendant that the plaintiff has sought the wrong remedy. By seeking a remedy in private law, instead of public law, the plaintiff has, so it has been said, deprived the defendant of the special protection afforded by R.S.C., Ord. 53 . The formalism thus introduced into our procedure has been the subject of strong criticism by Sir Patrick Neill in a Child & Co. Oxford Lecture given in 1985, and by other academic writers. The curiosity of the present case is that it is, so to speak, the other way round. The plaintiff is seeking a remedy in public law. It is the defendant who asserts that the plaintiff's remedy, if any (and Mr. Alexander for the panel concedes nothing), lies in private law. Mr. Alexander has cast away the protection afforded by R.S.C., Ord. 53 in the hope, perhaps, that the panel may in the words of Mr. Lever be subject to no law at all.

On this part of the case Mr. Alexander has advanced arguments on two levels. On the level of pure policy he submits that it is undesirable for decisions or rulings of the panel to be reviewable. The intervention of the court would at best impede, at worst frustrate, the purposes for which the panel exists. Secondly, on a more technical level, he submits that to hold that the panel is subject to the supervisory jurisdiction of the High Court would be to extend that jurisdiction further than it has ever been extended before.

On the policy level, I find myself unpersuaded. Mr. Alexander made much of the word "self-regulating." No doubt self-regulation has many advantages. But I was unable to see why the mere fact that a body is self-regulating makes it less appropriate for judicial review. Of course there will be many self-regulating bodies which are wholly inappropriate for judicial review. The committee of an ordinary club affords an obvious example. But the reason why a club is not subject to judicial review is not just because it is self-regulating. The panel wields enormous power. It has a giant's strength. The fact that it is self-regulating, which means, presumably, that it is not subject to regulation by others, and in particular the Department of Trade and Industry, makes it not less but more appropriate that it should be subject to judicial review by the courts.

It has been said that "it is excellent to have a giant's strength, but it is tyrannous to use it like a giant." Nobody suggests that there is any present danger of the panel abusing its power. But it is at least possible to imagine circumstances in which a ruling or decision of the panel might give rise to legitimate complaint. An obvious example would be if it reached a decision in flagrant breach of the rules of natural justice. It is no answer to say that there would be a right of appeal in such a case. For a complainant has no right to appeal where the decision is that there has been no breach of the code. Yet a complainant is just as much entitled to natural justice as the company against whom the complaint is made.*846

Nor is it any answer that a company coming to the market must take it as it finds it. The City is not a club which one can join or not at will. In that sense, the word "self-regulation" may be misleading. The panel regulates not only itself, but all others who have no alternative but to come to the market in a case to which the code applies.

Mr. Alexander urged on us the importance of speed and finality in these matters. I accept that submission. I accept also the possibility that unmeritorious appli-

[1987] Q.B. 815                                                                                                         Page 22

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

cations will be made from time to time as a harassing or delaying tactic. It would be up to the court to ensure that this does not happen. These considerations are all very relevant to the exercise of the court's discretion in particular cases. They mean that a successful application for judicial review is likely to be very rare. But they do not mean that we should decline jurisdiction altogether.

So long as there is a possibility, however remote, of the panel abusing its great powers, then it would be wrong for the courts to abdicate responsibility. The courts must remain ready, willing and able to hear a legitimate complaint in this as in any other field of our national life. I am not persuaded that this particular field is one in which the courts do not belong, or from which they should retire, on grounds of policy. And if the courts are to remain in the field, then it is clearly better, as a matter of policy, that legal proceedings should be in the realm of public law rather than private law, not only because they are quicker, but also because the requirement of leave under R.S.C., Ord. 53 will exclude claims which are clearly unmeritorious.

So I turn to Mr. Alexander's more technical argument. He starts with the speech of Lord Diplock in    Council of Civil Service Unions v. Minister for the Civil Service[1985] A.C. 374    , 409:

"For a decision to be susceptible to judicial review the decision-maker must be empowered by public law (and not merely, as in arbitration, by agreement between private parties) to make decisions that, if validly made, will lead to administrative action or abstention from action by an authority endowed by law with executive powers, which have one or other of the consequences mentioned in the preceding paragraph. The ultimate source of the decision-making power is nearly always nowadays a statute or subordinate legislation made under the statute; but in the absence of any statute regulating the subject matter of the decision the source of the decision-making power may still be the common law itself, i.e., that part of the common law that is given by lawyers the label of 'the prerogative.' Where this is the source of decision-making power, the power is confined to executive officers of central as distinct from local government and in constitutional practice is generally exercised by those holding ministerial rank."

On the basis of that speech, and other cases to which Mr. Alexander referred us, he argues (i) that the sole test whether the body of persons is subject to judicial review is the source of its power, and (ii) that there has been no case where that source has been other than legislation, including subordinate legislation, or the prerogative.**847**

I do not agree that the source of the power is the sole test whether a body is subject to judicial review, nor do I so read Lord Diplock's speech. Of course the source of the power will often, perhaps usually, be decisive. If the source of power is a statute, or subordinate legislation under a statute, then clearly the body in question will be subject to judicial review. If, at the other end of the scale, the source of power is contractual, as in the case of private arbitration, then clearly the arbitrator is not subject to judicial review: see    Reg. v. National Joint Council for the Craft of Dental Technicians (Disputes Committee), Ex parte Neate[1953] 1 Q.B. 704        .

But in between these extremes there is an area in which it is helpful to look not just at the source of the power but at the nature of the power. If the body in question is exercising public law functions, or if the exercise of its functions have public law consequences, then that may, as Mr. Lever submitted, be sufficient to bring the body within the reach of judicial review. It may be said that to refer to "public law" in this context is to beg the question. But I do not think it does. The essential distinction, which runs through all the cases to which we referred, is between a domestic or private tribunal on the one hand and a body of persons who are under some public duty on the other. Thus in    Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864    Lord Parker C.J., after tracing the development of certiorari from its earliest days, said, at p. 882:

"The only constant limits throughout were that [the tribunal] was performing a public duty. Private or domestic tribunals have always been outside the scope of certiorari since their authority is derived solely from contract, that is, from the agreement of the parties concerned."    To the same effect is a passage from a speech of Lord Parker C.J. in an earlier case, to which we were not, I think, referred,    Reg. v. Industrial Court, Ex parte A.S.S.E.T.[1965] 1 Q.B. 377    , 389:

[1987] Q.B. 815                                                                                    Page 23
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 (Cite as: [1987] Q.B. 815)

"It has been urged on us that really this arbitral tribunal is not a private arbitral tribunal but that in effect it is undertaking a public duty or a quasi-public duty and as such is amenable to an order of mandamus. I am quite unable to come to that conclusion. It is abundantly clear that they had no duty to undertake the reference. If they refused to undertake the reference they could not be compelled to do so. I do not think that the position is in any way different once they have undertaken the reference. They are clearly doing something which they are not under any public duty to do and, in those circumstances, I see no jurisdiction in this court to issue an order of mandamus to the industrial court."

More recently, in Reg. v. British Broadcasting Corporation, Ex parte Lavelle[1983] 1 W.L.R. 23 , Woolf J. had to consider an application for judicial review where the relief sought was an injunction under R.S.C., Ord. 53, r. 1(2) . The case was brought by an employee of the B.B.C. In refusing relief, Woolf J. said, at p. 31:  **848**

"Ord. 53, r. 1(2) does not strictly confine applications for judicial review to cases where an order for mandamus, prohibition or certiorari could be granted. It merely requires that the court should have regard to the nature of the matter in respect of which such relief may be granted. However, although applications for judicial review are not confined to those cases where relief could be granted by way of prerogative order, I regard the wording of Ord. 53, r. 1(2) and section 31(2) of the Act of 1981 as making it clear that the application for judicial review is confined to reviewing activities of a public nature as opposed to those of a purely private or domestic character. The disciplinary appeal procedure set up by the B.B.C. depends purely upon the contract of employment between the applicant and the B.B.C., and therefore it is a procedure of a purely private or domestic character."

So I would reject Mr. Alexander's argument that the sole test whether a body is subject to judicial review is the source of its power. So to hold would in my judgment impose an artificial limit on the developing law of judicial review. That artificiality is well illustrated in the present case by reference to the listing regulations issued by the Council of the Stock Exchange. As the foreword to the current edition makes clear, a new edition of the regulations became necessary as the result of the Stock Exchange

(Listing) Regulations 1984 . Those Regulations were made as the result of a requirement of an E.E.C. Council directive. Mr. Alexander conceded that the listing regulations are now the subject of public law remedies. By contrast (if his submission is correct) the code, which is the subject not of a Council directive, but of a Commission recommendation, is not.

I now turn to the second of Mr. Alexander's two arguments under this head. He submits that there has never been a case when the source of the power has been other than statutory or under the prerogative. There is a certain imprecision in the use of the term "prerogative" in this connection, as Professor Sir William Wade makes clear in another Child & Co. Oxford Lecture, "Procedure and Prerogative in Public Law" (1985) 101 L.Q.R. 180 . Strictly the term "prerogative" should be confined to those powers which are unique to the Crown. As Professor Wade points out, there was nothing unique in the creation by the government, out of funds voted by Parliament, of a scheme for the compensation of victims of violent crime. Any foundation or trust, given sufficient money, could have done the same thing. Nor do I think that the distinction between the Criminal Injuries Compensation Board and a private foundation or trust for the same purposes lies in the source of the funds. The distinction must lie in the nature of the duty imposed, whether expressly or by implication. If the duty is a public duty, then the body in question is subject to public law.

So once again one comes back to what I regard as the true view, that it is not just the source of the power that matters, but also the nature of the duty. I can see nothing in Reg. v. Criminal Injuries Compensation Board, Ex parte Lain[1967] 2 Q.B. 864 which contradicts that view, or compels us to decide that, in non-statutory cases, judicial review is **849** confined to bodies created under the prerogative, whether in the strict sense, or in the wider sense in which that word has now come to be used. Indeed, the passage from Diplock L.J.'s judgment, at p. 884, which Sir John Donaldson M.R. has already read, points in the opposite direction.

But suppose I am wrong: suppose that the courts are indeed confined to looking at the source of the power, as Mr. Alexander submits. Then I would accept Mr. Lever's submission that the source of the power in the present case is indeed governmental, at

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                                          Page 24
[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

least in part. Mr. Alexander argued that, so far from the source of the power being governmental, this is a case where the government has deliberately abstained from exercising power. I do not take that view. I agree with Mr. Lever when he says that there has been an implied devolution of power. Power exercised behind the scenes is power nonetheless. The express powers conferred on inferior tribunals were of critical importance in the early days when the sole or main ground for intervention by the courts was that the inferior tribunal had exceeded its powers. But those days are long since past. Having regard to the way in which the panel came to be established, the fact that the Governor of the Bank of England appoints both the chairman and the deputy chairman, and the other matters to which Sir John Donaldson M.R. has referred, I am persuaded that the panel was established "under authority of the Government," to use the language of Diplock L.J. in Lain's case. If in addition to looking at the source of the power we are entitled to look at the nature of the power, as I believe we are, then the case is all the stronger.

Before leaving Mr. Alexander's second argument, I should mention one last point. The jurisdiction of the court to grant relief by way of judicial review is now, of course, recognised by section 31 of the Supreme Court Act 1981. Section 31(1)(a) refers specifically to the old prerogative writs, namely mandamus, prohibition and certiorari. Section 31(1)(b) and (2) provide that in an application for judicial review, the court may grant a declaration or injunction if it is just or convenient to do so, having regard to various matters. I have already referred to the passage in Woolf J.'s judgment in Reg. v. British Broadcasting Corporation, Ex parte Lavelle [1983] 1 W.L.R. 23, 31, in which he says that applications for judicial review under R.S.C., Ord. 53, r. 1(2) are not confined to those cases where relief could be granted by way of prerogative order. As at present advised, I would agree with that observation. I would only add as a rider that section 31(1) of the Supreme Court Act 1981 should not be treated as having put a stop to all further development of the law relating to the prerogative remedies. I do not accept Mr. Alexander's submission that we are here extending the law. But if we were, I would not regard that as an insuperable objection. The prerogative writs have always been a flexible instrument for doing justice. In my judgment they should remain so. NICHOLLS L.J.

I entirely agree with the judgments of Sir John Donaldson M.R. and Lloyd L.J. which I have had the advantage of reading in draft. I add only a few supplementary observations of my own. **\*850** *Jurisdiction*

I take as my starting point Reg. v. Criminal Injuries Compensation Board, Ex parte Lain [1967] 2 Q.B. 864, 882, where Lord Parker C.J. noted that the only constant limits of the ancient remedy of certiorari were that the tribunal in question was performing a public duty. He contrasted private or domestic tribunals whose authority is derived solely from the agreement of the parties concerned.

With that in mind, one looks at the Panel on Take-overs and Mergers ("the panel"). The panel promulgates the City Code on Take-overs and Mergers. As its name implies, the code is concerned with take-over and merger transactions. Its ambit is very wide indeed. Among the companies to which it applies are all listed public companies considered by the panel to be resident in the United Kingdom.

Despite the wider range of the companies and persons it directly affects, the panel submitted that it is not performing a public duty and that none of its activities is susceptible to judicial review. The only jurisdiction which the panel has is derived from the consent of its members. It is, in the terms of Lord Parker's dichotomy, a private or domestic tribunal whose authority is derived solely from the agreement of the bodies concerned. It was submitted that the activities of the panel constitute self-regulation, and self-regulation involves a voluntary submission of those who deal in the market to the rules laid down by the panel and a commitment to accept the decisions of the panel.

I am unable to accept this as an accurate analysis of the panel's authority and functions. The panel is an unincorporated association. Its members comprise a chairman and a deputy chairman appointed by the Governor of the Bank of England, and representatives of the 11 bodies mentioned by Sir John Donaldson M.R. at the beginning of his judgment. On a day-to-day basis the panel works through its executive, headed by the director general. He also is appointed by the Governor of the Bank of England, and so is the chairman of an appeal committee which hears appeals

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1
F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10
[1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

against rulings given by the executive.

Beyond this the panel seems to have no formal con-
stitution. Whether there is a contract between its
members, or between the Bank of England and the
bodies which appoint representatives, and, if so, what
are its terms, were not matters in evidence or explored
before us. Presumably, therefore, the code and
amendments to it require the approval of all the
members of the panel. However, it seems clear that,
whether or not there is a legally binding contract, there
is an understanding between the bodies whose repre-
sentatives are members of the panel that they will take
all such steps, by way of disciplinary proceedings
against their members or otherwise, as are reasonably
and properly open to them to ensure that the code and
the rulings of the panel are observed. Similarly with
the Bank of England: its weighty influence in the City
of London is directed to the same end. Indeed, the
leading part played by the Bank of England in setting
up and running the panel is one of the matters which
must be kept in mind if the true role of the panel is to
be evaluated.

    Another matter which must be noted is the
involvement of the Stock Exchange, one of the bodies
appointing      a      representative      on      the
panel. **\*851**      Since the code is concerned with
take-overs and many, if not most, of the important
take-overs will be of companies whose shares are
listed on the Stock Exchange by companies whose
shares are similarly listed, the Stock Exchange is
much concerned with the matters which the code seeks
to regulate. In turn, a major element in the enforce-
ment of these regulations is the sanctions which the
Stock Exchange possesses over listed companies.

    In this regard it is important also to note that,
whatever may have been the position in the past, it is
clear that today the Council of the Stock Exchange is
performing a public duty when deciding whether or
not to admit a security to official listing and whether
or not to discontinue such a listing. There is no longer
a formal listing agreement entered into by companies
seeking a listing of their securities. The council now
has all the power required or permitted to be conferred
on  "the  competent  authorities"  by,  inter
alia  , the  admission directive of the
Council of the European Communities of 5 March
1979 (79/279/E.E.C.)  : see the  Stock Ex-
change (Listing) Regulations 1984  . Article

15  of that directive expressly provides that
member states shall ensure that decisions of the
competent authorities refusing the admission of a
security to official listing or discontinuing such a
listing shall be subject to the right to apply to the
courts. Such an application, in this country, would
take the form of an application for judicial review.

From this it is evident that the activities of the council
of the Stock Exchange in laying down requirements
which a company must observe if it is to obtain and
retain an official listing, and in interpreting those
requirements, and adjudicating upon alleged breaches
of those requirements, are activities which are subject
to judicial review.

Today those requirements include observing the code.
In paragraph 6.15 of its official publication "Admis-
sion of Securities to Listing," the council states that it
attaches "great importance" to observance of the code.

    The code contains a statement of general prin-
ciples. For example, that all shareholders of the same
class of an offeree company must be treated similarly
by an offeror, and that during the course of a take-over
or when one is in contemplation neither the offeror nor
the offeree nor their advisers may furnish information
to some shareholders which is not made available to
all. The code also contains some detailed rules. Some
of these are far reaching. Thus a company can be
compelled, in certain circumstances, to make an offer,
or to increase the amount of an offer it has made.
Under     rule 9     a person who acquires shares
carrying 30 per cent. or more of the voting rights of a
company is required to make an offer to purchase all
the  equity  capital  of  the  company. Rule
6(2)     provides that if while an offer is open the
offeror or any person acting in concert with it pur-
chases shares at above the offer price the offeror shall
increase its offer to not less than the highest price paid
for the shares so acquired. I do not suggest for one
moment that these obligations are other than fair and
reasonable and necessary. But, nonetheless, they are
far reaching, and the sanctions for their enforcement
are also formidable: they include suspension of a
listing by the Council of the Stock Exchange, in per-
formance of its public duty in that regard. **\*852**

Thus the system which has evolved, on the point I am
now considering, is indistinguishable in its effect from
a delegation by the Council of the Stock Exchange to

Copr. © West 2010 No Claim to Orig. Govt. Works

[1987] Q.B. 815                                                                    Page 26

[1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 [1987] Q.B. 815 [1987] 2 W.L.R. 699 [1987] 1 All E.R. 564 (1987) 3 B.C.C. 10 [1987] B.C.L.C. 104 [1987] 1 F.T.L.R. 181 (1987) 131 S.J. 23 **(Cite as: [1987] Q.B. 815)**

the panel, a group of people which includes its representative, of its public law task of spelling out standards and practices in the field of take-overs which listed companies must observe if they are to enjoy the advantages of a Stock Exchange listing and of determining whether there have been breaches of those standards and practices. As is stated in the code, those who do not conduct themselves in matters relating to take-overs according to the code cannot expect to enjoy the facilities of the securities market in the United Kingdom.

In my view, and quite apart from any other factors which point in the same direction, given the leading and continuing role played by the Bank of England in the affairs of the panel, the statutory source of the powers and duties of the Council of the Stock Exchange, the wide-ranging nature and importance of the matters covered by the code, and the public law consequences of non-compliance, the panel is performing a public duty in prescribing and operating the code (including ruling on complaints).The particular facts

I am not without sympathy for the applicants. The Kuwait Investment Office stood to receive about £300,000 in additional underwriting fees from Norton Opax Plc. if the Norton Opax bid for McCorquodale Plc. was successful and thus, depending upon one's view of the likely trend in the price of Norton Opax shares, that might have given K.I.O. a significant financial interest in the success of the Norton Opax bid. Then at a critical time in the course of the contest between the rival bids, when Datafin Plc. was precluded from buying McCorquodale shares at above 315p per share and Norton Opax was precluded from buying McCorquodale shares at over 303.3p per share, K.I.O. bought, through the brokers who were joint brokers to the Norton Opax offer, a substantial number of McCorquodale shares at 315.5p. I can well understand why the applicants felt aggrieved.

But the difficulties confronting the applicants on this judicial review application are manifestly insuperable. The panel, correctly, approached the matter on the basis of the code's definition of "acting in concert." The panel heard evidence from a K.I.O. representative, and accepted that K.I.O. treated investment and underwriting as separate businesses and that genuine investment reasons explained why K.I.O. had not bought earlier and why it bought when it did. These, par excellence, were matters for the panel.

Any lingering concern about the scope for abuse of core underwriting agreements, and whether any steps should be taken to prevent a recurrence of this type of situation where suspicion and distrust are        ***853***        bound to breed, are matters for the panel. The evidence of the chairman shows that the panel have these considerations well in mind. Leave to apply for judicial review granted. Declaration that court had jurisdiction to hear application. Substantive application dismissed. No order for costs of panel. Applicants to pay costs of interveners. (P. M. )

END OF DOCUMENT

Copr. © West 2010 No Claim to Orig. Govt. Works